YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
ELIANIS N. PEREZ
Assistant Director
CATHERINE M. RENO
Senior Litigation Counsel
AMANDA B. SAYLOR
CHRISTOPHER I. PRYBY
Trial Attorneys
Office of Immigration Litigation
General Litigation and Appeals Section

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his Official Capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his Official Capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity.<br><br>Defendants. | **COMPLAINT** |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

1

## INTRODUCTION

1.      At the end of last year, the nation was shocked by images and videos of members of Tren de Aragua seizing control of apartment complexes in Aurora, Colorado. The fact that a foreign terrorist organization could gain such a foothold in the United States of America is unacceptable. But it is the direct byproduct of the sanctuary policies pushed by the State of Colorado, and certain of its subdivisions. This is a suit to put an end to those disastrous policies and restore the supremacy of federal immigration law.

2.      Within hours of assuming the Presidency, President Trump declared a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens" into the country. Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Further exacerbating this national crisis, some of these criminal aliens find safe havens from federal law enforcement detection in so-called Sanctuary Cities where they live and work in communities whose members may become their crime victims. This national crisis underscores the vital importance of "[e]nforcing our Nation's immigration laws." *Id.*

3.      The United States brings this declaratory and injunctive action to prohibit the State of Colorado, City of Denver, and its subdivisions from enforcing several state and local laws— namely, Colorado House Bill 19-1124, Senate Bill 21-131, and House Bill 23-1100 (creating Articles 76.6, 74, and 76.7 of Title 24 of the Colorado Revised Statutes and amending other provisions), Denver Executive Order No. 142, and Ordinance No. 940-17, §1, 8-28-17 (codified

3

at Denver Revised Municipal Code §§ 28-250–253), hereinafter "Sanctuary Laws"—that by intent and design interfere with and discriminate against the Federal Government's enforcement of federal immigration law. That all violates the Supremacy Clause of the United States Constitution.[1]

4.      The United States has well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. Indeed, Congress this year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[2]

5.      Foremost, federal immigration law expressly preempts state and local laws that restrict sharing information "regarding the citizenship or immigration status, lawful or unlawful, or any individual," 8 U.S.C. § 1373(a), which broadly encompasses, among other things, "the presence, whereabouts, or activities" of aliens with the Federal Government. H.R. Rep. No. 725, 104th Cong., 2d. Sess. 383 (1996). But that is *exactly* what the Sanctuary Laws do.

6.      Moreover, under conflict preemption principles, a State cannot fashion "an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal immigration laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67(1941)). But the Sanctuary Laws were enacted for the sole purpose of impeding the Federal Government's ability to enforce immigration law and remove illegal aliens.

7.      Further, well-established principles of intergovernmental immunity prohibit a State from

---

[1] *See* C.R.S. §§ 24-76.6-101–103; 24-76.7-101, 103; 24-74-101–108; Denver Revised Municipal Code §§ 28-250–253; Denver Executive Order No. 142.
[2] Press Release, DHS, President Trump Signs the Laken Riley Act in Law (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

"discriminat[ing] against the Federal Government or those with whom it deals." *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). Yet the Sanctuary Laws directly discriminate against the Federal Government's own operations: The Laws specifically cite the federal statutes that state and local officials are prohibited from assisting immigration authorities from enforcing.

8.     These sanctuary policies have "tied the hands of law enforcement, emboldened dangerous criminals and left [Colorado's] communities vulnerable." *Id.* Indeed, three Members of Congress have implored Governor Polis to repeal these laws, explaining: "These laws hamper and often outright prevent public safety investigations from being opened, which degrades the ability of law enforcement to investigate cases where immigration status might be a factor."[3]

9.     Local communities in Colorado have borne the brunt of these policies. In the words of Douglas County Colorado Commissioner Kevin Van Winkle: "We swore an oath to protect public safety, but these laws prevent us from doing so."[4] "These laws require us to conceal the identity of those who committed a crime and are here illegally. That's a serious public safety issue." *Id.* As Douglas County Colorado Commissioner George Teal put it: "Douglas County is not a sanctuary county. We want to work with the federal government on issues of illegal immigration to keep our community safe." *Id.*

10.     These unfortunate circumstances are not preordained; indeed, the Constitution forbids them. The Supremacy Clause prohibits Colorado and its officials from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it

---

[3] Letter from Representatives Gabe Evans, Lauren Boebert, and Jeff Crank to Governor Jared Polis, (Jan. 17, 2025), https://gabeevans.house.gov/sites/evo-subsites/gabeevans.house.gov/files/evo-media-document/letter-to-polis-on-sanctuary-policies.pdf.

[4] *Douglas County appeals Denver judge's dismissal of immigration lawsuit*, Douglas County (Jan. 30, 2025), https://www.douglas.co.us/douglas-county-appeals-denver-judges-dismissal-of-immigration-lawsuit/.

by the Constitution. The Supremacy Clause also prohibits Colorado from singling out the Federal Government for adverse treatment—as the challenged laws do—thereby discriminating against the Federal Government. The Sanctuary Laws are themselves unlawful and cannot stand.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

12.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this district.

13.    The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

14.    Plaintiff, the United States of America, regulates immigration under its constitutional and statutory authorities, and it enforces federal immigration laws through its Executive agencies, including the Departments of Justice, State, Labor, and Homeland Security ("DHS") as well as DHS's component agencies, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

15.    Defendant Colorado is a State of the United States.

16.    Defendant Jared Polis is the Governor of Colorado and is being sued in his official capacity.

17.    Defendant Colorado General Assembly is the state legislature of the State of Colorado.

18.    Defendant Philip Weiser is the Attorney General of Colorado and is being sued in his official capacity.

19.    Defendant City and County of Denver is a city and county within Colorado.

20.    Defendant Denver City Council is the legislative branch of government for the City and County of Denver.

21.    Defendant Mike Johnston is the Mayor of the City and County of Denver and is being sued in his official capacity.

22.    Defendant Denver Sheriff Department is a criminal justice agency that oversees, *inter alia*, two jail facilities, security for the district and county court systems, state inmate transportation, and extradition duties for the city and county of Denver, Colorado.

23.    Defendant Elias Diggins is the Sheriff of Denver, Colorado, and is being sued in his official capacity.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

### The Constitution vests the supreme authority over immigration in the Federal Government.

24.    The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

25.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Davidowitz*, 312 U.S. at 67, or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

26.    "The Government of the United States has broad, undoubted power over the subject of

7

immigration and the status of aliens." *Arizona*, 567 U.S. at 394. This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* (citations omitted).

27.    Exercising this authority, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

28.    In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

29.    DHS also may request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id*. § 287.7(d). And in some instances, DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any

crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). And in other instances, the INA gives the federal immigration authorities the discretion to detain a given based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

30.     Federal immigration authorities also "shall have power without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

31.     Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4).

32.     "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things,

"[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

33.    Congress also authorized states and localities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

34.    Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

## FACTUAL BACKGROUND

### Colorado

### House Bill 19-1124

35.    In 2019, the Colorado General Assembly enacted, and Governor Polis signed into law, House Bill 19-1124, titled "Protect Colorado Residents From Federal Government Overreach." It created Article 76.6 of Title 24 of the Colorado Revised Statutes.

36.    House Bill 19-1124 does three things. *First*, it provides that a Colorado law enforcement officer "shall not arrest or detain an individual on the basis of a civil immigration detainer request." C.R.S. § 24-76.6-102(2). Indeed, it declares "the continued detention of an inmate at the request of federal immigration authorities beyond when he or she would otherwise be released constitutes a warrantless arrest, which is unconstitutional" C.R.S. § 24-76.6-102(1)(b). It only allows law enforcement to "cooperat[e]" or "assist[] federal immigration enforcement authorities" in executing a "warrant issued by a federal judge" or honoring any writ issued by any state or federal

judge concerning the transfer of a prisoner to or from federal custody. *Id.* § 24-76.6-102(4).

37.    *Second*, House Bill 19-1124 imposes strict informational and access limits upon federal immigration authorities. Under the bill, "[a] probation officer or probation department employee shall not provide personal information about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1). It defines personal information as: "confidential identifying information about an individual, including but not limited to home or work contact information; family or emergency contact information; probation meeting date and time; community corrections locations; community corrections meeting date and time; or the meeting date and time for criminal court-ordered classes, treatment, and appointments." C.R.S. § 24-76.6-101(4).

38.    *Third*, it hampers local law enforcement's ability to arrange interviews between federal immigration authorities and inmates by imposing onerous pre- and post-requisites to the interview. Prior to (and after) "coordinating telephone or video interviews between federal immigration authorities and individuals incarcerated in any county or local jail or other custodial facility," the individual must be advised—in writing in the language of his choice—that (1) "[t]he interview is being sought by federal immigration authorities"; (2) "[t]he individual has the right to decline the interview and remain silent"; (3) "[t]he individual has the right to speak to an attorney before submitting to the interview"; and (4) "[a]nything the individual says may be used against him or her in subsequent proceedings, including in a federal immigration court." C.R.S. § 24-76.6-103(2).

**Senate Bill 21-131**

39.    The second of the Colorado Sanctuary Laws was enacted in 2021 as Senate Bill 21-131 and created Article 74 of Title 24 to the Colorado Revised Statutes.

40.    Senate Bill 21-131 does three things. *First*, it prohibits state agency employees from sharing "personal identifying information"—including information available through a database

or automated network—used for the purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws and 8 U.S.C. sec. 1325 or 1326," with limited exceptions. C.R.S. § 24-74-103. The "personal identifying information" includes a person's "biometric data ... home or work addresses or other contact information; [and] immigration or citizenship status[.]" *Id.* § 24-74-102(1).

41.    *Second*, Senate Bill 21-131 prohibits state agency employees from requesting information or documents necessary to ascertain a person's immigration status "for the purpose of identifying if the person has complied with federal immigration laws," with limited exceptions. C.R.S. § 24-74-104(1). State employees are prohibited from collecting information regarding place of birth, citizenship or immigration status, or information gleaned from passports, permanent resident cards, alien registration cards, and employment authorizations documents. *Id* § 24-74-104(2).

42.    *Third*, Senate Bill 21-131 imposes strict limitations on those provided access to databases or automated information in Colorado. C.R.S. § 24-74-105. To be granted access to "personal identifiable information"—including immigration or citizenship status—one must have certified within the past year that the records or information obtained will not be used "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement[.]" *Id.* § 24-74-105(1)(a). Users must also certify that they will not "disclose personal identifying information" obtained to "individuals or entities engaged in investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws" (unless required by federal or state law or to comply with a court-issued subpoena, warrant, or order). *Id.* § 24-74-105(1)(b).

43.    Senate Bill 21-131 severely restricts state employees from requesting and sharing information about immigration status with federal immigration enforcement authorities.

44.    Prior to the enactment of Senate Bill 21-131, Colorado Division of Motor Vehicles staff helped ICE monitor, locate, and in some cases detain, illegal aliens.[5] They were able to do so due to a 2013 Colorado law allowing aliens residing in Colorado to apply for driver's licenses. *Id.* State Representative Serena Gonzales-Gutierre stated that the Senate Bill 21-131 was intended to address "that foundation of trust that has been broken here in Colorado because of the interactions that we have seen between ICE and state departments such as the DMV." *Id.*

45.    Senate Bill 21-131's prohibition on information sharing under §§ 24-74-103 and 105(1)(a) and (1)(b) allows state agency employees to share records or information with federal immigration agencies where "required by federal or state law or to comply with a court-issued subpoena, warrant, or order." Similarly, § 24-74-104 carves out an exception where "required by state or federal law" or as a condition to establishing eligibility for various government funded programs.

## House Bill 23-1100

46.    The third of the Colorado Sanctuary Laws was enacted in 2023 as House Bill 23-1100 and created Article 76.7 of Title 24 of the Colorado Revised Statutes.

47.    C.R.S. § 24-76.7-103 prohibits "the state, any unit of local government, a county sheriff, or any agency, officer, employee, or agent thereof" from entering into or renewing an "immigration detention agreement" beginning on January 1, 2024. C.R.S. §§ 24-76.7-103(1); 101(1). "Immigration detention agreement" is defined as: "any contract, including but not limited to an intergovernmental service agreement, or portion thereof for payment to a governmental entity to detain individuals for federal civil immigration purposes" C.R.S. § 24-76.7-101(2).

48.    Upon information and belief, the state does not restrict agreements to detain persons with

---

[5] Faith Miller, *Colorado third in the nation to pass sweeping data privacy legislation*, COLORADO NEWSLINE (June 18, 2021), https://coloradonewsline.com/2021/06/18/colorado-third-in-the-nation-to-pass-sweeping-data-privacy-legislation/.

entities other than the federal government. *See, e.g.*, C.R.S. §§ 29-1-201; 29-1-203(1); 24-60-501, art. V, subdiv. (h).

49.    Upon information and belief, Colorado state and local governments have not authorized any agreement with the federal government to detain persons for federal civil immigration purposes without payment.

50.    Accordingly, these Colorado laws work to the detriment of federal enforcement of immigration law in Colorado and surrounding states.

<u>Denver</u>

**Denver Revised Municipal Code Sections 28-250 through 28-253**

51.    In August 2017, the Denver City Council passed City Ordinance No. 940-17, the Public Safety Enforcement Priorities Act. It adopted a new Article in Chapter 28 of the Denver Revised Municipal Code. It explicitly limits local cooperation with federal immigration enforcement.

52.    *First,* Section 28-250 states no city employee shall "use any city funds or resources to assist in the enforcement of federal immigration laws." Denver Revised Municipal Code § 28-250(a). This bar includes "[a]ssisting or cooperating in [an] official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws," "[r]equesting information about the national origin, immigration or citizenship status of any individual or engaging in activities designed to ascertain such information," absent very limited exceptions, or including on city services or benefits applications "any question regarding national origin, immigration or citizenship status of the applicant, or conditioning the provision of city services or benefits upon the national origin, immigration or citizenship status of any individual, except to the extent required by any federal, state or city law or regulation." *Id.* It provides that no city agent shall "[d]isseminat[e] information about the national origin,

immigration or citizenship status of any individual except to the extent required by any federal, state or city law or regulation." *Id.* Nor shall they "[i]nitiat[e] any law enforcement contact solely for purposes of determining the person's national origin, immigration or citizenship status, or arresting or detaining any individual solely on the basis of the individual's immigration or citizenship status." *Id.*

53.    *Second*, Section 28-251 forbids Denver from entering "into any contractual agreement that would commit or require any city officer or employee to directly or indirectly assist in the enforcement of federal immigration laws," including agreements authorized by 8 U.S.C. § 1357(g) or any intergovernmental services agreement entered into with DHS under 8 U.S.C. § 1103(a)(11)(B). Denver Revised Municipal Code § 28-251. Likewise, Denver cannot "enter into any contractual agreement requiring the collection or dissemination of individually identifiable information about the national origin, immigration or citizenship status of any person, over and above the extent to which the city is required to collect or disseminate such information" under federal, state or city law. *Id.*

54.    *Third*, Section 28-252 restricts federal immigration authorities' ability to interview incarcerated individuals. It prohibits federal immigration authorities from access to all "secure areas of any city or county jail or other city-owned law enforcement facility for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration" absent presentation of "a warrant issued by a federal judge or magistrate." *Id.* § 28-252(a). It defines "secure area" as "any area of the facility that is not generally open and accessible to the general public, but instead requires special permission for admittance by a city officer or employee on an individual basis." *Id.* It permits coordination of telephone or video interviews between federal immigration authorities and inmates "to the same extent as telephone or video

contact with such individuals is allowed by the general public"—except law enforcement must first advise the inmate of certain "legal rights" in writing, in his chosen language. *Id.* § 28-252(b).

55.    *Fourth*, Section 28-253 bars law enforcement from detaining individuals based on detainer requests. *Id.* § 28-253(c). When served a civil immigration detainer, an officer cannot arrest, detain, or provide an individual's personal information to federal immigration enforcement authorities, "regardless of whether or not the administrative warrant is accompanied by a final order of removal or deportation, any prior deportation order, or any other civil immigration document based solely on alleged violations of the civil provisions of federal immigration laws." *Id.*

56.    Although Denver does not prohibit the sheriff department from responding to notification requests, it does not deem them to "create any obligation" to detain the individual beyond the time he is eligible for release "unless the request is accompanied by a warrant issued by a federal judge or magistrate." *Id.* § 28-253(d). And law enforcement "shall as promptly as practicable advise" the individual "that federal immigration enforcement authorities have requested information concerning the date and time when the inmate will be released" and notify him that he "enjoys certain legal rights if contacted by federal immigration enforcement authorities" (*id.*).

57.    Simply put, Denver Revised Municipal Code Sections 28-250 through 28-253 prevent Denver law enforcement officers from honoring federal civil immigration detainers and impede federal immigration authority efforts to enforce immigration law.

## Denver Executive Order No. 142

58.    Also in 2017, Denver's then-Mayor Michael Hancock issued Executive Order No. 142. Its

purpose was to "establish Denver as a safe and welcoming city for all."[6]

59.    The Executive Order, *inter alia*, instructed all city agencies, including law enforcement departments, to comply with the Public Safety Enforcement Priorities Act's express prohibition on "[a]ssisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws." Exec. Order No. 142, ¶ 18.0 (citing Denver Revised Municipal Code § 28-250(a)(1)). It implemented training that "emphasize[d] the limitations around collecting and sharing national origin, immigration and citizenship data, including sharing information pertaining to appointment times, dates or whereabouts of clients for such services with federal immigration enforcement officials from ICE, U.S. Customs and Border Protection, or U.S. Citizenship and Immigration Services." *Id.* Exec. Order No. 142, ¶ 18.0. It also required executive directors or heads of departments/agencies/offices to report "any efforts made known to them by federal immigration enforcement officials from [ICE], [CBP], or U.S. Citizenship and Immigration Services to enforce civil immigration laws with the cooperation, support, or use of City resources," and threatened discipline, "up to and including termination," for failure to comply. *Id.* ¶¶ 19.0, 20.0.

60.    Denver Revised Municipal Code §§ 28-250–253 and Exec. Order No. 142 are impediments to the Federal Government's ability to properly and meaningfully enforce federal immigration laws and they discriminate against federal immigration enforcement. Additionally, the information-sharing restrictions violate 8 U.S.C. § 1373.

61.    In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, Denver Revised Municipal Code §§ 28-250–253

---

[6] Exec. Order No. 142 (Aug. 31, 2017), https://denvergov.org/files/assets/public/v/1/executive-orders/documents/142-standing-with-immigrants-and-refugees.pdf.

and Exec. Order No. 142 constitute unlawful direct regulation of the Federal Government.

### The challenged laws impede the operation of the federal immigration laws.

62.     Federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

63.     Colorado House Bill 19-1124, Senate Bill 21-131, and House Bill 23-1100 impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state law enforcement officials from assisting with federal civil immigration enforcement. Under these laws, state officers are explicitly prohibited from complying with immigration detainers or civil immigration warrants; they are also prevented from sharing critical immigration information, and from entering into or renewing agreements to detain noncitizens for federal civil immigration violations. *See* C.R.S. §§ 24-76.6-101–103; C.R.S. §§ 24-76.7-101–103; C.R.S. §§ 24-74-101–108; C.R.S. § 24-72-204.

64.     Denver Revised Municipal Code §§ 28-250–253 (Ordinance No. 940-17) impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by prohibiting detention of an alien based solely on an immigration detainer; prohibiting city employees from collecting information on immigration or citizenship status; prohibiting the

sharing of any other information about individuals for purposes of immigration enforcement; and, prohibiting use of city resources or city cooperation with civil immigration enforcement, including prohibiting providing access to secure areas or facilities. *See* Denver Revised Municipal Code §§ 28-250–253.

65.    The Colorado Sanctuary Laws limit federal immigration authorities' ability to interview individuals in state custody, even though the INA expressly provides that aliens in this country "*shall* be inspected by immigration officers." *Id.* § 1225(a)(3) (emphasis added). Colorado law also limits the circumstances in which federal immigration officers may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

66.    Colorado's Sanctuary Laws run directly afoul of 8 U.S.C. § 1373 by forbidding state Probation Department employees from "provid[ing] personal information[, including custody status or release dates,] about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1). Colorado has therefore prohibited the activities that federal law requires.

67.    Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state custody. Congress not only recently reaffirmed its commitment to this mandate, but also augmented the authority of federal agents in this space by adding predicate offenses that trigger this detention requirement. *Id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

68.    To this end, C.R.S. § 24-76.7-103, which limits Colorado state and local governments' ability to enter into immigration detention agreements, has and will continue to inhibit federal immigration enforcement, especially in remote areas of Colorado. The law limits federal agents from detaining all illegal aliens it is required to detain. Upon information and belief, transferring detainees to the ICE immigration detention facility in Aurora—now the only location where ICE

can detain individuals within the state of Colorado—upon apprehension poses risks in many circumstances. Because ICE's Denver Field Office covers the entire states of Colorado and Wyoming, and the federal government can no longer temporarily house detainees in county detention facilities, immigration officers are forced to travel long distances, even at late hours and in poor weather conditions, to transport people to the Aurora facility. Upon information and belief, as a result, federal immigration authorities have to release individuals that it otherwise would detain or alternatively incur significant transport expenses that it would not have incurred prior to C.R.S. § 24-76.7-103.

69.    The restrictions on providing ICE access to removable aliens in their custody, *see, e.g.*, C.R.S. § 24-76.6-102(2), also conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

70.    The challenged Sanctuary Laws impede DHS's ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States as well as DHS's access to such aliens to facilitate the transfer of custody—even where DHS presents a congressionally authorized civil administrative warrant of arrest or removal, *see* 8 U.S.C. §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

71.    By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), the challenged laws frequently require federal immigration officers either to (1) engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering

immigration officers, the particular alien, and members of the public, or (2) determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.

72.    Colorado has no lawful interest in assisting removable aliens' evasion of federal law enforcement.

73.    It appears from the challenged provisions that Colorado does not permit its employees to place a detainer or administrative warrant in the alien's file or to enter its existence in its databases, such that if an alien is transferred to another law enforcement agency, that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government.

74.    Colorado singles out the Federal Government for its disfavored treatment. *See* C.R.S. §§ 24-76.6-102, 103; 24-76.7-101, 103.

75.    These provisions are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement, as well as (with respect to the information-sharing and maintenance restrictions) expressly violate 8 U.S.C. § 1373.

76.    In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## **CLAIMS FOR RELIEF**

## **COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE**

## **(PREEMPTION)**

77.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

78.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

79.     The Sanctuary Laws violate the Supremacy Clause because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

80.     The Sanctuary Laws are also expressly preempted in large part. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

## COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE

## (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

81.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

82.     Defendants' enforcement of the challenged provisions discriminates against the Federal Government.

83.     The challenged provisions single out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

84.     Such discriminatory targeting of the Federal Government is unlawful. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal government … if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status.") (citations and alterations omitted).

85.     Accordingly, the challenged provisions violate the Doctrine of Intergovernmental

Immunity and therefore are invalid on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL REGULATION OF FEDERAL GOVERNMENT)

86.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

87.    Defendants' enforcement of the Sanctuary Laws effects direct regulation of the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

88.    Accordingly, the challenged Sanctuary Laws effect regulation of the Federal Government and are alternatively invalid on that basis.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A.    That this Court enter a judgment declaring that the challenged provisions violate the Supremacy Clause and are therefore invalid;

B.    That this Court issue preliminary and permanent injunctions that prohibit Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions;

C.    That this Court award the United States its costs and fees in this action; and

D.    That this Court award any other relief it deems just and proper.

DATED: May 2, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

ELIANIS N. PEREZ
Assistant Director

AMANDA B. SAYLOR
CHRISTOPHER I. PRYBY
Trial Attorneys

/s/ Catherine M. Reno
CATHERINE M. RENO
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-8557
Fax: (202) 305-7000
Email: catherine.m.reno@usdoj.gov

*Attorneys for the United States*