BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
ELIANIS N. PEREZ
Assistant Director
CATHERINE M. RENO
Senior Litigation Counsel
AMANDA B. SAYLOR
Trial Attorney
Office of Immigration Litigation
General Litigation and Appeals Section

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>      v.<br><br>STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his Official Capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his Official Capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity.<br><br>           Defendants. | **FIRST AMENDED COMPLAINT** |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**<u>INTRODUCTION</u>**

1. At the end of last year, the nation was shocked by images and videos of members of Tren de Aragua seizing control of apartment complexes in Aurora, Colorado. The fact that a foreign terrorist organization could gain such a foothold in the United States of America is unacceptable. But it is the direct byproduct of the sanctuary policies pushed by the State of Colorado, and certain of its subdivisions. This is a suit to put an end to those disastrous policies and restore the supremacy of federal immigration law.

2. Within hours of assuming the Presidency, President Trump declared a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens" into the country. Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Further exacerbating this national crisis, some of these criminal aliens find safe havens from federal law enforcement detection in so-called Sanctuary Cities where they live and work in communities whose members may become their crime victims. This national crisis underscores the vital importance of "[e]nforcing our Nation's immigration laws." *Id.*

3. The United States brings this declaratory and injunctive action to prohibit the State of Colorado, City of Denver, and its subdivisions from enforcing several state and local laws—

namely, Colorado House Bill 19-1124, Senate Bill 21-131, House Bill 23-1100 (creating Articles 76.6, 74, and 76.7 of Title 24 of the Colorado Revised Statutes and amending other provisions), Senate Bill 25-276 (creating Article 74.1 of Title 24 and amending various provisions of the Colorado Revised Statutes), Denver Executive Order No. 142, and Ordinance No. 940-17, §1, 8-28-17 (codified at Denver Revised Municipal Code §§ 28-250–253), hereinafter "Sanctuary Laws"—that by intent and design interfere with and discriminate against the Federal Government's enforcement of federal immigration law. That all violates the Supremacy Clause of the United States Constitution.[1]

4.      The United States has well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. Indeed, Congress this year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[2]

5.      Foremost, federal immigration law expressly preempts state and local laws that restrict sharing information "regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), which broadly encompasses, among other things, "the presence, whereabouts, or activities" of aliens with the Federal Government. H.R. Rep. No. 725, 104th Cong., 2d. Sess. 383 (1996). But that is *exactly* what the Sanctuary Laws do.

6.      Moreover, under conflict preemption principles, a State cannot fashion "an obstacle to the

---

[1] *See* C.R.S. §§ 24-76.6-101–103; 24-76.7-101, 103; 24-74-101–108; 24-74.1-101–103; Denver Revised Municipal Code §§ 28-250–253; Denver Executive Order No. 142.

[2] Press Release, DHS, President Trump Signs the Laken Riley Act in Law (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

accomplishment and execution of the full purposes and objectives" of the federal immigration laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67(1941)). But the Sanctuary Laws were enacted for the sole purpose of impeding the Federal Government's ability to enforce immigration law and remove illegal aliens.

7.     Further, well-established principles of intergovernmental immunity prohibit a State from "discriminat[ing] against the Federal Government or those with whom it deals." *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). Yet the Sanctuary Laws directly discriminate against the Federal Government's own operations: The Laws specifically cite the federal statutes that state and local officials are prohibited from assisting immigration authorities from enforcing.

8.     These sanctuary policies have "tied the hands of law enforcement, emboldened dangerous criminals and left [Colorado's] communities vulnerable." *Id.* Indeed, three Members of Congress have implored Governor Polis to repeal these laws, explaining: "These laws hamper and often outright prevent public safety investigations from being opened, which degrades the ability of law enforcement to investigate cases where immigration status might be a factor."[3]

9.     Local communities in Colorado have borne the brunt of these policies. In the words of Douglas County Colorado Commissioner Kevin Van Winkle: "We swore an oath to protect public safety, but these laws prevent us from doing so."[4] "These laws require us to conceal the identity of those who committed a crime and are here illegally. That's a serious public safety issue." *Id.* As

---

[3] Letter from Representatives Gabe Evans, Lauren Boebert, and Jeff Crank to Governor Jared Polis, (Jan. 17, 2025), https://gabeevans.house.gov/sites/evo-subsites/gabeevans.house.gov/files/evo-media-document/letter-to-polis-on-sanctuary-policies.pdf.

[4] *Douglas County appeals Denver judge's dismissal of immigration lawsuit*, DOUGLAS COUNTY (Jan. 30, 2025), https://www.douglas.co.us/douglas-county-appeals-denver-judges-dismissal-of-immigration-lawsuit/.

Douglas County Colorado Commissioner George Teal put it: "Douglas County is not a sanctuary county. We want to work with the federal government on issues of illegal immigration to keep our community safe." *Id.* When officers choose to cooperate with federal immigration enforcement agents to keep their communities safe and enforce federal law, the State of Colorado hauls them into court as punishment for doing their jobs.[5]

10.     These dangerous circumstances are not preordained; indeed, the Constitution forbids them. The Supremacy Clause prohibits Colorado and its officials from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution. The Supremacy Clause also prohibits Colorado from singling out the Federal Government for adverse treatment—as the challenged laws do—thereby discriminating against the Federal Government. The Sanctuary Laws are themselves unlawful and cannot stand.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

12.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this district.

13.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

14.     Plaintiff, the United States of America, regulates immigration under its constitutional and statutory authorities, and it enforces federal immigration laws through its Executive agencies,

---

[5] *See* Complaint, *State of Colorado v. Alexander Zwinck*, Case No. 2025-cv-30303 (Mesa County, CO, District Ct.)(July 22, 2025).

including the Departments of Justice, State, Labor, and Homeland Security ("DHS") as well as DHS's component agencies, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

15.     Defendant Colorado is a State of the United States.

16.     Defendant Jared Polis is the Governor of Colorado and is being sued in his official capacity.

17.     Defendant Colorado General Assembly is the state legislature of the State of Colorado.

18.     Defendant Philip Weiser is the Attorney General of Colorado and is being sued in his official capacity.

19.     Defendant City and County of Denver is a city and county within Colorado.

20.     Defendant Denver City Council is the legislative branch of government for the City and County of Denver.

21.     Defendant Mike Johnston is the Mayor of the City and County of Denver and is being sued in his official capacity.

22.     Defendant Denver Sheriff Department is a criminal justice agency that oversees, *inter alia*, two jail facilities, security for the district and county court systems, state inmate transportation, and extradition duties for the city and county of Denver, Colorado.

23.     Defendant Elias Diggins is the Sheriff of Denver, Colorado, and is being sued in his official capacity.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

### The Constitution vests the supreme authority over immigration in the Federal Government.

24.     The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take

Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

25.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Davidowitz*, 312 U.S. at 67, or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

26.     "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* (citations omitted).

27.     Exercising this authority, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

28.     In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department

7

to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

29.     DHS also may request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id*. § 287.7(d). And in some instances, DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). And in other instances, the INA gives the federal immigration authorities the discretion to detain a given based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

30.     Federal immigration authorities also "shall have power without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

31.     Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c),

1231(a)(1)(B)(iii), (a)(4).

32.     "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

33.     Congress also authorized states and localities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

34.     Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any

building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

## FACTUAL BACKGROUND

### Colorado

**House Bill 19-1124**

35.     In 2019, the Colorado General Assembly enacted, and Governor Polis signed into law,
House Bill 19-1124, titled "Protect Colorado Residents From Federal Government Overreach." It
created Article 76.6 of Title 24 of the Colorado Revised Statutes.[6]

36.     House Bill 19-1124 does three things. *First*, it provides that a Colorado law enforcement
officer "shall not arrest or detain an individual on the basis of a civil immigration detainer request."
C.R.S. § 24-76.6-102(2).[7] Indeed, it declares "the continued detention of an inmate at the request
of federal immigration authorities beyond when he or she would otherwise be released constitutes
a warrantless arrest, which is unconstitutional" C.R.S. § 24-76.6-102(1)(b). It only allows law
enforcement to "cooperat[e]" or "assist[] federal immigration enforcement authorities" in
executing a "warrant issued by a federal judge" or honoring any writ issued by any state or federal
judge concerning the transfer of a prisoner to or from federal custody. *Id.* § 24-76.6-102(4).

37.     *Second*, House Bill 19-1124 imposes strict informational and access limits upon federal
immigration authorities. Under the bill, "[a] probation officer or probation department employee

---

[6] On May 23, 2025, Governor Polis signed Senate Bill 25-276 into law. This law amends several
existing Colorado Revised Statutes, including Articles 76.6 and 74, for the purpose of hindering
cooperation with federal immigration officials. Senate Bill 25-276's amendments to C.R.S. §§ 24-
76.6 and 24-74 are incorporated into each section of this Amended Complaint where appropriate.

[7] The law defines "Civil immigration detainer" as "a written request issued by federal immigration
enforcement authorities pursuant to 8 CFR 287.7 to law enforcement officers to maintain custody
of an individual beyond the time when the individual is eligible for release from custody, including
any request for law enforcement agency action, warrant for arrest of alien, order to detain or release
alien, or warrant of removal/deportation on any form promulgated by federal immigration
enforcement authorities." C.R.S. § 24-76.6-101(1).

shall not provide personal information about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1)(a). It defines personal information as: "confidential identifying information about an individual, including but not limited to home or work contact information; family or emergency contact information; probation meeting date and time; community corrections locations; community corrections meeting date and time; or the meeting date and time for criminal court-ordered classes, treatment, and appointments." C.R.S. § 24-76.6-101(4).

38.    Senate Bill 25-276 broadened the group of employees bound by C.R.S. § 24-76.6-103's information sharing restriction by: (1) adding "pretrial officer or pretrial services office employee" into the list of employees covered by the statute, *id.* § 24-76.6-103(1)(a), and (2) expounding that "pretrial officer" or "pretrial service office employee" includes agents acting on behalf of, or at the direction of those employees, *id.* § 24-76.6-103(1)(b).

39.    *Third*, it hampers local law enforcement's ability to arrange interviews between federal immigration authorities and inmates by imposing onerous pre- and post-requisites to the interview. Prior to (and after) "coordinating telephone or video interviews between federal immigration authorities and individuals incarcerated in any county or local jail or other custodial facility," the individual must be advised—in writing in the language of his choice—that (1) "[t]he interview is being sought by federal immigration authorities"; (2) "[t]he individual has the right to decline the interview and remain silent"; (3) "[t]he individual has the right to speak to an attorney before submitting to the interview"; and (4) "[a]nything the individual says may be used against him or her in subsequent proceedings, including in a federal immigration court." C.R.S. § 24-76.6-103(2).

## Senate Bill 21-131

40.    The second of the Colorado Sanctuary Laws was enacted in 2021 as Senate Bill 21-131 and created Article 74 of Title 24 to the Colorado Revised Statutes.

41.    Senate Bill 21-131 does three things. *First*, it prohibits state agency employees from sharing "personal identifying information"—including information available through a database or automated network—used for the purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws and 8 U.S.C. sec. 1325 or 1326," with limited exceptions. C.R.S. § 24-74-103. The "personal identifying information" employees are prohibited from sharing includes a person's "biometric data … home or work addresses or other contact information; [and] immigration or citizenship status[.]" *Id.* § 24-74-102(1).

42.    *Second*, Senate Bill 21-131 prohibits state agency employees from requesting information or documents necessary to ascertain a person's immigration status "for the purpose of identifying if the person has complied with federal immigration laws," with limited exceptions. C.R.S. § 24-74-104(1). State employees are prohibited from collecting information regarding place of birth, citizenship or immigration status, or information gleaned from passports, permanent resident cards, alien registration cards, and employment authorizations documents. *Id* § 24-74-104(2).

43.    *Third*, Senate Bill 21-131 imposes strict limitations on those provided access to databases or automated information in Colorado. C.R.S. § 24-74-105. To be granted access to "personal identifiable information"—including immigration or citizenship status—a third party must have certified within the past year that the records or information obtained will not be used "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement[.]" *Id.* § 24-74-105(1)(a). Users must also certify that they will not "disclose personal identifying information" obtained to "individuals or entities engaged in investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws" (unless required by federal or state law or to comply with

a court-issued subpoena, warrant, or order). *Id.* § 24-74-105(1)(b).

44.     Senate Bill 25-276 amended the definitions of "state agency" and "state agency employees," adding legislative and judicial branch employees, to expand the group of employees bound by Senate Bill 21-131's information sharing restrictions. *Id.* § 24-74-102(3)–(4). It also created a new class of covered employee, defined at C.R.S. § 24-74-102(1.6) as a "political subdivision employee" and a new covered entity, defined at C.R.S. § 24-74-102(1.5) as a "political subdivision." *See id.* § 24-74-103(1). "Political subdivision," "political subdivision employee," and "a private entity that contracts with, and collects or manages data on behalf of, a state agency or political subdivision" are now subject to § 24-74-105's certification requirement. *See id.* § 24-74-102(5).   Senate Bill 25-276's amendments also expanded the definition of "third party" so as to broaden C.R.S. § 24-74-105's reach.

45.     In addition to the amendments in the subsections noted above, Section 13 of Senate Bill 25-276 carved out a new subsection of this statute at C.R.S. § 24-74.1-101–103, "Policies Regarding Data and Access," addressing prohibitions on information sharing in health care, education, and library settings. *Id.* This statute prohibits a broadly defined group of state agency employees, *id.* § 24-74.1-101, from collecting information concerning an individual's place of birth, immigration or citizenship status, or information included on a passport, permanent resident card, alien registration card, or employment authorization documents, with limited exceptions. *Id.* § 24-74.1-102(1).

46.     As with the other challenged statutes, this provision discounts the validity of subpoenas, warrants, and orders except when issued by federal judges or magistrates. *Id.* §§ 24-74.1-102(2); 24-74.1-102(3)(a)(IV). This provision goes further to mandate that covered entities create information sharing policies in alignment with the statute, including procedures restricting access

to—and release of—information, documentation requirements, and notification requirements that alert individuals to the fact that federal immigration authorities have requested information. *Id.* § 24-74.1-103. It also requires covered entities to request and document the name, employer, and badge number of the person leading the federal immigration enforcement.[8]

47.     As in the case of C.R.S. § 24-74-107, as amended by Senate Bill 25-276, an entity found to have intentionally violated the statute is subject to a civil penalty of up to $50,000 per violation. *Id.* §§ 24-74.1-101; 24-74-107. Civil penalties collected are credited to the civil immigration legal defense fund. *Id.* The law declares that it "does not preempt 8 U.S.C. Sec. 1373." *Id.* § 24-74.1-102(4).

48.     Senate Bill 21-131 severely restricts state employees from requesting and sharing information about immigration status with federal immigration enforcement authorities.

49.     Prior to the enactment of Senate Bill 21-131, Colorado Division of Motor Vehicles staff helped ICE monitor, locate, and in some cases, detain illegal aliens.[9] They were able to do so due to a 2013 Colorado law allowing aliens residing in Colorado to apply for driver's licenses. *Id.* State Representative Serena Gonzales-Gutierre stated that the Senate Bill 21-131 was intended to address "that foundation of trust that has been broken here in Colorado because of the interactions that we have seen between ICE and state departments such as the DMV." *Id.*

50.     Senate Bill 21-131's prohibition on information sharing under §§ 24-74-103 and 105(1)(a) and (1)(b) allows state agency employees to share records or information with federal immigration agencies where "required by federal or state law or to comply with a court-issued subpoena,

---

[8] The law defines "federal immigration enforcement" as "an effort to investigate, enforce, or assist in the investigation or enforcement of a federal civil immigration law or a federal criminal immigration law that penalizes a person's presence in, entry or reentry to, or employment in the United States." C.R.S. § 24-74.1-101(2).

[9] Faith Miller, *Colorado third in the nation to pass sweeping data privacy legislation*, COLORADO NEWSLINE (June 18, 2021), https://coloradonewsline.com/2021/06/18/colorado-third-in-the-nation-to-pass-sweeping-data-privacy-legislation/.

warrant, or order." *Id.* §§ 24-74-103(1), 24-74-105(1)(a). Similarly, § 24-74-104 carves out an exception where "required by state or federal law" or as a condition to establishing eligibility for various government funded programs. Under Senate Bill 25-276's amendments, C.R.S. § 24-74-103(2) mandates that this provision "shall not interfere with criminal investigations or proceedings that are authorized by judicial process or to restrict a state agency employee or political subdivision employee from fully investigating, participating in, cooperating with, or assisting federal law enforcement agencies in criminal investigations." Notwithstanding this statement, Senate Bill 25-276's amendments operate to severely restrict employees from collecting or sharing information with federal immigration enforcement authorities.

### House Bill 23-1100

51.    The third of the Colorado Sanctuary Laws was enacted in 2023 as House Bill 23-1100 and created Article 76.7 of Title 24 of the Colorado Revised Statutes.

52.    C.R.S. § 24-76.7-103 prohibits "the state, any unit of local government, a county sheriff, or any agency, officer, employee, or agent thereof" from entering into or renewing an "immigration detention agreement" beginning on January 1, 2024. C.R.S. §§ 24-76.7-103(1); 101(1). "Immigration detention agreement" is defined as: "any contract, including but not limited to an intergovernmental service agreement, or portion thereof for payment to a governmental entity to detain individuals for federal civil immigration purposes" C.R.S. § 24-76.7-101(2).

53.    Upon information and belief, the state does not restrict agreements to detain persons with entities other than the federal government. *See, e.g.*, C.R.S. §§ 29-1-201; 29-1-203(1); 24-60-501, art. V, subdiv. (h).

54.    Upon information and belief, Colorado state and local governments have not authorized any agreement with the federal government to detain persons for federal civil immigration

purposes without payment.

55.    Accordingly, these Colorado laws work to the detriment of federal enforcement of immigration law in Colorado and surrounding states.

**Senate Bill 25-276**

56.    On May 23, 2025, Governor Polis signed into law Senate Bill 25-276, titled "Concerning Measures To Prevent The Violation Of The Civil Rights Of Persons In Colorado Based On Immigration Status, And, In Connection Therewith, Reducing An Appropriation." The law doubled down on Colorado's already radical sanctuary policies, further expanding its prohibitions on state and local employees cooperating with federal immigration authorities and hampering the Executive from enforcing immigration law in Colorado.

57.    In addition to the amendments discussed, *supra*, the bill further constrained state and local officials' ability to comply with immigration detainers in three ways.

58.    *First*, it expands House Bill 19-1124's prohibition on arresting or detaining individuals based on immigration detainers. *See id.* § 24-76.6-102(2). Specifically, it adds a provision to the Code of Criminal Procedure that prohibits jailers from "delay[ing] a defendant's release from custody for the purpose of an immigration enforcement operation." *Id.* § 16-4-102(2)(e.5)(I).

59.    It defines the phrase "Immigration enforcement operation" as "an operation in which the primary objective is the identification or apprehension of a person or persons to: (a) Subject them to civil immigration detention, removal, or deportation proceedings, or removal or deportation from the United States; or (b) Criminally prosecute them for offenses related to their immigration status." *Id.* § 24-76.6-101(2.7). It exempts from that definition only conduct (1) "contemplated by or in compliance with" C.R.S. § 24-76.6-102(4), which allows law enforcement to "cooperat[e]" or "assist[] federal immigration enforcement authorities" in executing a "warrant issued by a

16

federal judge" or (2) honoring any judicial writ concerning the transfer of a prisoner to or from federal custody. *Id.* § 16-4-102(2)(e.5)(II)(A).

60.    The bill broadens House Bill 19-1124's definition of "civil immigration detainer" (*see supra* n. 36) to include *any* request (as opposed to a written request under 8 C.F.R. § 287.7), and changes the phrase "issued by federal immigration authorities" to "for federal immigration enforcement." *Id.* § 24-76.6-101(1).

61.    *Second*, it expands House Bill 19-1124's prohibition on arresting or detaining an individual on the basis of a civil immigration detainer. It defines "detain" as "includ[ing] the denial or delay of release from custody for immigration enforcement operations or for immigration enforcement purposes." *Id.* § 24-76.6-102(2)(a). It further clarifies that "[i]f an individual has posted bond and the bond has been processed, the continued detainment of the individual on the basis of a civil immigration detainer is a new, warrantless arrest." *Id.* § 24-76.6-102(2)(b). It also adds definitions for "detention facility" and "government entity." *Id.* § 24-76.6-101(1.5), (2.3).

62.    *Third*, the bill exponentially expands the areas in which a "person is not subject to civil arrest." *Id.* § 13-1-403(1). Colorado law previously stated that "a person shall not be subject to civil arrest while the person is present at a courthouse or on its environs, or while going to, attending, or coming from a court proceeding." *Id.* § 13-1-403 (2020). Senate Bill 25-276 adds to C.R.S. § 13-1-403 the phrase "or while the person is receiving treatment in a related facility," *id.* § 13-1-403, and defines "related facility" to include a non-exclusive laundry-list of entities, services, and programs that address "behavioral health," any hospitals or detention/commitment facilities operated by the Department of Human Services, and even foster care and nursing homes. *Id.* § 13-1-402(6)(a)–(m). A person who knowingly violates this provision is liable for damages in

a civil action for false imprisonment. *Id.* § 13-1-404.

Denver

**Denver Revised Municipal Code Sections 28-250 through 28-253**

63.    In August 2017, the Denver City Council passed City Ordinance No. 940-17, the Public

Safety Enforcement Priorities Act. It adopted a new Article in Chapter 28 of the Denver Revised

Municipal Code. It explicitly limits local cooperation with federal immigration enforcement.

64.    *First,* Section 28-250 states no city employee shall "use any city funds or resources to assist

in the enforcement of federal immigration laws." Denver Revised Municipal Code § 28-250(a).

This bar includes "[a]ssisting or cooperating in [an] official capacity with any investigation,

detention, or arrest procedures relating to alleged violations of the civil provisions of federal

immigration laws," "[r]equesting information about the national origin, immigration or citizenship

status of any individual or engaging in activities designed to ascertain such information," absent

very limited exceptions, or including on city services or benefits applications "any question

regarding national origin, immigration or citizenship status of the applicant, or conditioning the

provision of city services or benefits upon the national origin, immigration or citizenship status of

any individual, except to the extent required by any federal, state or city law or regulation." *Id.* It

provides that no city agent shall "[d]isseminat[e] information about the national origin,

immigration or citizenship status of any individual except to the extent required by any federal,

state or city law or regulation." *Id.* Nor shall they "[i]nitiat[e] any law enforcement contact solely

for purposes of determining the person's national origin, immigration or citizenship status, or

arresting or detaining any individual solely on the basis of the individual's immigration or

citizenship status." *Id.*

65.    *Second*, Section 28-251 forbids Denver from entering "into any contractual agreement that

would commit or require any city officer or employee to directly or indirectly assist in the enforcement of federal immigration laws," including agreements authorized by 8 U.S.C. § 1357(g) or any intergovernmental services agreement entered into with DHS under 8 U.S.C. § 1103(a)(11)(B). Denver Revised Municipal Code § 28-251. Likewise, Denver cannot "enter into any contractual agreement requiring the collection or dissemination of individually identifiable information about the national origin, immigration or citizenship status of any person, over and above the extent to which the city is required to collect or disseminate such information" under federal, state or city law. *Id.*

66.    *Third*, Section 28-252 restricts federal immigration authorities' ability to interview incarcerated individuals. It prohibits federal immigration authorities from access to all "secure areas of any city or county jail or other city-owned law enforcement facility for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration" absent presentation of "a warrant issued by a federal judge or magistrate." *Id.* § 28-252(a). It defines "secure area" as "any area of the facility that is not generally open and accessible to the general public, but instead requires special permission for admittance by a city officer or employee on an individual basis." *Id.* It permits coordination of telephone or video interviews between federal immigration authorities and inmates "to the same extent as telephone or video contact with such individuals is allowed by the general public"—except law enforcement must first advise the inmate of certain "legal rights" in writing, in his chosen language. *Id.* § 28-252(b).

67.    *Fourth*, Section 28-253 bars law enforcement from detaining individuals based on detainer requests. *Id.* § 28-253(c). When served a civil immigration detainer, an officer cannot arrest, detain, or provide an individual's personal information to federal immigration enforcement authorities, "regardless of whether or not the administrative warrant is accompanied by a final order of removal

or deportation, any prior deportation order, or any other civil immigration document based solely on alleged violations of the civil provisions of federal immigration laws." *Id.*

68.     Although Denver does not prohibit the sheriff department from responding to notification requests, it does not deem them to "create any obligation" to detain the individual beyond the time he is eligible for release "unless the request is accompanied by a warrant issued by a federal judge or magistrate." *Id.* § 28-253(d). And law enforcement "shall as promptly as practicable advise" the individual "that federal immigration enforcement authorities have requested information concerning the date and time when the inmate will be released" and notify him that he "enjoys certain legal rights if contacted by federal immigration enforcement authorities" (*id.*).

69.     Simply put, Denver Revised Municipal Code Sections 28-250 through 28-253 prevent Denver law enforcement officers from honoring federal civil immigration detainers and impede federal immigration authority efforts to enforce immigration law.

### Denver Executive Order No. 142

70.     Also in 2017, Denver's then-Mayor Michael Hancock issued Executive Order No. 142. Its purpose was to "establish Denver as a safe and welcoming city for all."[10]

71.     The Executive Order, *inter alia*, instructed all city agencies, including law enforcement departments, to comply with the Public Safety Enforcement Priorities Act's express prohibition on "[a]ssisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws." Exec. Order No. 142, ¶ 18.0 (citing Denver Revised Municipal Code § 28-250(a)(1)). It implemented training that "emphasize[d] the limitations around collecting and sharing national origin,

---

[10] Exec. Order No. 142 (Aug. 31, 2017), https://denvergov.org/files/assets/public/v/1/executive-orders/documents/142-standing-with-immigrants-and-refugees.pdf.

immigration and citizenship data, including sharing information pertaining to appointment times, dates or whereabouts of clients for such services with federal immigration enforcement officials from ICE, U.S. Customs and Border Protection, or U.S. Citizenship and Immigration Services." *Id.* Exec. Order No. 142, ¶ 18.0. It also required executive directors or heads of departments/agencies/offices to report "any efforts made known to them by federal immigration enforcement officials from [ICE], [CBP], or U.S. Citizenship and Immigration Services to enforce civil immigration laws with the cooperation, support, or use of City resources," and threatened discipline, "up to and including termination," for failure to comply. *Id.* ¶¶ 19.0, 20.0.

72.     Denver Revised Municipal Code §§ 28-250–253 and Exec. Order No. 142 are impediments to the Federal Government's ability to properly and meaningfully enforce federal immigration laws and they discriminate against federal immigration enforcement. Additionally, the information-sharing restrictions violate 8 U.S.C. § 1373.

73.     In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, Denver Revised Municipal Code §§ 28-250–253 and Exec. Order No. 142 constitute unlawful direct regulation of the Federal Government.

## The challenged laws impede the operation of the federal immigration laws.

74.     Federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or

unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

75.    Colorado House Bill 19-1124, Senate Bill 21-131, and House Bill 23-1100 impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state law enforcement officials from assisting with federal civil immigration enforcement. Under these laws, state officers are explicitly prohibited from complying with immigration detainers or civil immigration warrants; they are also prevented from sharing critical immigration information, and from entering into or renewing agreements to detain noncitizens for federal civil immigration violations. *See* C.R.S. §§ 24-76.6-101–103; C.R.S. §§ 24-76.7-101–103; C.R.S. §§ 24-74-101–108; C.R.S. § 24-72-204. In fact, Defendants have already begun cracking down on state personnel for alleged violations. On July 22, 2025, Defendants Phillip Weiser and the State of Colorado filed a complaint seeking relief under C.R.S. § 24-74-107 for alleged violations of C.R.S. §§ 24-74-103–104.[11]

76.    Denver Revised Municipal Code §§ 28-250–253 (Ordinance No. 940-17) impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by prohibiting detention of an alien based solely on an immigration detainer; prohibiting city employees from collecting information on immigration or citizenship status; prohibiting the sharing of any other information about individuals for purposes of immigration enforcement; and, prohibiting use of city resources or city cooperation with civil immigration enforcement, including

---

[11] *See* Press Release, Attorney General Phil Weiser, *AG Weiser files lawsuit to hold Mesa sheriff's deputy liable after state investigation revealed illegal coordination with federal immigration officials* (July 22, 2025), https://coag.gov/press-releases/attorney-general-phil-weiser-lawsuit-mesa-sheriffs-deputy-federal-immigration/; *see also* Shelly Bradbury, *Colorado sheriff's deputy who alerted ICE to Utah student violated state law, AG says*, THE DENVER POST (July 22, 2025), https://www.denverpost.com/2025/07/22/utah-student-ice-arrest-colorado-mesa-deputy-caroline-goncalves/?share=mi0cnaveh0eeshuysnoe.

prohibiting providing access to secure areas or facilities. *See* Denver Revised Municipal Code §§ 28-250–253.

77.    The Colorado Sanctuary Laws limit federal immigration authorities' ability to interview individuals in state custody, even though the INA expressly provides that aliens in this country "*shall* be inspected by immigration officers." *Id.* § 1225(a)(3) (emphasis added). Colorado law also limits the circumstances in which federal immigration officers may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

78.    Colorado's Sanctuary Laws run directly afoul of 8 U.S.C. § 1373 by forbidding state Probation Department employees from "provid[ing] personal information[, including custody status or release dates,] about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1)(a). Colorado has therefore prohibited the activities that federal law requires.

79.    Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state custody. Congress not only recently reaffirmed its commitment to this mandate, but also augmented the authority of federal agents in this space by adding predicate offenses that trigger this detention requirement. *Id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

80.    To this end, C.R.S. § 24-76.7-103, which limits Colorado state and local governments' ability to enter into immigration detention agreements, has and will continue to inhibit federal immigration enforcement, especially in remote areas of Colorado. The challenged law limits federal agents from detaining all illegal aliens despite federal law requiring their detention. *See CoreCivic, Inc. v. Governor of New Jersey*, No. 23-2598, 2025 WL 2046488, at *8 (3d Cir. July 22, 2025) ("Federal law gives federal officials discretion to contract for immigration detention. 8 U.S.C. § 1231(g); 48 C.F.R. § 3017.204-90; 8 C.F.R. § 235.3. [The state's] law destroys that

discretion."). Upon information and belief, transferring detainees to the ICE immigration detention facility in Aurora—now the only location where ICE can detain individuals within the state of Colorado—upon apprehension poses risks in many circumstances. Because ICE's Denver Field Office covers the entire states of Colorado and Wyoming, and the federal government can no longer temporarily house detainees in county detention facilities, immigration officers are forced to travel long distances, even at late hours and in poor weather conditions, to transport people to the Aurora facility. Upon information and belief, as a result, federal immigration authorities have to release individuals that it otherwise would detain or alternatively incur significant transport expenses that it would not have incurred prior to C.R.S. § 24-76.7-103. *See CoreCivic*, WL 2046488, at *8 (explaining that under the state's prohibition of state and local governments and private parties from making, renewing, or extending any contract to detain people for civil immigration violations: "ICE would have to tie up time and money building and running lockups itself, change its operations, and risk compromising national security. And if every state enacted such bans, they would 'destroy the federal function.'") (quoting *United States v. Fresno County*, 429 U.S. 452, 463–64, 463 n.11 (1977)).

81.    The restrictions on providing ICE access to removable aliens in their custody, *see, e.g.*, C.R.S. § 24-76.6-102(2), also conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

82.    The challenged Sanctuary Laws impede DHS's ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States as well as DHS's access to such aliens to facilitate the transfer of custody—even

where DHS presents a congressionally authorized civil administrative warrant of arrest or removal, *see* 8 U.S.C. §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

83.    By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), the challenged laws frequently require federal immigration officers either to (1) engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and members of the public, or (2) determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.

84.    Colorado has no lawful interest in assisting removable aliens' evasion of federal law enforcement.

85.    It appears from the challenged provisions that Colorado does not permit its employees to place a detainer or administrative warrant in the alien's file or to enter its existence in its databases, such that if an alien is transferred to another law enforcement agency, that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government.

86.    Colorado singles out the Federal Government for its disfavored treatment. *See* C.R.S. §§ 24-76.6-102, 103; 24-76.7-101, 103; 24-74.1-102.

87.    These provisions are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement, as well as (with respect to the information-sharing and maintenance restrictions) expressly violate 8 U.S.C. § 1373.

88.    In rejecting congressionally authorized means of enforcing federal immigration law,

including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
### (PREEMPTION)

89.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

90.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

91.     The Sanctuary Laws violate the Supremacy Clause because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

92.     The Sanctuary Laws are also expressly preempted in large part. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

93.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

94.     Defendants' enforcement of the challenged provisions discriminates against the Federal Government.

95.     The challenged provisions single out federal immigration officials, expressly and

implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

96.     Such discriminatory targeting of the Federal Government is unlawful. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal government … if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status.") (citations and alterations omitted).

97.     Accordingly, the challenged provisions violate the Doctrine of Intergovernmental Immunity and therefore are invalid on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE

## (UNLAWFUL REGULATION OF FEDERAL GOVERNMENT)

98.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

99.     Defendants' enforcement of the Sanctuary Laws effects direct regulation of the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

100.     Accordingly, the challenged Sanctuary Laws effect regulation of the Federal Government and are alternatively invalid on that basis.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A.  That this Court enter a judgment declaring that the challenged provisions violate the Supremacy Clause and are therefore invalid;

B.  That this Court issue preliminary and permanent injunctions that prohibit Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions;

C.  That this Court award the United States its costs and fees in this action; and

D.  That this Court award any other relief it deems just and proper.

DATED: July 25, 2025

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

ELIANIS N. PEREZ
Assistant Director

CATHERINE M. RENO
Senior Litigation Counsel

/s/ Amanda B. Saylor
AMANDA B. SAYLOR
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-6837
Fax: (202) 305-7000
Email: Amanda.B.Saylor@usdoj.gov

*Attorneys for the United States*

BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
~~Acting~~ Principal Deputy Assistant Attorney General
Civil Division
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
ELIANIS N. PEREZ
Assistant Director
CATHERINE M. RENO
Senior Litigation Counsel
AMANDA B. SAYLOR
~~CHRISTOPHER I. PRYBY~~
Trial Attorney~~s~~
Office of Immigration Litigation
General Litigation and Appeals Section

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his Official Capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his Official Capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity. | **FIRST AMENDED** COMPLAINT |
| Defendants. | |

1

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      At the end of last year, the nation was shocked by images and videos of members of Tren de Aragua seizing control of apartment complexes in Aurora, Colorado. The fact that a foreign terrorist organization could gain such a foothold in the United States of America is unacceptable. But it is the direct byproduct of the sanctuary policies pushed by the State of Colorado, and certain of its subdivisions. This is a suit to put an end to those disastrous policies and restore the supremacy of federal immigration law.

2.      Within hours of assuming the Presidency, President Trump declared a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens" into the country. Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Further exacerbating this national crisis, some of these criminal aliens find safe havens from federal law enforcement detection in so-called Sanctuary Cities where they live and work in communities whose members may become their crime victims. This national crisis underscores the vital importance of "[e]nforcing our Nation's immigration laws." *Id.*

3.      The United States brings this declaratory and injunctive action to prohibit the State of

Colorado, City of Denver, and its subdivisions from enforcing several state and local laws—namely, Colorado House Bill 19-1124, Senate Bill 21-131, ~~and~~ House Bill 23-1100 (creating Articles 76.6, 74, and 76.7 of Title 24 of the Colorado Revised Statutes and amending other provisions), Senate Bill 25-276 (creating Article 74.1 of Title 24 and amending various provisions of the Colorado Revised Statutes), Denver Executive Order No. 142, and Ordinance No. 940-17, §1, 8-28-17 (codified at Denver Revised Municipal Code §§ 28-250–253), hereinafter "Sanctuary Laws"—that by intent and design interfere with and discriminate against the Federal Government's enforcement of federal immigration law. That all violates the Supremacy Clause of the United States Constitution.[1]

4.    The United States has well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. Indeed, Congress this year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[2]

5.    Foremost, federal immigration law expressly preempts state and local laws that restrict sharing information "regarding the citizenship or immigration status, lawful or unlawful, o~~r~~f any individual," 8 U.S.C. § 1373(a), which broadly encompasses, among other things, "the presence, whereabouts, or activities" of aliens with the Federal Government. H.R. Rep. No. 725, 104th Cong., 2d. Sess. 383 (1996). But that is *exactly* what the Sanctuary Laws do.

---

[1] *See* C.R.S. §§ 24-76.6-101–103; 24-76.7-101, 103; 24-74-101–108; 24-74.1-101–103; Denver Revised Municipal Code §§ 28-250–253; Denver Executive Order No. 142.

[2] Press Release, DHS, President Trump Signs the Laken Riley Act in Law (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

6.     Moreover, under conflict preemption principles, a State cannot fashion "an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal immigration laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67(1941)). But the Sanctuary Laws were enacted for the sole purpose of impeding the Federal Government's ability to enforce immigration law and remove illegal aliens.

7.     Further, well-established principles of intergovernmental immunity prohibit a State from "discriminat[ing] against the Federal Government or those with whom it deals." *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). Yet the Sanctuary Laws directly discriminate against the Federal Government's own operations: The Laws specifically cite the federal statutes that state and local officials are prohibited from assisting immigration authorities from enforcing.

8.     These sanctuary policies have "tied the hands of law enforcement, emboldened dangerous criminals and left [Colorado's] communities vulnerable." *Id.* Indeed, three Members of Congress have implored Governor Polis to repeal these laws, explaining: "These laws hamper and often outright prevent public safety investigations from being opened, which degrades the ability of law enforcement to investigate cases where immigration status might be a factor."[3]

9.     Local communities in Colorado have borne the brunt of these policies. In the words of Douglas County Colorado Commissioner Kevin Van Winkle: "We swore an oath to protect public safety, but these laws prevent us from doing so."[4] "These laws require us to conceal the identity

_____

[3] Letter from Representatives Gabe Evans, Lauren Boebert, and Jeff Crank to Governor Jared Polis, (Jan. 17, 2025), https://gabeevans.house.gov/sites/evo-subsites/gabeevans.house.gov/files/evo-media-document/letter-to-polis-on-sanctuary-policies.pdf.

[4] *Douglas County appeals Denver judge's dismissal of immigration lawsuit*, DOUGLAS COUNTY (Jan. 30, 2025), https://www.douglas.co.us/douglas-county-appeals-denver-judges-dismissal-of-immigration-lawsuit/.

4

of those who committed a crime and are here illegally. That's a serious public safety issue." *Id.* As

Douglas County Colorado Commissioner George Teal put it: "Douglas County is not a sanctuary

county. We want to work with the federal government on issues of illegal immigration to keep our

community safe." *Id.* When officers choose to cooperate with federal immigration enforcement

agents to keep their communities safe and enforce federal law, the State of Colorado hauls them

into court as punishment for doing their jobs.[5]

10.     These ~~unfortunate~~ dangerous circumstances are not preordained; indeed, the Constitution

forbids them. The Supremacy Clause prohibits Colorado and its officials from obstructing the

Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted

to it by the Constitution. The Supremacy Clause also prohibits Colorado from singling out the

Federal Government for adverse treatment—as the challenged laws do—thereby discriminating

against the Federal Government. The Sanctuary Laws are themselves unlawful and cannot stand.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

12.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one

Defendant resides in this District and a substantial part of the acts or omissions giving rise to this

action arose from events in this district.

13.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201,

and 2202, and its inherent equitable powers.

## PARTIES

14.     Plaintiff, the United States of America, regulates immigration under its constitutional and

---

[5] *See* Complaint, *State of Colorado v. Alexander Zwinck*, Case No. 2025-cv-30303 (Mesa County,
CO, District Ct.)(July 22, 2025).

statutory authorities, and it enforces federal immigration laws through its Executive agencies, including the Departments of Justice, State, Labor, and Homeland Security ("DHS") as well as DHS's component agencies, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

15.     Defendant Colorado is a State of the United States.

16.     Defendant Jared Polis is the Governor of Colorado and is being sued in his official capacity.

17.     Defendant Colorado General Assembly is the state legislature of the State of Colorado.

18.     Defendant Philip Weiser is the Attorney General of Colorado and is being sued in his official capacity.

19.     Defendant City and County of Denver is a city and county within Colorado.

20.     Defendant Denver City Council is the legislative branch of government for the City and County of Denver.

21.     Defendant Mike Johnston is the Mayor of the City and County of Denver and is being sued in his official capacity.

22.     Defendant Denver Sheriff Department is a criminal justice agency that oversees, *inter alia*, two jail facilities, security for the district and county court systems, state inmate transportation, and extradition duties for the city and county of Denver, Colorado.

23.     Defendant Elias Diggins is the Sheriff of Denver, Colorado, and is being sued in his official capacity.

## **CONSTITUTIONAL AND STATUTORY BACKGROUND**

   The Constitution vests the supreme authority over immigration in the Federal Government.

24.     The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations,"

U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

25.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Davidowitz*, 312 U.S. at 67, or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

26.    "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* (citations omitted).

27.    Exercising this authority, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

28.    In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request

that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

29.    DHS also may request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id*. § 287.7(d). And in some instances, DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). And in other instances, the INA gives the federal immigration authorities the discretion to detain a given based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

30.    Federal immigration authorities also "shall have power without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

31.    Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c),

1231(a)(1)(B)(iii), (a)(4).

32.     "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

33.     Congress also authorized states and localities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

34.     Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any

building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

**FACTUAL BACKGROUND**

Colorado

**House Bill 19-1124**

35.      In 2019, the Colorado General Assembly enacted, and Governor Polis signed into law, House Bill 19-1124, titled "Protect Colorado Residents From Federal Government Overreach." It created Article 76.6 of Title 24 of the Colorado Revised Statutes.[6]

36.      House Bill 19-1124 does three things. *First*, it provides that a Colorado law enforcement officer "shall not arrest or detain an individual on the basis of a civil immigration detainer request." C.R.S. § 24-76.6-102(2).[7] Indeed, it declares "the continued detention of an inmate at the request of federal immigration authorities beyond when he or she would otherwise be released constitutes a warrantless arrest, which is unconstitutional" C.R.S. § 24-76.6-102(1)(b). It only allows law enforcement to "cooperat[e]" or "assist[] federal immigration enforcement authorities" in executing a "warrant issued by a federal judge" or honoring any writ issued by any state or federal judge concerning the transfer of a prisoner to or from federal custody. *Id.* § 24-76.6-102(4).

37.      *Second*, House Bill 19-1124 imposes strict informational and access limits upon federal immigration authorities. Under the bill, "[a] probation officer or probation department employee

---

[6] On May 23, 2025, Governor Polis signed Senate Bill 25-276 into law. This law amends several existing Colorado Revised Statutes, including Articles 76.6 and 74, for the purpose of hindering cooperation with federal immigration officials. Senate Bill 25-276's amendments to C.R.S. §§ 24-76.6 and 24-74 are incorporated into each section of this Amended Complaint where appropriate.

[7] The law defines "Civil immigration detainer" as "a written request issued by federal immigration enforcement authorities pursuant to 8 CFR 287.7 to law enforcement officers to maintain custody of an individual beyond the time when the individual is eligible for release from custody, including any request for law enforcement agency action, warrant for arrest of alien, order to detain or release alien, or warrant of removal/deportation on any form promulgated by federal immigration enforcement authorities." C.R.S. § 24-76.6-101(1).

shall not provide personal information about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1)(a). It defines personal information as: "confidential identifying information about an individual, including but not limited to home or work contact information; family or emergency contact information; probation meeting date and time; community corrections locations; community corrections meeting date and time; or the meeting date and time for criminal court-ordered classes, treatment, and appointments." C.R.S. § 24-76.6-101(4).

38.     Senate Bill 25-276 broadened the group of employees bound by C.R.S. § 24-76.6-103's information sharing restriction by: (1) adding "pretrial officer or pretrial services office employee" into the list of employees covered by the statute, *id.* § 24-76.6-103(1)(a), and (2) expounding that "pretrial officer" or "pretrial service office employee" includes agents acting on behalf of, or at the direction of those employees, *id.* § 24-76.6-103(1)(b).

39.     *Third*, it hampers local law enforcement's ability to arrange interviews between federal immigration authorities and inmates by imposing onerous pre- and post-requisites to the interview. Prior to (and after) "coordinating telephone or video interviews between federal immigration authorities and individuals incarcerated in any county or local jail or other custodial facility," the individual must be advised—in writing in the language of his choice—that (1) "[t]he interview is being sought by federal immigration authorities"; (2) "[t]he individual has the right to decline the interview and remain silent"; (3) "[t]he individual has the right to speak to an attorney before submitting to the interview"; and (4) "[a]nything the individual says may be used against him or her in subsequent proceedings, including in a federal immigration court." C.R.S. § 24-76.6-103(2).

**Senate Bill 21-131**

40.     The second of the Colorado Sanctuary Laws was enacted in 2021 as Senate Bill 21-131 and created Article 74 of Title 24 to the Colorado Revised Statutes.

41.    Senate Bill 21-131 does three things. *First*, it prohibits state agency employees from sharing "personal identifying information"—including information available through a database or automated network—used for the purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws and 8 U.S.C. sec. 1325 or 1326," with limited exceptions. C.R.S. § 24-74-103. The "personal identifying information" employees are prohibited from sharing includes a person's "biometric data … home or work addresses or other contact information; [and] immigration or citizenship status[.]" *Id.* § 24-74-102(1).

41.42.  *Second*, Senate Bill 21-131 prohibits state agency employees from requesting information or documents necessary to ascertain a person's immigration status "for the purpose of identifying if the person has complied with federal immigration laws," with limited exceptions. C.R.S. § 24-74-104(1). State employees are prohibited from collecting information regarding place of birth, citizenship or immigration status, or information gleaned from passports, permanent resident cards, alien registration cards, and employment authorizations documents. *Id* § 24-74-104(2).

43.    *Third*, Senate Bill 21-131 imposes strict limitations on those provided access to databases or automated information in Colorado. C.R.S. § 24-74-105. To be granted access to "personal identifiable information"—including immigration or citizenship status—a third partyone must have certified within the past year that the records or information obtained will not be used "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement[.]" *Id.* § 24-74-105(1)(a). Users must also certify that they will not "disclose personal identifying information" obtained to "individuals or entities engaged in investigating for, participating in, cooperating with, or assisting in federal immigration enforcement, including enforcement of civil immigration laws" (unless required by federal or state

law or to comply with a court-issued subpoena, warrant, or order). *Id.* § 24-74-105(1)(b).

44.     Senate Bill 25-276 amended the definitions of "state agency" and "state agency employees," adding legislative and judicial branch employees, to expand the group of employees bound by Senate Bill 21-131's information sharing restrictions. *Id.* § 24-74-102(3)–(4). It also created a new class of covered employee, defined at C.R.S. § 24-74-102(1.6) as a "political subdivision employee" and a new covered entity, defined at C.R.S. § 24-74-102(1.5) as a "political subdivision." *See id.* § 24-74-103(1). "Political subdivision," "political subdivision employee," and "a private entity that contracts with, and collects or manages data on behalf of, a state agency or political subdivision" are now subject to § 24-74-105's certification requirement. *See id.* § 24-74-102(5).   Senate Bill 25-276's amendments also expanded the definition of "third party" so as to broaden C.R.S. § 24-74-105's reach.

45.     In addition to the amendments in the subsections noted above, Section 13 of Senate Bill 25-276 carved out a new subsection of this statute at C.R.S. § 24-74.1-101–103, "Policies Regarding Data and Access," addressing prohibitions on information sharing in health care, education, and library settings. *Id.* This statute prohibits a broadly defined group of state agency employees, *id.* § 24-74.1-101, from collecting information concerning an individual's place of birth, immigration or citizenship status, or information included on a passport, permanent resident card, alien registration card, or employment authorization documents, with limited exceptions. *Id.* § 24-74.1-102(1).

46.     As with the other challenged statutes, this provision discounts the validity of subpoenas, warrants, and orders except when issued by federal judges or magistrates. *Id.* §§ 24-74.1-102(2); 24-74.1-102(3)(a)(IV). This provision goes further to mandate that covered entities create information sharing policies in alignment with the statute, including procedures restricting access

to—and release of—information, documentation requirements, and notification requirements that alert individuals to the fact that federal immigration authorities have requested information. *Id.* § 24-74.1-103. It also requires covered entities to request and document the name, employer, and badge number of the person leading the federal immigration enforcement.[8]

42.47.  As in the case of C.R.S. § 24-74-107, as amended by Senate Bill 25-276, an entity found to have intentionally violated the statute is subject to a civil penalty of up to $50,000 per violation. *Id.* §§ 24-74.1-101; 24-74-107. Civil penalties collected are credited to the civil immigration legal defense fund. *Id.* The law declares that it "does not preempt 8 U.S.C. Sec. 1373." *Id.* § 24-74.1-102(4).

43.48.  Senate Bill 21-131 severely restricts state employees from requesting and sharing information about immigration status with federal immigration enforcement authorities.

44.49.  Prior to the enactment of Senate Bill 21-131, Colorado Division of Motor Vehicles staff helped ICE monitor, locate, and in some cases, detain, illegal aliens.[9] They were able to do so due to a 2013 Colorado law allowing aliens residing in Colorado to apply for driver's licenses. *Id.* State Representative Serena Gonzales-Gutierre stated that the Senate Bill 21-131 was intended to address "that foundation of trust that has been broken here in Colorado because of the interactions that we have seen between ICE and state departments such as the DMV." *Id.*

45.50.  Senate Bill 21-131's prohibition on information sharing under §§ 24-74-103 and 105(1)(a) and (1)(b) allows state agency employees to share records or information with federal immigration

---

[8] The law defines "federal immigration enforcement" as "an effort to investigate, enforce, or assist in the investigation or enforcement of a federal civil immigration law or a federal criminal immigration law that penalizes a person's presence in, entry or reentry to, or employment in the United States." C.R.S. § 24-74.1-101(2).

[9] Faith Miller, *Colorado third in the nation to pass sweeping data privacy legislation*, COLORADO NEWSLINE (June 18, 2021), https://coloradonewsline.com/2021/06/18/colorado-third-in-the-nation-to-pass-sweeping-data-privacy-legislation/.

agencies where "required by federal or state law or to comply with a court-issued subpoena, warrant, or order." *Id.* §§ 24-74-103(1), 24-74-105(1)(a). Similarly, § 24-74-104 carves out an exception where "required by state or federal law" or as a condition to establishing eligibility for various government funded programs. Under Senate Bill 25-276's amendments, C.R.S. § 24-74-103(2) mandates that this provision "shall not interfere with criminal investigations or proceedings that are authorized by judicial process or to restrict a state agency employee or political subdivision employee from fully investigating, participating in, cooperating with, or assisting federal law enforcement agencies in criminal investigations." Notwithstanding this statement, Senate Bill 25-276's amendments operate to severely restrict employees from collecting or sharing information with federal immigration enforcement authorities.

**House Bill 23-1100**

~~46.~~51.  The third of the Colorado Sanctuary Laws was enacted in 2023 as House Bill 23-1100 and created Article 76.7 of Title 24 of the Colorado Revised Statutes.

~~47.~~52.  C.R.S. § 24-76.7-103 prohibits "the state, any unit of local government, a county sheriff, or any agency, officer, employee, or agent thereof" from entering into or renewing an "immigration detention agreement" beginning on January 1, 2024. C.R.S. §§ 24-76.7-103(1); 101(1). "Immigration detention agreement" is defined as: "any contract, including but not limited to an intergovernmental service agreement, or portion thereof for payment to a governmental entity to detain individuals for federal civil immigration purposes" C.R.S. § 24-76.7-101(2).

~~48.~~53.  Upon information and belief, the state does not restrict agreements to detain persons with entities other than the federal government. *See, e.g.*, C.R.S. §§ 29-1-201; 29-1-203(1); 24-60-501, art. V, subdiv. (h).

~~49.~~54.  Upon information and belief, Colorado state and local governments have not authorized

any agreement with the federal government to detain persons for federal civil immigration purposes without payment.

55.    Accordingly, these Colorado laws work to the detriment of federal enforcement of immigration law in Colorado and surrounding states.

**Senate Bill 25-276**

56.    On May 23, 2025, Governor Polis signed into law Senate Bill 25-276, titled "Concerning Measures To Prevent The Violation Of The Civil Rights Of Persons In Colorado Based On Immigration Status, And, In Connection Therewith, Reducing An Appropriation." The law doubled down on Colorado's already radical sanctuary policies, further expanding its prohibitions on state and local employees cooperating with federal immigration authorities and hampering the Executive from enforcing immigration law in Colorado.

57.    In addition to the amendments discussed, *supra*, the bill further constrained state and local officials' ability to comply with immigration detainers in three ways.

58.    *First*, it expands House Bill 19-1124's prohibition on arresting or detaining individuals based on immigration detainers. *See id.* § 24-76.6-102(2). Specifically, it adds a provision to the the Code of Criminal Procedure that prohibits jailers from "delay[ing] a defendant's release from custody for the purpose of an immigration enforcement operation." *Id.* § 16-4-102(2)(e.5)(I).

59.    It defines the phrase "Immigration enforcement operation" as "an operation in which the primary objective is the identification or apprehension of a person or persons to: (a) Subject them to civil immigration detention, removal, or deportation proceedings, or removal or deportation from the United States; or (b) Criminally prosecute them for offenses related to their immigration status." *Id.* § 24-76.6-101(2.7). It exempts from that definition only conduct (1) "contemplated by or in compliance with" C.R.S. § 24-76.6-102(4), (which allows law enforcement to "cooperat[e]"

or "assist[] federal immigration enforcement authorities" in executing a "warrant issued by a federal judge" or (2) honoring any judicial writ concerning the transfer of a prisoner to or from federal custody. *Id.* § 16-4-102(2)(e.5)(II)(A).

60.    The bill broadens House Bill 19-1124's definition of "civil immigration detainer" (*see supra* n. 36) to include *any* request (as opposed to a written request under 8 C.F.R. § 287.7), and changes the phrase "issued by federal immigration authorities" to "for federal immigration enforcement." *Id.* § 24-76.6-101(1).

61.    *Second*, it expands House Bill 19-1124's prohibition on arresting or detaining an individual on the basis of a civil immigration detainer. It defines "detain" as: "includ[ing] the denial or delay of release from custody for immigration enforcement operations or for immigration enforcement purposes." *Id.* § 24-76.6-102(2)(a). It further clarifies: that "I[i]f an individual has posted bond and the bond has been processed, the continued detainment of the individual on the basis of a civil immigration detainer is a new, warrantless arrest." *Id.* § 24-76.6-102(2)(b). It also adds definitions for "detention facility" and "government entity." *Id.* § 24-76.6-101(1.5), (2.3).

50.62. *Third*, the bill exponentially expands the areas in which a "person is not subject to civil arrest." *Id.* § 13-1-403(1). Colorado law previously stated: that "a person shall not be subject to civil arrest while the person is present at a courthouse or on its environs, or while going to, attending, or coming from a court proceeding." *Id.* § 13-1-403 (2020). Senate Bill 25-276 adds to C.R.S. § 13-1-403 the phrase "or while the person is receiving treatment in a related facility," *id.* § 13-1-403), and defines "related facility" to include a non-exclusive laundry-list of entities, services, and programs that address "behavioral health," any hospitals or detention/commitment facilities operated by the Department of Human Services, and even foster care and nursing homes. *Id.* § 13-1-402(6)(a)–(m). A person who knowingly violates this provision is liable for damages in

a civil action for false imprisonment. *Id.* § 13-1-404.

Denver

**Denver Revised Municipal Code Sections 28-250 through 28-253**

~~51.~~63.  In August 2017, the Denver City Council passed City Ordinance No. 940-17, the Public

Safety Enforcement Priorities Act. It adopted a new Article in Chapter 28 of the Denver Revised

Municipal Code. It explicitly limits local cooperation with federal immigration enforcement.

~~52.~~64.  *First,* Section 28-250 states no city employee shall "use any city funds or resources to assist

in the enforcement of federal immigration laws." Denver Revised Municipal Code § 28-250(a).

This bar includes "[a]ssisting or cooperating in [an] official capacity with any investigation,

detention, or arrest procedures relating to alleged violations of the civil provisions of federal

immigration laws," "[r]equesting information about the national origin, immigration or citizenship

status of any individual or engaging in activities designed to ascertain such information," absent

very limited exceptions, or including on city services or benefits applications "any question

regarding national origin, immigration or citizenship status of the applicant, or conditioning the

provision of city services or benefits upon the national origin, immigration or citizenship status of

any individual, except to the extent required by any federal, state or city law or regulation." *Id.* It

provides that no city agent shall "[d]isseminat[e] information about the national origin,

immigration or citizenship status of any individual except to the extent required by any federal,

state or city law or regulation." *Id.* Nor shall they "[i]nitiat[e] any law enforcement contact solely

for purposes of determining the person's national origin, immigration or citizenship status, or

arresting or detaining any individual solely on the basis of the individual's immigration or

citizenship status." *Id.*

~~53.~~65.  *Second*, Section 28-251 forbids Denver from entering "into any contractual agreement that

18

would commit or require any city officer or employee to directly or indirectly assist in the enforcement of federal immigration laws," including agreements authorized by 8 U.S.C. § 1357(g) or any intergovernmental services agreement entered into with DHS under 8 U.S.C. § 1103(a)(11)(B). Denver Revised Municipal Code § 28-251. Likewise, Denver cannot "enter into any contractual agreement requiring the collection or dissemination of individually identifiable information about the national origin, immigration or citizenship status of any person, over and above the extent to which the city is required to collect or disseminate such information" under federal, state or city law. *Id.*

54.66.  *Third*, Section 28-252 restricts federal immigration authorities' ability to interview incarcerated individuals. It prohibits federal immigration authorities from access to all "secure areas of any city or county jail or other city-owned law enforcement facility for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration" absent presentation of "a warrant issued by a federal judge or magistrate." *Id.* § 28-252(a). It defines "secure area" as "any area of the facility that is not generally open and accessible to the general public, but instead requires special permission for admittance by a city officer or employee on an individual basis." *Id.* It permits coordination of telephone or video interviews between federal immigration authorities and inmates "to the same extent as telephone or video contact with such individuals is allowed by the general public"—except law enforcement must first advise the inmate of certain "legal rights" in writing, in his chosen language. *Id.* § 28-252(b).

55.67.  *Fourth*, Section 28-253 bars law enforcement from detaining individuals based on detainer requests. *Id.* § 28-253(c). When served a civil immigration detainer, an officer cannot arrest, detain, or provide an individual's personal information to federal immigration enforcement authorities, "regardless of whether or not the administrative warrant is accompanied by a final order of removal

or deportation, any prior deportation order, or any other civil immigration document based solely on alleged violations of the civil provisions of federal immigration laws." *Id.*

~~56.~~68.  Although Denver does not prohibit the sheriff department from responding to notification requests, it does not deem them to "create any obligation" to detain the individual beyond the time he is eligible for release "unless the request is accompanied by a warrant issued by a federal judge or magistrate." *Id.* § 28-253(d). And law enforcement "shall as promptly as practicable advise" the individual "that federal immigration enforcement authorities have requested information concerning the date and time when the inmate will be released" and notify him that he "enjoys certain legal rights if contacted by federal immigration enforcement authorities" (*id.*).

~~57.~~69.  Simply put, Denver Revised Municipal Code Sections 28-250 through 28-253 prevent Denver law enforcement officers from honoring federal civil immigration detainers and impede federal immigration authority efforts to enforce immigration law.

**Denver Executive Order No. 142**

~~58.~~70.  Also in 2017, Denver's then-Mayor Michael Hancock issued Executive Order No. 142. Its purpose was to "establish Denver as a safe and welcoming city for all."[10]

~~59.~~71.  The Executive Order, *inter alia*, instructed all city agencies, including law enforcement departments, to comply with the Public Safety Enforcement Priorities Act's express prohibition on "[a]ssisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws." Exec. Order No. 142, ¶ 18.0 (citing Denver Revised Municipal Code § 28-250(a)(1)). It implemented training that "emphasize[d] the limitations around collecting and sharing national origin,

---

[10] Exec. Order No. 142 (Aug. 31, 2017), https://denvergov.org/files/assets/public/v/1/executive-orders/documents/142-standing-with-immigrants-and-refugees.pdf.

immigration and citizenship data, including sharing information pertaining to appointment times, dates or whereabouts of clients for such services with federal immigration enforcement officials from ICE, U.S. Customs and Border Protection, or U.S. Citizenship and Immigration Services." *Id.* Exec. Order No. 142, ¶ 18.0. It also required executive directors or heads of departments/agencies/offices to report "any efforts made known to them by federal immigration enforcement officials from [ICE], [CBP], or U.S. Citizenship and Immigration Services to enforce civil immigration laws with the cooperation, support, or use of City resources," and threatened discipline, "up to and including termination," for failure to comply. *Id.* ¶¶ 19.0, 20.0.

~~60.~~72.  Denver Revised Municipal Code §§ 28-250–253 and Exec. Order No. 142 are impediments to the Federal Government's ability to properly and meaningfully enforce federal immigration laws and they discriminate against federal immigration enforcement. Additionally, the information-sharing restrictions violate 8 U.S.C. § 1373.

~~61.~~73.  In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, Denver Revised Municipal Code §§ 28-250–253 and Exec. Order No. 142 constitute unlawful direct regulation of the Federal Government.

### The challenged laws impede the operation of the federal immigration laws.

~~62.~~74.  Federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or

unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

63.75.  Colorado House Bill 19-1124, Senate Bill 21-131, and House Bill 23-1100 impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state law enforcement officials from assisting with federal civil immigration enforcement. Under these laws, state officers are explicitly prohibited from complying with immigration detainers or civil immigration warrants; they are also prevented from sharing critical immigration information, and from entering into or renewing agreements to detain noncitizens for federal civil immigration violations. *See* C.R.S. §§ 24-76.6-101–103; C.R.S. §§ 24-76.7-101–103; C.R.S. §§ 24-74-101–108; C.R.S. § 24-72-204. In fact, Defendants have already begun cracking down on state personnel for alleged violations. On July 22, 2025, Defendants Phillip Weiser and the State of Colorado filed a complaint seeking relief under C.R.S. § 24-74-107 for alleged violations of C.R.S. §§ 24-74-103–104.[11]

64.76.  Denver Revised Municipal Code §§ 28-250–253 (Ordinance No. 940-17) impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by prohibiting detention of an alien based solely on an immigration detainer; prohibiting city employees from collecting information on immigration or citizenship status; prohibiting the sharing of any other information about individuals for purposes of immigration enforcement; and, prohibiting use of city resources or city cooperation with civil immigration enforcement, including

---

[11] *See* Press Release, Attorney General Phil Weiser, *AG Weiser files lawsuit to hold Mesa sheriff's deputy liable after state investigation revealed illegal coordination with federal immigration officials* (July 22, 2025), https://coag.gov/press-releases/attorney-general-phil-weiser-lawsuit-mesa-sheriffs-deputy-federal-immigration/; *see also* Shelly Bradbury, *Colorado sheriff's deputy who alerted ICE to Utah student violated state law, AG says*, THE DENVER POST (July 22, 2025), https://www.denverpost.com/2025/07/22/utah-student-ice-arrest-colorado-mesa-deputy-caroline-goncalves/?share=mi0cnaveh0eeshuysnoe.

prohibiting providing access to secure areas or facilities. *See* Denver Revised Municipal Code §§ 28-250–253.

65.77.  The Colorado Sanctuary Laws limit federal immigration authorities' ability to interview individuals in state custody, even though the INA expressly provides that aliens in this country "*shall* be inspected by immigration officers." *Id.* § 1225(a)(3) (emphasis added). Colorado law also limits the circumstances in which federal immigration officers may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

66.78.  Colorado's Sanctuary Laws run directly afoul of 8 U.S.C. § 1373 by forbidding state Probation Department employees from "provid[ing] personal information[, including custody status or release dates,] about an individual to federal immigration authorities." C.R.S. § 24-76.6-103(1)(a). Colorado has therefore prohibited the activities that federal law requires.

67.79.  Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state custody. Congress not only recently reaffirmed its commitment to this mandate, but also augmented the authority of federal agents in this space by adding predicate offenses that trigger this detention requirement. *Id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

68.80.  To this end, C.R.S. § 24-76.7-103, which limits Colorado state and local governments' ability to enter into immigration detention agreements, has and will continue to inhibit federal immigration enforcement, especially in remote areas of Colorado. The challenged law limits federal agents from detaining all illegal aliens despite federal law requiring their detention. *See CoreCivic, Inc. v. Governor of New Jersey*, No. 23-2598, 2025 WL 2046488, at *8 (3d Cir. July 22, 2025) ("Federal law gives federal officials discretion to contract for immigration detention. 8 U.S.C. § 1231(g); 48 C.F.R. § 3017.204-90; 8 C.F.R. § 235.3. [The state's] law destroys that

discretion."). Upon information and belief, transferring detainees to the ICE immigration detention facility in Aurora—now the only location where ICE can detain individuals within the state of Colorado—upon apprehension poses risks in many circumstances. Because ICE's Denver Field Office covers the entire states of Colorado and Wyoming, and the federal government can no longer temporarily house detainees in county detention facilities, immigration officers are forced to travel long distances, even at late hours and in poor weather conditions, to transport people to the Aurora facility. Upon information and belief, as a result, federal immigration authorities have to release individuals that it otherwise would detain or alternatively incur significant transport expenses that it would not have incurred prior to C.R.S. § 24-76.7-103. *See CoreCivic*, WL 2046488, at *8 (explaining that under the state's prohibition of state and local governments and private parties from making, renewing, or extending any contract to detain people for civil immigration violations: "ICE would have to tie up time and money building and running lockups itself, change its operations, and risk compromising national security. And if every state enacted such bans, they would 'destroy the federal function.'") (quoting *United States v. Fresno County*, 429 U.S. 452, 463–64, 463 n.11 (1977)).

69.81.  The restrictions on providing ICE access to removable aliens in their custody, *see, e.g.*, C.R.S. § 24-76.6-102(2), also conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

70.82.  The challenged Sanctuary Laws impede DHS's ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States as well as DHS's access to such aliens to facilitate the transfer of custody—even

where DHS presents a congressionally authorized civil administrative warrant of arrest or removal, *see* 8 U.S.C. §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

~~71.~~83.  By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), the challenged laws frequently require federal immigration officers either to (1) engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and members of the public, or (2) determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.

~~72.~~84.  Colorado has no lawful interest in assisting removable aliens' evasion of federal law enforcement.

~~73.~~85.  It appears from the challenged provisions that Colorado does not permit its employees to place a detainer or administrative warrant in the alien's file or to enter its existence in its databases, such that if an alien is transferred to another law enforcement agency, that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government.

~~74.~~86.  Colorado singles out the Federal Government for its disfavored treatment. *See* C.R.S. §§ 24-76.6-102, 103; 24-76.7-101, 103; 24-74.1-102.

~~75.~~87.  These provisions are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement, as well as (with respect to the information-sharing and maintenance restrictions) expressly violate 8 U.S.C. § 1373.

~~76.~~88.  In rejecting congressionally authorized means of enforcing federal immigration law,

25

including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
### (PREEMPTION)

~~77.~~89.  Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

~~78.~~90.  The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

~~79.~~91.  The Sanctuary Laws violate the Supremacy Clause because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

~~80.~~92.  The Sanctuary Laws are also expressly preempted in large part. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

~~81.~~93.  Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

~~82.~~94.  Defendants' enforcement of the challenged provisions discriminates against the Federal Government.

~~83.~~95.  The challenged provisions single out federal immigration officials, expressly and

implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

84.96.  Such discriminatory targeting of the Federal Government is unlawful. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal government … if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status.") (citations and alterations omitted).

85.97.  Accordingly, the challenged provisions violate the Doctrine of Intergovernmental Immunity and therefore are invalid on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE

## (UNLAWFUL REGULATION OF FEDERAL GOVERNMENT)

86.98.  Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

87.99.  Defendants' enforcement of the Sanctuary Laws effects direct regulation of the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

88.100.Accordingly, the challenged Sanctuary Laws effect regulation of the Federal Government and are alternatively invalid on that basis.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A.  That this Court enter a judgment declaring that the challenged provisions violate the Supremacy Clause and are therefore invalid;

B.  That this Court issue preliminary and permanent injunctions that prohibit Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions;

C.  That this Court award the United States its costs and fees in this action; and

D.  That this Court award any other relief it deems just and proper.

DATED:- July 25, 2025

                                  BRETT A. SHUMATE
                                  Assistant Attorney General

                                  YAAKOV M. ROTH

                                  Principal DeputyActing Assistant Attorney General

                                  DREW C. ENSIGN
                                  Deputy Assistant Attorney General

                                  SEAN SKEDZIELEWSKI
                                  Counsel to the Assistant Attorney General

                                  ELIANIS N. PEREZ
                                  Assistant Director

                                  AMANDA B. SAYLORCATHERINE M. RENO
                                  CHRISTOPHER I. PRYBY
                                  Trial AttorneysSenior Litigation Counsel

                                  /s/ Catherine M. RenoAmanda B. Saylor
                                  CATHERINE M. RENOAMANDA B. SAYLOR
                                  Senior Litigation CounselTrial Attorney
                                  United States Department of Justice
                                  Civil Division
                                  Office of Immigration Litigation
                                  General Litigation and Appeals Section
                                  P.O. Box 868
                                  Ben Franklin Station
                                  Washington, DC 20044
                                  Telephone: (202) 353-8557
                                  Fax: (202) 305-7000
                                  Email: catherine.m.reno@usdoj.gov

                                  *Attorneys for the United States*