**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 25-cv-1391-GPG-KAS

UNITED STATES OF AMERICA,

Plaintiffs,

v.

STATE OF COLORADO, et al.,

Defendants.

---

**BRIEF OF AMICI CURIAE ACLU OF COLORADO
IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**

---

Timothy R. Macdonald
Sara R. Neel
Anna Kurtz
American Civil Liberties Foundation of Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone:    720.402.3151
Email: tmacdonald@aclu-co.org
        sneel@aclu-co.org
        akurtz@aclu-co.org

## INTERESTS OF *AMICUS*

The ACLU of Colorado (ACLU-CO) is a state affiliate of the American Civil Liberties Union, and a statewide, nonprofit, nonpartisan organization with more than 40,000 members and supporters. The ACLU-CO is dedicated to protecting the principles embodied in the U.S. Constitution, Colorado Constitution, and civil rights statutes through litigation, advocacy, and public education. The ACLU-CO has long advocated for the constitutional and civil rights of immigrants through know-your-rights presentations and other public education, legislative advocacy, and litigation – both as direct counsel and amicus.

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................ 1

I.    The Challenged Policies Protect Public Safety and the Functioning of State
      Government............................................................................................................ 2

      A.    The challenged policies help alleviate reluctance to work with law
            enforcement due to fear of immigration consequences. ....................... 3

      B.    The challenged policies preserve law enforcement resources for
            enforcing criminal law. ........................................................................... 8

      C.    The Government's claim that the challenged policies make
            Americans less safe is wrong. ............................................................ 10

II.   The Challenged Policies Help Ensure that Colorado Law Enforcement Officers
      Act According to the Constitution and State Law................................................ 11

III.  The Challenged Policies Preserve Strong Economies Driven by Immigrants...... 14

      A.    Local governments with "sanctuary" policies have stronger
            economies. ........................................................................................... 14

      B.    Colorado immigrants without documentation pay taxes that fund
            state and local government and public services. ................................ 15

      C.    If Colorado and Denver are required to assist with the federal
            government's mass deportations, families and the economy will
            suffer. ................................................................................................... 16

CONCLUSION ........................................................................................................ 18

**ARGUMENT**

The challenged laws are entirely consistent with the United States Constitution. They are also good government policy. Colorado's laws make our state more safe, not less. Crime rates in metro Denver and Colorado have been on a material decline since late 2022. Chase Woodruff, *After Months of Deportation Rhetoric, Trump's First Hours in Office Put Aurora on Edge*, Colo. Newsline (Jan. 21, 2025), https://perma.cc/693P-SZN6. President Trump's repeated claims that Aurora was "taken over" by gang members was rejected by Aurora's own Republican mayor, former U.S. Representative Mike Coffman, as "grossly exaggerated.*"* Chase Woodruff, *How False Claims of a 'Complete Gang Takeover' Drew Trump to Aurora*, Colo. Newsline (Oct. 11, 2024), https://perma.cc/492A-5HD9; Irie Sentner, *Trump Calls Aurora a 'War Zone.' Even its Republican Mayor Disagrees*, Politico (Oct. 12, 2024), https://perma.cc/5WDS-T97B. This Court should reject the claims in the Amended Complaint with the same vigor. The federal government's lawsuit should be seen for what it is: another publicity stunt to scapegoat hardworking immigrants seeking a better life for themselves and their families.

As the Colorado and Denver Defendants have explained in their own briefing, the Constitution reserves broad "police powers" to the states that include the authority to direct the activities of law enforcement officers. The term "police powers" does not refer solely to an abstract legal concept, but to actions that state and local policymakers take to protect the health, safety, and welfare of their residents. The State of Colorado, the General Assembly, and the City and County of Denver determined that law enforcement participation in civil immigration enforcement did not serve these interests. Contrary to the federal government's

1

allegations, Colorado and Denver did not make these decisions out of malice for the federal government or to thwart immigration enforcement, but for sound public policy reasons supported by evidence.

The ACLU-CO submits this brief to describe some of the reasons why jurisdictions like Colorado and Denver choose to limit their law enforcement agencies' participation in immigration enforcement. First, the challenged policies protect public safety and the functioning of state government by mitigating the fear that reporting a crime, showing up to court, or cooperating with police will lead to someone's deportation. Such policies also ensure that local law enforcement agencies can allocate scarce resources for their core mission of enforcing criminal law. Second, by guarding against constitutional violations, such as holding people in jail past their release date or engaging in questionable immigration enforcement tactics, the challenged policies protect Coloradans' liberties while limiting state and local officers' exposure to liability. Finally, the challenged policies protect the substantial contributions that immigrants make to the tax base and overall economic well-being of our communities.

## I.    The Challenged Policies Protect Public Safety and the Functioning of State Government.

Colorado's police power "is an inherent attribute of sovereignty with which the state is endowed for the protection and general welfare of its citizens." *Town of Dillon v. Yacht Club Condos. Homeowners Ass'n*, 325 P.3d 1032, 1038-39 (Colo. 2014). Under Colorado law, municipalities like Denver also "have broad police powers, including the power to establish laws that promote the health, safety, and welfare of citizens." *Id.* Colorado and Denver wisely exercised their police powers in adopting the challenged laws, which evidence and experience have taught are crucial for the safety and well-being of Coloradans and the functioning of state

2

and local government.

**A. The challenged policies help alleviate reluctance to work with law enforcement due to fear of immigration consequences.**

Like state and local governments in other parts of the country, Colorado and Denver have reasonably determined that "their local law enforcement efforts are handcuffed by … unbounded cooperation with immigration enforcement. They have concluded that persons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home." *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part on other grounds,* 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated,* 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). They passed the challenged laws to mitigate that public safety risk.

Denver's challenged Executive Order No. 142, for example, observed that "[l]ocal government's ability to protect and serve all people is enhanced when community members feel safe coming forward as either a victim of or witness to a crime, regardless of their legal status." It expressly sought to "promot[e] public safety through community trust," to "[f]oster[] respect and trust between community members and all City officials, including law enforcement," and "[t]o protect victims and witnesses of crime and hold violent offenders in our community accountable."

Likewise, the General Assembly passed House Bill 19-1124, which initially codified several of the challenged statutes, in part to advance public safety by promoting trust between law enforcement agencies and communities. *See* H.B. 19-1124, § 1(1)(c), 2019 Colo. Sess.

3

Laws 2759 ("Any requirement that public safety agencies play a role in enforcing federal civil immigrations laws can undermine public trust"); *see also id.* at §1(1)(f), Colo. Sess. Laws 2759–60 ("In times of crisis, Colorado courts are the main points of contact for the most vulnerable, including crime victims, victims of sexual abuse and domestic violence, witnesses to crimes who are aiding law enforcement, limited English speakers, unrepresented litigations, and children of families, who seek justice and due process"). As one of the bill's prime sponsors explained, "Everyone in this state should have unfettered access to justice, meaning if we see something happening, we should not be afraid to call 911. We shouldn't be afraid if we're a victim to reach out to law enforcement. And if people are afraid to do that, that hurts us all. It makes it unsafe in our communities for us all." *Hearing on H.B. 19-1124 Before the H. Comm. on State, Veterans & Mil. Affs.*, 71st Gen. Assemb. (Mar. 28, 2019) (statement of Rep. Adrienne Benavidez); s*ee also Hearing on H.B. 19-1124 Before the S. Comm. on State, Veterans & Mil. Affs.*, 71st Gen. Assemb., (Apr. 30, 2019) (statement of Sen. Mike Foote) ("When it comes to interacting with law enforcement, every person in our community should feel safe and should be able to speak with police, call the police, interact with the court system if they need to, and not worry about that particular police officer, police agency, or probation agency turning over documented or undocumented status to the immigration and customs enforcement agency").

Indeed, the challenged laws were adopted to ameliorate specific harms the state and city endured—both to public safety and to the functioning of their justice systems—under earlier legal schemes that actively involved local government in federal immigration enforcement. Prior to passage of H.B. 19-1124, for example, guidance from the State Court Administrator directed local probation officers to notify ICE whenever a person sentenced to probation was

born outside the United States. *See* Allison Sherry, *Immigration Advocates Argue New Probation Guidance Turns the Courts into 'ICE's Lackey'*, CPR News (Feb. 22, 2018), https://perma.cc/22D8-6FHV. Some counties, including Denver, provided ICE specific guidance on how to carry out arrests at probation appointments. *Id.* Under these policies, many immigrants missed appointments out of fear of placing themselves in legal jeopardy, thwarting the rehabilitation goals of probation and preventing restitution for victims. Colorado statutory provisions ending these practices were a direct response to this prior experience of frustrated state ends. *See* C.R.S. § 24-76.6-103(1)(a); *see also H.B. 19-1124 S. Comm. on State, Veterans & Mil. Affs.* (statement of Sen. Mike Foote) ("[If immigrants feel unsafe to go to probation appointments,] we're going to have people who are not interacting with the court system or not interreacting with law enforcement, and this can lead to victimization and people not being rehabilitated under the circumstances."). In describing this period, Denver's Office of Immigrant and Refugee Affairs similarly observed that under the state's earlier laws requiring local law enforcement to report suspected noncitizens to ICE, "any interaction with local law enforcement could and did lead to deportation . . . [t]his resulted in immigrants not wanting to interact with local law enforcement, including hesitancy in reporting crimes due to profiling." Denver Off. of Immigr. & Refugee Affs., *A Historical Perspective: Understanding Denver Immigration Policies* at 4 (2023), https://perma.cc/84HS-CYDQ.

More recently, the General Assembly passed S.B. 25-276 to address threats to public safety and the functioning of state and local government institutions from local officers' continued contributions to federal civil immigration enforcement. S.B. 25-276, 2025 Colo. Sess. Laws 1209. For example, the bill sought to contain the harm wrought by the loose disclosure

of Coloradans' personal information. The bills' prime sponsors emphasized that practice's chilling effect on individuals' and families' participation in public life in our state, including schooling, describing "declining students' attendance rates as families hide in fear." *Hearing on S.B. 25-276 Before the H. Comm. on Judiciary*, 75th Gen. Assemb. (Apr. 28, 2025) (statement of Rep. Elizabeth Velasco); *see also id.* ("Right now our neighbors are afraid . . . taking their children to school, going to the doctor, or cooperating with authorities."); *see also id.* (statement of Rep. Lorena García) ("people . . . continue to be afraid to access everyday critical public services."). They further described the ripple effects to communal safety "when an immigrant refuses to come to court to testify as a victim or a witness," or "if a tenant is afraid to enter the courthouse and respond to a landlord's court petition." *Id.* (statement of Rep. Elizabeth Velasco). In light of these impacts throughout the state, S.B. 25-276 sought to "continue rebuilding communities' trust in the vital institutions that add to the safety and quality of life for all" Coloradans. *Id.*

The challenged policies are supported not only by local lived experience, but empirical evidence that fostering cooperation between police and immigrant communities drives down crime. A 2012 survey of Latine respondents demonstrates that the fear of immigration consequences deters undocumented immigrants, and many Latine people overall, from providing information to police. For example, 45% of Latine individuals, and 67% of those without status, stated that they are less likely to voluntarily offer information about crimes or to report a crime because they are afraid the police will ask them or people they know about their immigration status. Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigrant Enforcement* 5-6, University of Illinois at Chicago (May 2013),

https://perma.cc/54C6-N52F.

Consistent with these findings, overall crime rates are higher in counties where local law enforcement honor ICE detainers than in similar counties with so-called "sanctuary" policies. Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress 5 (Jan. 26, 2017), https://perma.cc/72R5-AUA3 ("*The Effects of Sanctuary Policies*"). Significantly, "sanctuary practices are associated with a decrease in both property crime and violent crime within counties over time." Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States,* 106 Soc. Sci. Rsch. 102743 (Aug. 2022).

The challenged policies are particularly important tools for addressing domestic and gender-based violence in the state. Immigrant women are particularly vulnerable to such violence due to factors like language barriers, lack of familiarity with available support systems, and fear of police based on experiences in their country of origin. Michael Runner, *et al*., Fam. Violence Prevention Fund, *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations*, Robert Wood Johnson Found. 11 (Mar. 2009), https://perma.cc/R25J-E6LC; *see S.B. 25-276 H. Judiciary Comm. Hearing* (statement of Rep. Elizabeth Velasco) (domestic violence victims, whether documented individuals or not, need access to our civil justice system for orders of protection and similar relief). Moreover, some abusers threaten their victims with deportation if they disclose the abuse. Robert Wood Johnson Found., *supra*, at 12. Thus, "the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation." *Chicago*, 888 F.3d at 280. Given that reluctance, it is

7

unsurprising that "the adoption of sanctuary policies is accompanied by a lower rate of domestic homicides involving a female *Hispanic* victim." Catalina Amuedo-Dorantes & Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence*? at 5, 2022 Am. L. & Econ. Rev. 116 (2020), https://perma.cc/A39R-CFC4.

### B. The challenged policies preserve law enforcement resources for enforcing criminal law.

In addition to encouraging trust and cooperation between law enforcement and immigrant communities, the challenged policies protect public safety by ensuring that state and local law enforcement agencies focus on their core mission: enforcing criminal law. Indeed, "data suggest that when local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, communities are safer[,] and community members stay more engaged in the local economy." *The Effects of Sanctuary Policies*, *supra*, at 2.

"The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities." *Chicago*, 888 F.3d at 282. The crime rate among immigrants – whether documented or not – is the same or *lower* than that of citizens. *Debunking the Myth of Immigrants and Crime*, Fact Sheet, Am. Immigr. Council (Oct. 2024) (citing studies), https://perma.cc/B97Q-DR9C; Michael T. Light, et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 Proc. Nat'l Acad. Sci. USA 51 (Dec. 7, 2020). And the experience in Denver during the time of mandated reporting to ICE was that the majority of people held on an immigration detainer were charged with misdemeanor and lower-level offenses. Colo. Fiscal Inst., *Misplaced*

8

*Priorities: SB 90 and the Cost to Local Communities*, https://perma.cc/N73F-T55W. Colorado and Denver have reasonably determined that rather than holding immigrants past their required release dates, law enforcement resources are better expended investigating crimes and apprehending suspects, regardless of their immigration or citizenship status.

Indeed, a study by the Colorado Fiscal Institute on the fiscal impacts of SB90 (a law that had, for half a decade, required local law enforcement to report to ICE), found that Colorado had been spending "upwards of $13 million per year to enforce federal immigration laws – more than it would cost to put an additional 200 additional police officers or sheriff's deputies on the street." *Id.* It further found that "[t]he City and County of Denver alone pays up to $1.5 million per year to arrest and detain suspected undocumented immigrants." *Id.* That equated to "the same amount of general fund money allocated to the Denver District Attorney's Office for the Family Violence Unit, which screens and prosecutes cases of family violence ranging from spousal or intimate partner abuse to elder abuse and child sexual assault – a public safety service that provides an on-call staff that responds to child fatalities 24-hours a day, seven days a week." *Id.* The study observed that, in 2013, "[i]n an era of budget deficits, reduced services, hiring freezes and cuts across the board, local governments must allocate precious resources to arresting, reporting and detaining suspected undocumented immigrants charged with low-level crimes." *Id.*

The challenged laws sought to correct this misallocation of resources. In enacting the 2013 law that repealed S.B. 90, the Colorado legislature found that

> [b]y repealing requirements that local officials be compelled to participate in federal immigration issues, the general assembly can ensure that local resources are focused on public safety issues instead of on immigration issues that are the responsibility of the federal government. This will save local governments a significant amount of time,

energy, and resources.

Colo. H.B. 1258, 2013 Colo. Sess. Laws 477. These concerns remained top-of-mind in the

passage of the later-adopted challenged laws. *See, e.g., S.B. 25-276 H. Judiciary Comm.*

*Hearing* (statement of Rep. Elizabeth Velasco) ("The cost of civil immigration enforcement on

local resources—detaining people for civil immigration violations strains our local resources…

every dollar spent on civil immigration enforcement is a dollar that isn't spent on real public

safety efforts."). The challenged statutes keep law enforcement resources focused where they

belong: on public safety.

### C. The Government's claim that the challenged policies make Americans less safe is wrong.

Despite the evidence that the challenged policies enhance public safety, the United

States repeatedly asserts that they are dangerous. *See, e.g.*, Dkt. 31 ¶¶ 2, 8, 9, 10. The United

States identifies no facts that support their overblown rhetoric about the danger posed by the

challenged policies, relying instead on conclusory statements by political spokespeople. *See,*

*e.g., id.* ¶¶ 8-9.

The Teller County sheriff made similar unfounded claims in a recently resolved lawsuit

that the ACLU of Colorado won in challenging the lawfulness of the office's 287(g) agreement

with ICE. *Nash v. Mikesell*, 557 P.3d 369 (Colo. App. 2024). The sheriff argued that applying

the statutes that the United States challenges in this case to limit his agreement with ICE would

interfere with his statutory duty to "keep and preserve the peace" in the county. That argument

crumbled when put to the evidence at trial. As recognized by the Colorado Court of Appeals,

the sheriff "testified he was able to fulfill his statutory peacekeeping duties before [the]

Agreement. [The Sheriff] also didn't have any [officers] performing functions under that 287(g)

agreement for a time. And [the Sheriff] testified that he couldn't remember any issues with his ability to perform his duties during the time [his office] didn't have any [officers] performing immigration officer functions under [the 287(g)] Agreement." *Nash*, *Id.* at 378. Based on the trial record, the court concluded that "[n]one of the provisions of sections 24-76.6-101 and -102 prevent sheriffs from keeping and preserving the peace in their jurisdictions." *Id.* at 379.

Colorado treats immigrants accused of violent crimes just like all others so charged. They are arrested, detained, and brought before a judge to determine their disposition pending trial. Bail and conditions of release are set "to reasonably ensure the appearance of the person as required and to protect the safety of any person or the community, taking into consideration the individual characteristics of each person in custody," C.R.S. § 16-4-103(3)(a), with some ineligible for pretrial release, *id.* § 101. As these provisions demonstrate, Colorado and Denver do not release immigrants—or other defendants—who are accused of serious crimes willy-nilly.

Further, research indicates that "sanctuary" policies do not reduce deportations of people who have been convicted of violent offenses. Across several different statistical models, "sanctuary policies have *no effect* on deportations of people convicted of violent crimes, and sanctuary policies have the largest effect on deportations of people who were never convicted of any crime and do not increase crime rates in sanctuary jurisdictions." David K. Hausman, *Sanctuary Policies Reduce Deportations Without Increasing Crime*, PNAS vol. 117 no. 44 (Nov. 3, 2020), https://perma.cc/N2CE-JWSS.

## II.    The Challenged Policies Help Ensure that Colorado Law Enforcement Officers Act According to the Constitution and State Law.

In addition to advancing public safety, the challenged policies help state and local law

enforcement officers stay within the bounds of the Constitution and state law. Proponents of the statutes understood that complying with detainers often creates liability for local law enforcement agencies. As one sponsor of H.B. 19-1124 noted, when state and local law enforcement officers are "continuing to hold someone after they should be released, [that] is a violation of law, and the courts have said we cannot do that." *H.B. 19-1124 H. Comm. on State, Veterans & Mil. Affs. Hearing*, (statement of Rep. Adrienne Benavidez). The statute thus clarified the scope of law enforcement's authority when dealing with immigration detainers. *See id.* (written comments of Boulder County Sheriff Joe Pelle) ("[T]his bill would help keep Colorado Counties and the Sheriffs out of constitutional legal issues regarding immigration detention, while still allowing for legal detention and transfer based upon a warrant or a writ, (just like any other state or local case would require)."). Many courts have found that local governments have violated the Fourth Amendment when they detained someone based solely on an ICE detainer request. *See Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018) (plaintiff plausibly alleged county violated the Fourth Amendment by holding him based solely on an ICE detainer); *C.F.C. v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1236 (S.D. Fla. 2018) (same); *Abriq v. Hall*, 295 F. Supp. 3d 874 (M.D. Tenn. 2018) (same); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934 (D. Minn. 2017) (detention based solely on immigration detainer violated Fourth Amendment absent probable cause to believe plaintiff was likely to escape); *Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D.R.I. 2014), *aff'd in part, dismissed in part,* 793 F.3d 208 (1st Cir. 2015) (plaintiff stated a Fourth Amendment claim against state for detaining him without probable cause based on a detainer request); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791 (N.D. Ill. 2014) (plaintiff stated a Fourth Amendment claim against village for

continuing to hold him based on ICE detainer after he posted bond for traffic violation). Many local jurisdictions have paid large settlements to plaintiffs who were held pursuant to a detainer. *See Local Jurisdictions Remain Legally Vulnerable for Honoring ICE Detainers*, ACLU (Feb. 3, 2020), https://perma.cc/R6DG-VQ5P (listing cases); Luis Ferré-Sadurní, *New York City to Pay $92.5 Million to Improperly Detained Immigrants*, N.Y. Times (Dec. 18, 2024), https://perma.cc/492V-XMWT. These practices also expose officers to liability under the Colorado Constitution. Two Colorado sheriffs have already been sued under our state constitution's arrest and bail provisions for holding persons past their release dates on the basis of ICE requests. *Nash v. Mikesell*, 557 P.3d 369 (Colo. App. 2024); *Cisneros v. Elder*, No. 18CV30549, 2018 WL 7199167 (El Paso Cty. Colo. Dist. Ct. Dec. 6, 2018). Under Colorado law, any Colorado law enforcement officer who causes the violation of a right protected under the Colorado Constitution is subject to liability for damages and attorneys' fees including potential personal liability up to $25,000, and their employer is generally obligated to satisfy the full amount of any uncollectible judgment. C.R.S. § 13-21-131(4)(a). The challenged policies help limit this potential liability.

Already in 2025, ICE and DHS have been sued for countless alleged constitutional violations, including here in Colorado, such as summarily removing Venezuelan nationals to El Salvador without due process, *D.B.U. v. Trump*, No. 1:25-cv- 01163 (D. Colo. filed Apr. 12, 2025); unlawfully expanding the power of "expedited removal," *Make the Road N.Y. v. Huffman*, No. 1:25-cv-00190 (D.D.C. filed Jan. 22, 2025); removing immigrants to a military facility at Guantánamo Bay, Cuba, *Las Americas Immigr. Advocacy Center v. Noem*, No. 1:25-cv-00418 (D.D.C. filed Feb. 12, 2025); detaining and attempting to deport a lawful permanent

resident without due process in retaliation for his constitutionally protected speech, *Khalil v. Joyce*, No. 2:25-cv-01963 (D.N.J. filed Mar. 9, 2025); and many, many more. Overall, there are dozens of pending lawsuits against the federal government for constitutional violations associated with immigration enforcement. *See* Civil Rights Litigation Clearinghouse, Univ. of Mich, *Special Collection: Trump Administration 2.0: Challenges to the Government*, https://clearinghouse.net/ collections/38759. Regardless of the outcomes of these lawsuits, Colorado and Denver have good reason to eliminate the risk of state and local involvement in these allegedly unlawful activities—along with the litigation and liability risks that come with them.

III.    **The Challenged Policies Preserve Strong Economies Driven by Immigrants.**

      A.  **Local governments with "sanctuary" policies have stronger economies.**

      One nationwide study, comparing counties that assisted federal immigration enforcement with those that did not, concluded that "[e]conomies are stronger in sanctuary counties – from higher median household incomes, less poverty, and less reliance on public assistance to higher labor force participation, higher employment-to-population ratios, and lower unemployment." *The Effects of Sanctuary Policies*, *supra,* at 3. On average, for counties with so-called "sanctuary" policies, the median household income was $4,353 higher, the poverty rate 2.3% lower, and the unemployment rate 1.1% lower. *Id.* at 1.

      Poverty was statistically significantly lower for counties with such policies. *Id.* at 7. And the percentage of people living at or below the federal poverty line was on average 1.4% lower for white people and 2.9% lower for Latine people. *Id.* at 8. These counties also had 4.9% fewer households relying on public assistance. *Id.*

14

**B. Colorado immigrants without documentation pay taxes that fund state and local government and public services.**

Colorado immigrants without documentation are notable members of the economy. Immigrants without documentation pay sales and excise taxes on their purchases, property taxes on their homes and as renters, and personal and business income taxes. These taxes fund public services provided by states and local governments. In 2022, nationwide, immigrants without documentation contributed an estimated $37.3 billion in state and local taxes. Carl Davis, Marco Guzman, & Emma Sifre, *Tax Payments by Undocumented Immigrants,* Institute on Taxation and Economic Policy 3 (July 30, 2024) https://perma.cc/Z64N-RRMA. Indeed, in Colorado, these noncitizens paid higher tax rates than the top 1% of our income scale. *Id.* at 20.

In Colorado, immigrants without documentation provided an estimated $436.5 million in state and local tax revenue, which includes $184.7 million in sales and excise taxes, $142.7 million in property taxes, and $104.3 million in personal and business income taxes. *Id.* at 14. This revenue funds government operations and public services. For example, Colorado uses its tax revenue to pay for public services, including K-12 and higher education, social services, healthcare, including Medicaid, correctional facilities, and state courts and probation services. Colo. Gen. Assemb., *Explore the Colorado State Budget*, https://perma.cc/V2N4-86HD. Similarly, Denver uses its tax revenue to pay for services like affordable housing, capital projects, and public safety. See Denver Budget and Mgmt. Off., *Your Taxpayer Receipt*, https://perma.cc/6B4E-H484. The proponents of the challenged laws recognized these contributions. *See, e.g.*, *S.B. 25-276 H. Judiciary Comm. Hearing* (statement of Rep. Lorena García) (acknowledging that noncitizens represent "an essential part of Colorado's economic,

cultural, and social fabric").

**C. If Colorado and Denver are required to assist with the federal government's mass deportations, families and the economy will suffer.**

Following President Trump's Executive Orders and threats to deport all immigrants regardless of criminal background, immigrants in Colorado stopped going to work and pulled children out of school. *See* Caitlyn Kim, *Rumors of Immigration Arrests Spread Across Colorado, But Details are Unclear*, CPR News, (Jan. 24, 2025), https://perma.cc/YEY3-YMXC; *Immigration Enforcement Impacts Construction Companies in Colorado*, CBS Colorado, (Feb. 15, 2025), https://www.cbsnews.com/colorado/video/immigration-enforcement-impacts-construction-companies-in-colorado/; Gabriela Vidal, *Migrant Families Fear Sending Their Kids to Colorado School Amid Immigra*tion Concerns, CBS Colorado, (Jan. 27, 2025), https://perma.cc/2L2A-XGYQ. Even months later, immigrants are staying home. *See* Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times (Mar. 9, 2025), https://perma.cc/FWQ5-GD9G.

"Immigrants power Colorado's economy." Colo. Fiscal Inst., *Immigrants Power Colorado's Economy* (2025), https://perma.cc/T62W-M7QN. Immigrants make up 15% of Colorado business owners and 11.5% of Colorado's workforce, and immigrant labor power generates state GDP across industries, including agriculture, forestry, fishing, hunting, mining, construction, manufacturing, trade, transportation, warehousing, utilities, information, finance, insurance, real estate, rentals, leasing, professional services, scientific services, management services, administrative services, waste management services, educational services, health care, social assistance, arts, entertainment, recreation, accommodation services, food services, and public administration. *Id.* The same is true in Denver, where immigrants make

up 15% of the local workforce and 16% of local business owners. Colo. Fiscal Inst., *Immigrants Power Denver County's Economy* (2025), https://perma.cc/5XBP-KED4. Collectively, these workers and business owners generate $54 billion of economic output. Colo. Fiscal Inst., *Immigrants Are a Vital Part of Colorado's Future* (2025), https://perma.cc/FX3W-SRBH.

Colorado and Denver are right to opt out of assisting in the detention and deportation of these vital members of their communities and economies. Given their contributions, detaining or deporting just 1 in 10 undocumented Coloradans would result in an estimated loss of at least $43.6 million in state and local tax revenue. David Dyssegaard Kallick, Shamier Settle & Shana McClain, *The Economic and Fiscal Impacts of Mass Deportation: What's at Risk in Colorado*, Immigr. Rsch. Initiative & Colo. Fiscal Inst. (2025), https://perma.cc/R3WH-EGXGf. The loss of so many workers from the labor force would increase the cost of living for all Coloradans, cause businesses to downsize, and reduce the number of jobs available for U.S.-born workers. *Id.; see also See* Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation,* Univ. of New Hamp., Casey Sch. of Pub. Pol'y 8 (Aug. 29, 2024), https://perma.cc/2C3Z-THTP (describing economists' estimation that mass deportations would lead to loss of jobs for immigrants and U.S. citizens, less produced goods and services, and a loss of tax revenue). We have seen this happen: under the Secure Communities program, the federal government deported 420,000 people from 2010-2015, resulting in the loss of 400,000 jobs for noncitizens and 600,000 jobs for citizens. *See* Chloe N. East, et al., *The Labor Market Effects of Immigration Enforcement,* IZA Inst. of Labor Econ., 26–27 (2018), https://perma.cc/MQW6-XGLL; *S.B. 25-276 H. Judiciary Comm. Hearing* (statement of Rep. Lorena García) ("Research shows that for every 500,000

immigrants deported, 44,000 U.S.-born workers lose their jobs."). In Colorado, our farming, restaurant, construction, and home and office service sectors would be especially hard-hit. *Id.*

And these predictions underestimate the damage, as they do not account for the disruption of raids and other tactics to businesses and communities, the impacts to family members who lose a breadwinner, or the costs to the foster care system for children who wind up without parents in the United States. *Id.* When breadwinners are detained or deported, the loss of income can make families struggle to pay rent or mortgages, utilities, and pay for food and medicine. *See* Akash Pillai, et al., *Potential Impacts of Mass Detention and Deportation Efforts on the Health and Well-Being of Immigrant Families,* KFF (Feb. 6, 2025). https://perma.cc/ZK3C-YDMG. Separation of families causes direct health impacts, including depression, worsening chronic conditions, and the inability to pay for health care. *Id.* In Colorado, an estimated 276,589 people, and 130,958 children, live with at least one family member without documentation. *See* Silva Mathema, *State-by-State Estimates of Family Members of Unauthorized Immigrants,* Center for Am. Progress (Mar. 16, 2017), https://perma.cc/2GBW-QGCY. Our state and local governments should not be assisting in tearing our communities apart.

Given the quantifiable economic risks of participating in federal immigration enforcement—not to mention its brutal social and humanitarian costs, the challenged laws are not just lawful, they are demonstrably good governance.

## CONCLUSION

For the foregoing reasons, *Amicus* ACLU-CO respectfully urges the Court to grant Defendants' Motions to Dismiss.

Dated: Sept. 2, 2025                    Respectfully submitted,


                                        /s/ Timothy R. Macdonald
                                        Timothy R. Macdonald
                                        Sara R. Neel
                                        Anna Kurtz
                                        American Civil Liberties Foundation of Colorado
                                        303 E. 17th Avenue, Suite 350
                                        Denver, CO 80203
                                        Telephone:    720.402.3151
                                        tmacdonald@aclu-co.org
                                        sneel@aclu-co.org
                                        akurtz@aclu-co.org