BRETT A. SHUMATE
Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division
ELIANIS N. PEREZ
Assistant Director
CATHERINE M. RENO
Senior Litigation Counsel
VICTORIA TURCIOS
Trial Attorney
Office of Immigration Litigation

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his Official Capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his Official Capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,<br><br>                Defendants. | Case No. 1:25-cv-1391-GPG-KAS |

## PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

   I. Principles of Dual Sovereignty ......................................................................... 3

   II. Federal Immigration Law ................................................................................. 5

   III. Challenged Sanctuary Laws .......................................................................... 9

      A.  Colorado ............................................................................................... 9

      B.  City and County of Denver .................................................................... 14

   IV. Procedural History ....................................................................................... 16

STANDARD OF REVIEW .................................................................................. 17

ARGUMENT .................................................................................................... 17

   I. Federal Law Preempts the Sanctuary Laws (Count One) .............................. 17

      A.  Federal Law expressly preempts the Sanctuary Laws' information-sharing
         provisions ............................................................................................. 17

      B.  Federal Law impliedly preempts the Sanctuary Laws. ........................... 26

      C.  The Tenth Amendment is not implicated. ............................................... 33

   II. The Sanctuary Laws Unlawfully Discriminate Against the Federal Government
      (Count Two) .................................................................................................. 40

   III. The Sanctuary Laws Unlawfully Regulate the Federal Government (Count
      Three) ......................................................................................................... 46

   IV. The Proper Defendants Are Named In This Suit. ........................................... 50

CONCLUSION ................................................................................................. 53

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012)........................................................passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................................................ 17

*Berger v. New York*, 388 U.S. 41 (1967) ........................................................................ 47

*Brown v. City of Tulsa*, 124 F.4th 1251 (10th Cir. 2025)............................................ 51, 52

*Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001) .............................................. 40

*Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231 (10th Cir. 2013) ............. 17

*California v. Superior Ct. of California*, 482 U.S. 400 (1987) ........................................... 3

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999).................... 32, 33, 34, 35

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023)............................. 17

*Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020)....................................... 20

*Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115 (2016) ............................. 40

*CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3rd Cir. 2025) .. 41, 42, 44, 49

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).................................. 26, 28

*Cunningham v. Neagle*, 135 U.S. 1 (1890)...................................................................... 47

*Davis v. Elmira Sav. Bank*, 161 U.S. 275 (1896). ......................................................... 32

*Dawson v. Steager*, 586 U.S. 171 (2019) ................................................................ 41, 43

*Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008) ......................................... 4

*Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) ..................................... 17

*EagleMed LLC v. Cox*, 868 F.3d 893 (10th Cir. 2017) ................................................... 40

*Ex parte Young*, 209 U.S. 123 (1908)........................................................ 50, 51, 52, 53

i

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)................................. 20

*Franks v. Delaware*, 438 U.S. 154 (1978) ...................................................................... 31

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)......................................................... 26

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ....................................... 39

*Galvan v. Press*, 347 U.S. 522 (1954) .......................................................................... 27

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) ................................................ 49

*Gundy v. United States*, 588 U.S. 128 (2019) ............................................................... 20

*Hines v. Davidowitz*, 312 U.S. 52 (1941)..................................................... 27, 28, 30, 34

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981)............ 37

*Hughes v. Oklahoma*, 441 U.S. 322 (1979).................................................................... 39

*Kentucky v. Dennison*, 65 U.S. 66 (1860)........................................................................ 4

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ........................... 19, 20, 22

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ..................................................... 48

*Loughrin v. United States*, 573 U.S. 351 (2014) ........................................................... 20

*Mayo v. United States*, 319 U.S. 441 (1943) ................................................................. 46

*McCulloch v. Maryland*, 17 U.S. 316 (1819) .................................................................. 46

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022).............................................. 41, 45

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................................... 18

*Murphy v. NCAA*, 584 U.S. 453 (2018)............................................................ 3, 4, 32, 36

*Nash v. Fla. Indus. Comm'n*, 389 U.S. 235 (1967) ........................................................ 32

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ........................................................... 30

*New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010) ........... 33

*New York v. U.S. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020)................................... 33, 38

*New York v. United States*, 505 U.S. 144 (1992)........................................................... 35

*Nielsen v. Preap*, 586 U.S. 392 (2019) ...................................................................... 8, 29

*North Dakota v. United States*, 495 U.S. 423 (1990) ..................................................... 41

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ......................................................... 28

*P. Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190
    (1983) ........................................................................................................................ 17

*Patel v. Garland*, 596 U.S. 328, (2022) ........................................................................ 19

*Perez v. Cambell*, 402 U.S. 637 (1971) ........................................................................ 39

*Printz v. United States*, 521 U.S. 898 (1997) ................................................................ 35

*Puerto Rico v. Branstad*, 483 U.S. 219 (1987) .............................................................. 4

*Russello v. United States*, 464 U.S. 16 (1983) ........................................................ 22, 30

*Sable v. Myers*, 563 F.3d 1120 (10th Cir. 2009) ........................................................... 53

*South Carolina v. Baker*, 485 U.S. 505 (1988) ............................................................. 34

*Steinle v. City and Cnty. of San Francisco*, 919 F.3d 1154 (9th Cir. 2019) .................... 20

*Truax v. Raich*, 239 U.S. 33 (1915) .............................................................................. 27

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) .............................. 19

*United States v. California*, No. 2:18-cv-721-WBS-DB, 2018 WL 5780003 (E.D. Cal.
    Nov. 1, 2018) ............................................................................................................ 44

*United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993) ..................................... 46, 48

*United States v. Herrera*, 51 F.4th 1226 (10th Cir. 2022) ............................................. 20

*United States v. Illinois*, No. 25-cv-01285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) . 20

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024) ................................. passim

*United States v. Locke*, 529 U.S. 89 (2000) ................................................................. 40

*United States v. Washington*, 596 U.S. 832 (2022) ...................................................... 41

*United States v. Whiting*, 563 U.S. 582, 587 (2011) ............................................... 20, 27

## Constitutional Provisions

U.S. Const. amend X ................................................................................................ 4, 33

U.S. Const. art. I, § 8, cl. 4 ...................................................................................... 1, 40

U.S. Const. art. I, § 10 ................................................................................................ 4

U.S. Const. art. VI, cl. 2 ...................................................................................... 1, 2, 4, 33

## Federal Statutes

8 U.S.C. § 237(a)(1)(C) .............................................................................................. 47

8 U.S.C. § 237(a)(1)(D) .............................................................................................. 47

8 U.S.C. § 1101 ............................................................................................................ 5

8 U.S.C § 1101(a)(15) ................................................................................................ 38

8 U.S.C. § 1103(a)(3) .................................................................................................. 6

8 U.S.C. § 1103(a)(11) ............................................................................................ 5, 44

8 U.S.C. § 1182 ..................................................................................... 5, 28, 31, 38, 44

8 U.S.C. § 1225 .......................................................................................... 5, 28, 31, 44

8 U.S.C. § 1226 ...................................................................................................... 8, 29

8 U.S.C. § 1226(a) ..................................................................................... 5, 7, 28, 29

8 U.S.C. § 1226(c) ..................................................................................... 7, 8, 29

8 U.S.C. § 1226(d)(1)(A) ............................................................................................. 7

8 U.S.C. § 1226(f) ................................................................................................... 9, 29

8 U.S.C. § 1227(a)(1)(C) ............................................................................................ 21

8 U.S.C. § 1229a .................................................................................................... 5, 44

8 U.S.C. § 1231 ................................................................................... 8, 28, 29, 44

8 U.S.C. § 1231(a) ...................................................................................................... 6

8 U.S.C. § 1231(a)(4)(A) ................................................................... 6, 21

8 U.S.C. § 1231(g) ............................................................................ 5, 44

8 U.S.C. § 1305 ...................................................................................... 21

8 U.S.C. § 1306 ...................................................................................... 21

8 U.S.C. § 1357(g)(1) ............................................................................ 49

8 U.S.C. § 1373(a) ........................................................................... passim

8 U.S.C. § 1373(c) ........................................................................... 19, 20

8 U.S.C. § 1644 ............................................................................... passim

30 U.S.C. § 1201 .................................................................................... 37

49 U.S.C. App. § 1305(a)(1) (1988 ed.) ................................................ 18

## Federal Regulations

8 C.F.R. § 274a.12 .................................................................................. 21

8 C.F.R. § 287.7 ....................................................................................... 9

8 C.F.R. § 287.7(a) ................................................................................... 6

## State and Local Laws

C.R.S. § 13-1-403(1) (2020) .............................................................. 13, 14

C.R.S. § 24-72-204(7) ............................................................................ 23

C.R.S. § 24-72-204(7)(a) ........................................................................ 11

C.R.S. § 24-72-204(7)(b)(I) ............................................................... 11, 43

C.R.S. § 24-74-101 ................................................................................. 10

C.R.S. § 24-74-102 ...................................................................... 10, 11, 23

C.R.S. § 24-74-103 ........................................................................... passim

C.R.S. § 24-74-104 ................................................................................................... 11

C.R.S. § 24-74-105 ................................................................................... 26, 30, 42, 44

C.R.S. § 24-74-106 ................................................................................................... 10

C.R.S. § 24-74-107 ................................................................................................... 42

C.R.S. § 24-74-108 ............................................................................................. 10, 11

C.R.S. § 24-74.1-101 ..................................................................................... 12, 13, 26

C.R.S. § 24-74.1-102 ........................................................................................... 12, 26

C.R.S. § 24-74.1-103 ..................................................................................... 12, 13, 26

C.R.S. § 24-76.6-101 ................................................................................. 9, 22, 26, 44

C.R.S. § 24-76.6-102 ......................................................................................... passim

C.R.S. § 24-76.6-103 ......................................................................................... passim

C.R.S. § 24-76.7-101 ..................................................................................... 12, 47, 49

C.R.S. § 24-76.7-102 ..................................................................................... 12, 47, 49

C.R.S. § 24-76.7-103 ..................................................................................... 12, 47, 49

C.R.S. § 42-1-206 ..................................................................................................... 11

C.R.S. § 42-1-206(3.5) ................................................................................... 12, 23, 30

D.R.M.C. § 28-250 ............................................................................................. passim

D.R.M.C. § 28-251 ........................................................................................... 15, 44

D.R.M.C. § 28-252 ................................................................................. 15, 31, 42, 43, 44

D.R.M.C. § 28-253 ............................................................................................. passim

## Other Authorities

Denver Code of Ordinances, Title I, Subtitle B, art. III, part 2, § 3.2.1 ............................ 53

Denver Exec. Order No. 142 (Aug. 31, 2017) ....................................................... 15, 51

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (2025)........................................................ 8

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 16, 17

House Bill 19-1124 ........................................................................................... 9, 10, 15, 40

House Bill 23-1100 ................................................................................................... 12, 40

ICE Policy No. 10074.2, Issuance of Immigration Detainers by ICE Immigration Officers,
    § 2.4 (Mar. 24, 2017) ................................................................................................... 6

Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of
    the United States*, 90 Fed. Reg. 8327(Jan. 20, 2025) ................................................. 1

Senate Bill 20-083 ........................................................................................................... 48

Senate Bill 21-131 ................................................................................................10, 11, 12, 43

Senate Bill 21-121 ........................................................................................................... 40

Senate Bill 25-276 ................................................................................................passim

**INTRODUCTION**

The Supremacy Clause declares: ""[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The United States Constitution vests the Federal Government with the exclusive power to regulate immigration. *See* U.S. Const. art. I, § 8, cl. 4. The immigration framework, that Congress established and federal agencies administer, reflects a careful balance of law enforcement, foreign affairs, and public safety concerns—concerns that belong to the nation as a whole, not a single state or locality. That framework does not permit state and local governments to establish their own set of immigration rules, yet that is exactly what Defendants here have done. Contrary to their claims, Defendants have not merely "opted out" of assisting the Federal Government—they have overtaken the authority exclusively vested with the Federal Government to further their own immigration agendas. Although localities may regulate legitimate areas of *local* concern, they may not do so in a manner that undermines the operations of the Federal Government. Colorado's and Denver's laws (the Sanctuary Laws) aim to stymie federal immigration enforcement at a time when the United States faces a "national emergency" from the unprecedented "illegal entry of aliens" into the country. Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).  In addition, they attempt to create an immigration policy of their own, separate from that of the federal government.  This they cannot do.  *See Arizona v. United States*, 567 U.S. 387, 408

1

(2012) ("This would allow the State to achieve its own immigration policy…This is not the system Congress created."). Sanctuary Laws, whatever the intention behind their passage, afford "sanctuary" to criminal illegal aliens allowing them to evade federal law enforcement and remain in our communities endangering the safety and security of American citizens. These laws are illegal and must be enjoined.

By expressly disregarding civil immigration detainers and administrative warrants—despite their explicit authorization by Congress—Defendants restrict federal immigration authorities' access to aliens in state and local custody and prohibit state and local officers from releasing those aliens to federal immigration authorities after their state or local detention. They also forbid state and local officials from participating in immigration detention agreements. Additionally, these Sanctuary Laws prevent otherwise willing state and local officers from communicating with federal immigration authorities and limit access to critical information. They even go so far as to direct personnel to promptly tip-off an illegal alien when a federal immigration agent requests information or access. *See* D.R.M.C. § 28-253(d); C.R.S. §§ 24-74.1-102(3)(a)(VII), 103(1); *id.* § 24-76.6-103(2).

Defendants' Sanctuary Laws are invalid under the Supremacy Clause of the United States Constitution for four independent reasons. *See* U.S. Const. art. VI, cl. 2. *First*, the Sanctuary Laws are expressly preempted because they impose restrictions on information sharing that violate the Immigration and Nationality Act ("INA"). *Second*, they are conflict preempted by the INA because they stand as obstacles to achieving its full purposes and objectives. *Third*, the Sanctuary Laws single out the Federal Government

for disfavored treatment in violation of the antidiscrimination component of the intergovernmental immunity doctrine. *And fourth*, they unlawfully regulate the Federal Government in violation of the intergovernmental immunity doctrine because they prevent federal immigration officials from using the tools Congress provided them for the efficient enforcement of federal immigration law.

As a result of the Sanctuary Laws, illegal aliens, including dangerous criminals, are permitted to move freely within Colorado, inflicting harm that was completely preventable because they should have been detained and removed as federal law demands. Nowhere in the Constitution is this lawless result required. In fact, that is precisely the harm our Framers sought to prevent in crafting the Supremacy Clause requires. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 418 (2012) (Scalia, J., concurring). Plaintiff's allegations easily state a claim for relief and this Court should deny Defendants' motions to dismiss.

## BACKGROUND

### I. Principles of Dual Sovereignty

The Constitution establishes a system of "dual sovereignty," in which the Federal Government and the states both wield sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Under that system, while the Federal Government lacks the "power to issue orders directly to the States," *id.* at 470, there are "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of California*, 482 U.S. 400, 405

(1987). For example, the Constitution expressly prohibits states from entering into treaties and laying duties on imports and exports. *See* U.S. Const. art. I, § 10. It also implicitly restricts states from exercising their powers in a way that would undermine those that are granted to the Federal Government or that harm other states. *See, e.g.*, *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337 (2008) (explaining that the Court has read into the Commerce Clause a limitation on states in light of the Framers' intent to prevent a state from retreating into economic isolation); *Puerto Rico v. Branstad*, 483 U.S. 219, 226 (1987) ("[T]he Extradition Clause creates a mandatory duty to deliver up fugitives upon proper demand[.]"); *Kentucky v. Dennison*, 65 U.S. 66, 100 (1860) ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]").

Finally, the Constitution grants enumerated legislative powers to Congress, *see* art. I, § 8, and confirms that legislative powers not granted to Congress are reserved for the states, *see* U.S. Const. amend. X. Under the Tenth Amendment, Congress must exercise its legislative power over individuals directly and may not commandeer states into enacting a federal regulatory program. *See Murphy*, 584 U.S. at 472. But when Congress exercises its enumerated powers to regulate individuals, states cannot stand in the way. The Supremacy Clause provides that federal law is the "supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," art. VI, cl. 2. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy*, 584 U.S. at 471.

**II. Federal Immigration Law**

Setting immigration policy is the exclusive prerogative of the Federal Government. *See* U.S. Const. art. I § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization"). Congress has exercised this authority through the INA and related laws, *see* 8 U.S.C. § 1101 *et seq.*, which together make up the framework for the "governance of immigration and alien status," *see Arizona*, 567 U.S. at 395. Those laws confer upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens suspected of being—or found to be—unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–1229a, 1231. They also direct the Executive Branch to arrange for appropriate detention locations for aliens pending removal or a decision on removal. *See, e.g.*, *id.* §§ 1103(a)(11), 1231(g). Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security (DHS) and two of its component agencies: Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP).

Congress gave DHS several tools to fulfill its responsibilities under the INA. For example, the INA expressly authorizes federal immigration officials to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). To obtain an administrative

warrant, ICE "must establish probable cause to believe that the subject is an alien who is removable from the United States."[1]

Relevant here, if an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). As a matter of policy, immigration detainers must be accompanied by an administrative warrant—either an alien arrest warrant or a warrant of removal—signed by an ICE immigration officer. ICE Policy No. 10074.2, § 2.4.

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to state or local criminal law enforcement confinement. Under those circumstances, the INA dictates that federal immigration officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes—and in some cases requires—federal immigration officials to assume custody

---

[1] ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (ICE Policy No. 10074.2).

immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c).

To fulfill their duties, federal immigration officials rely on law enforcement partners across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). The INA reflects that expectation of collaboration as several provisions of the statute regulate the manner in which federal, state, and local officials share information about aliens subject to both state criminal law enforcement and federal immigration enforcement. For example, the Federal Government must make resources available to state and local authorities to aid in determining whether those they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies … with respect to the arrest conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c).

The INA similarly provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1357(g)(10)(A) (providing that no formal agreement is

required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence).

These laws and processes promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). To address that concern, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, amending 8 U.S.C. § 1226 to mandate the detention of certain aliens who, based on their commission of or arrest for specified "predicate crimes," pose a threat to public safety. *See Preap*, 586 U.S. at 398 ("The categories of predicates for mandatory detention identified in subparagraphs (A)–[(E)] generally involve the commission of crimes.").

In the wake of President Trump's declaration of a national emergency at the southern border, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (2025), Congress enacted the Laken Riley Act, expanding the list of predicate crimes that trigger mandatory detention to include "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii)). Once an alien is ordered removed from the United States, removal must take place within 90 days, and the alien must be detained during that "removal period." *See* 8 U.S.C. § 1231. If the Federal Government fails to detain an alien subject

to mandatory detention and the alien harms a state or its residents, the Laken Riley Act authorizes that state to sue the Federal Government "to obtain appropriate injunctive relief." *See* Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(f)).

### III. Challenged Sanctuary Laws

#### A. Colorado

First, in 2019, the Colorado General Assembly and Governor of Colorado passed the first of the challenged Sanctuary Laws, House Bill 19-1124, aptly named "Prioritizing State Enforcement of Civil Immigration Law" and codified at Sections 24-76.6-101 to 24-76.6-103. This code, applicable to law enforcement and probation office personnel, construes detention pursuant to a detainer—including continued detention beyond the completion of a criminal sentence pursuant to an immigration detainer—as a new arrest. C.R.S. § 24-76.6-102(1)(a). Colorado views detention pursuant to immigration detainers as unconstitutional, warrantless arrests and explicitly directs law enforcement personnel *not* to honor immigration detainers. C.R.S. §§ 24-76.6-102(1)–(2). Senate Bill 25-276, enacted in May 2025, amended House Bill 19-1124's provisions to expand their reach. It broadened the definition of "civil immigration detainer" to include *any* request (not just a written request under 8 C.F.R. § 287.7) and changed the phrase "issued by federal immigration authorities" to "for federal immigration enforcement." *Id.* § 24-76.6-101(1). It also expanded House Bill 19-1124's prohibition on honoring immigration detainers by expanding "detain" to include delaying release for immigration enforcement and providing that continued detention based on a civil immigration detainer constitutes a new,

warrantless arrest if the alien has posted bond. C.R.S. §§ 24-76.6-102(2)(a)-–(b). House Bill 19-1124 allows law enforcement to cooperate with federal immigration authorities in only two narrow instances, both involving federal judge-issued warrants. C.R.S. § 24-76.6-102(4).

Senate Bill 25-276 expanded the definition of probation office personnel to include various pretrial personnel, prohibiting them from providing "personal information" (like contact information and date and time of probation or other court-ordered appointments) to federal immigration officials with limited exceptions. C.R.S. §§ 24-76.6-103(1)–(3), 101(4). Law enforcement may coordinate telephone or video interviews between federal immigration officials and detainees but only after the alien has been notified—in writing, in his chosen language, before the interview (and at release)—of his "rights" to decline the interview, remain silent and speak to an attorney; that anything he says may be used against him in immigration court; and that federal immigration authorities seek to interview him. C.R.S. § 24-76.6-103(2).

Second, Senate Bill 21-131, "Protection of Personal Identifying Information," was passed by the Colorado General Assembly and signed by the Colorado Governor in 2021 and codified at §§ 24-74-101 to 24-74-108. This law applies to the dissemination of "personal identifying information" (PII)[2] by state agencies and employees and third parties and prohibits disclosing PII or making it accessible in furtherance of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement,

---

[2] Defined as: "information that may be used, along [sic] or in conjunction with any other information, to identify a specific individual" and listing examples. C.R.S. § 24-74-102(1).

including enforcement of civil immigration laws." C.R.S. § 24-74-103. Senate Bill 25-276 expanded the definitions of "third party," "state agency," and "state agency employees," casting a wider net of individuals bound by Senate Bill 21-131's restrictions. C.R.S. §§ 24-74-102(3)–(4). It also created new classes of covered employees and entities: "political subdivision employee" and "political subdivision." *See* C.R.S. §§ 24-74-102, 24-74-103(1), 24-74-104(1).

Senate Bill 21-131 as amended, prohibits employees from inquiring into, or requesting information or documents to ascertain, immigration status, with limited exceptions. *Id.* § 24-74-104. To be granted access to PII through a non-public database, a third party must certify under penalty of perjury within the past year that they will not use that information for the purpose of investigating, participating in, cooperating with, or assisting in federal immigration enforcement, and that they will not disclose that information to individuals or entities who do. *Id.* § 24-74-105. Intentional violations are subject to a civil penalty of up to $50,000 per violation. *Id.* § 24-74-108.

Senate Bill 21-131 prohibits state Department of Revenue employees from permitting inspection of information contained in driver's licenses, identification cards, and vehicle registration applications. C.R.S. § 24-72-204(7)(a). Though an exception is provided for release to government agencies, release of information for the purposes of investigating, participating in, cooperating with, or assisting federal immigration enforcement is explicitly excluded. *See id.* §§ 24-72-204(7)(b)(I). And Senate Bill 21-131's amendments to C.R.S. § 42-1-206 purport to allow for sharing of information with criminal justice agencies, yet prohibit compliance with the same requests when made for the

purpose of investigating, participating, or assisting in federal immigration enforcement, including enforcement of civil immigration laws. *Id.* § 42-1-206(3.5).

Third, House Bill 23-1100, "Prohibit State and Local Government Involvement in Immigration Detention," was passed by the Colorado General Assembly and signed into law by the Governor in 2023, and codified at C.R.S. §§ 24-76.7-101 to 24-76.7-103. These Sanctuary Laws restrict government agency association with private entities that own, manage, or operate immigration detention facilities. Specifically, it bars governmental entities from entering into agreements of any kind for the detention of individuals in such facilities; from selling any public or government-owned property to such entities; from paying or reimbursing costs related to the sale, purchase, construction, development, ownership, management, or operation of an immigration detention facility to such entities; and from providing any financial incentive or benefit to a private entity or person in connection with the sale, purchase, construction, development, ownership, management, or operation of an immigration detention facility that will be owned, managed or operated by such entities. C.R.S. § 24-76.7-102(1). Under Section 24-76.7-103, as of January 1, 2024, state and local government entities are prohibited from entering into new immigration detention agreements or renewing prior agreements and state and local entities had to terminate existing agreements as soon as possible on or after that date. *Id.* § 24-76.7-103.

Fourth, on May 23, 2025, the Colorado Governor signed Senate Bill 25-276 into law. This law amended portions of Senate Bill 21-131 and House Bill 23-1100. It also carved out new subsections in C.R.S. §§ 24-74.1-101 to 103, "Policies Regarding Data

and Access," prohibiting information sharing in health care, education, and library settings. This carve-out prohibits a broadly defined group of state agency employees, *id.* § 24-74.1-101, from collecting information regarding an individual's place of birth, immigration or citizenship status, or information included on a passport, permanent resident card, alien registration card, or employment authorization document, with limited exceptions. *Id.* § 24-74.1-102(1). As with the other challenged statutes, the newly enacted and amended provisions ignore the validity of subpoenas, warrants, and orders if they are not issued by federal judges or magistrates. *Id.* §§ 24-74.1-102(2), 24-74.1-102(3)(a)(IV). This provision goes further to mandate that covered entities create information-sharing policies in alignment with the statute, including procedures restricting access to—and release of—information, documentation requirements, and notification requirements that alert individuals that federal immigration officials have requested information. *Id.* § 24-74.1-102(3)(a)(VII). It also requires covered entities to request and document the name, employer, and badge number of the person leading the immigration enforcement effort. *Id.* § 24-74.1-102(3)(a)(VI). Intentional violations are subject to civil penalties of up to $50,000 per violation. *Id.* § 24-74.1-103.

Senate Bill 25-276 also exponentially expanded the areas in which a "person is not subject to civil arrest." Colorado law previously stated that "a person shall not be subject to civil arrest while the person is present at a courthouse or on its environs, or while going to, attending, or coming from a court proceeding." C.R.S. § 13-1-403(1) (2020). Senate Bill 25-276 added the phrase "or while the person is receiving treatment in a related facility," *id.* § 13-1-403(1), broadly defining "related facility" to include a non-exclusive

laundry-list of entities, services, and programs that address "behavioral health," hospitals or detention and commitment facilities operated by the Department of Human Services, and foster care and nursing homes. *Id.* § 13-1-402(6)(a)–(m). A person who knowingly violates this provision is liable for damages in a civil action for false imprisonment and is subject to contempt of court. *Id.* § 13-1-404(1)-(2).

## B. City and County of Denver

On August 28, 2017, the Denver City Council passed Council Bill 17-0940, codified as Denver Revised Municipal Code ("D.R.M.C.") §§ 28-250 to 28-253, "Denver Public Safety Enforcement Priorities Act." These laws restrict local personnel from a wide range of activities related to federal immigration enforcement including providing information about—or access to—suspected immigration violators, cooperating with immigration investigations and detention, and entering into or maintaining contracts with private entities that house immigration detainees. *See* D.R.M.C. §§ 28-250 to 28-253.

Denver broadly bars city employees from using "any city funds or resources" to assist in enforcing federal immigration laws. *Id.* § 28-250(a). Entities cannot request or disseminate information about the national origin or immigration status of an individual, nor can they initiate law enforcement contact for the sole purpose of obtaining such information if doing so would be in furtherance of federal immigration enforcement. *Id.* Denver entities are allowed only to honor warrants that have been signed by federal judges or magistrates. D.R.M.C. § 28-250(b).

Denver's Sanctuary Laws also limit access to secure areas. Federal immigration authorities cannot access non-public parts of local jails for any purpose related to federal immigration enforcement without a judicial warrant. *Id.* § 28-252(a). And similar to Colorado House Bill 19-1124, C.R.S. § 24-76.6-103(2)(a)-(d), Denver's Sanctuary Laws permit city officers to arrange video interviews between detainees and federal immigration officials only if written "legal rights" have been provided to the detainee first. D.R.M.C. § 28-252(b). Denver's Sanctuary Laws prohibit law enforcement officers from honoring an immigration detainer or from providing information in response to federal immigration officials on the basis of an immigration warrant. *Id.* § 28-253(c). And Denver's Sanctuary Laws mandate that Sheriff Department personnel notify a detainee in writing promptly when federal immigration officials request information regarding the date and time of their release and require that the notice include information concerning certain "rights." D.R.M.C. § 28-253(d).

Denver's Sanctuary Laws further prohibit the city from entering into contracts that require employees to directly or indirectly assist in federal immigration enforcement, or that require collection or dissemination of individually identifiable information regarding immigration or citizenship status. D.R.M.C. § 28-251.

Also in 2017, Denver's mayor issued Executive Order No. 142, which implemented training and reporting requirements, and disciplinary provisions, to ensure all city employees comply with Council Bill 17-0940. Denver Exec. Order No. 142 (Aug. 31, 2017), ¶ 18.0-20.0.

15

**IV. Procedural History**

On May 2, 2025, the United States filed this action against the State of Colorado, City and County of Denver, Colorado General Assembly, Denver Sheriff Department, and Governor Jared Polis, Colorado Attorney General Philip Weiser, Mayor Mike Johnston, and Sheriff Elias Diggins, in their official capacities. *See* Compl., ECF No. 1. Following the enactment of Colorado Senate Bill 25-276 in May, the United States amended the Complaint. *See* First Amended Complaint (FAC), ECF No. 31. The FAC alleges three claims under the Supremacy Clause: preemption (Count One); unlawful discrimination against the Federal Government (Count Two), and unlawful regulation of the Federal Government (Count Three). *See id.* ¶¶ 74-88. The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing their Sanctuary Laws. *See id.*, Prayer for Relief ¶¶ A-D. On August 25, 2025, Defendants separately moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6). *See* Motion to Dismiss (State of Colorado, Gov. Polis, and Attorney General Weiser), ECF No. 37; Motion to Dismiss (Colorado General Assembly), ECF No. 38; Motion to Dismiss (Denver), ECF No. 39. The United States files this consolidated memorandum in opposition.[3]

---

[3] When referring to all Defendants, Plaintiff uses the term "Defendants." Where appropriate, Plaintiff refers to "State Defendants" (State of Colorado, Colorado General Assembly, Governor Jared Polis, and Attorney General Philip Weiser) and "City Defendants" (Defendants City and County of Denver, Denver Sheriff Department, Mayor Mike Johnston, and Sheriff Elias Diggins).

**STANDARD OF REVIEW**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A claim will survive a motion dismiss only when it is facially plausible, in other words, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Id.* (internal citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (allegations that "raise [the plaintiff's] right to relief above the speculative level" are adequate to survive a motion to dismiss). Importantly, dismissal is a "harsh remedy which must be cautiously studied … to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). Plaintiff's allegations easily satisfy this standard and Defendants' motions should be denied.

**ARGUMENT**

**I. Federal Law Preempts the Sanctuary Laws (Count One)**

    **A. Federal Law expressly preempts the Sanctuary Laws' information-sharing provisions.**

Independent of implied preemption, 8 U.S.C. §§ 1373(a) and 1644 expressly preempt the Sanctuary Laws' restrictions on information sharing. Express preemption occurs when Congress explicitly supersedes all state enactments in a particular area. *P. Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190, 203-

04 (1983). *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State … shall enact or enforce any law … relating to rates, routes, or services of any air carrier" (49 U.S.C. App. § 1305(a)(1) (1988 ed.)). That is precisely what Congress did in crafting 8 U.S.C. §§ 1373 and 1644.

Those statutes' preemptive language provides that a "[s]tate … or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[4] Thus, federal immigration law expressly preempts state and local laws that restrict sharing information "regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), which broadly encompasses, among other things, "the presence, whereabouts, or activities" of aliens with the Federal Government. H.R. Rep. No. 725, 104th Cong., 2d. Sess. 383 (1996). The Sanctuary Laws bar probation office personnel from providing "personal information" (like contact information and date and time of probation or other court-ordered appointments) to federal immigration officials with limited exceptions. C.R.S. §§ 24-76.6-103(1)–(3),

---

[4] Section 1644, while phrased slightly differently, contains the same substance: "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." Given their similarity, Plaintiff will refer to § 1373 throughout, but these arguments also encompass § 1644.

101(4). Because §§ 1373 and 1644 encompass this type of information, they expressly preempt the Sanctuary Laws.

State Defendants adopt an unreasonably narrow interpretation of §§ 1373(a) and 1644. *See* ECF No. 37 at 6–7. The Federal Government is the predominant repository of immigration status information, which is why the INA requires federal immigration officials to provide that information to states upon request. *See* 8 U.S.C. § 1373(c). State Defendants' reading would render §§ 1373(a) and 1644 pointless, because it would protect federal immigration officials' access to information that they already have. But under a proper reading, these statutes allow immigration officials to receive information from states that is relevant to immigration status. Furthermore, the statutory text, structure, and purpose of §§ 1373(a) and 1644 confirm that "information regarding citizenship or immigration status" also covers aliens' contact information and release dates. By its terms, § 1373(a) applies to any "information *regarding* [an individual's] citizenship or immigration status[.]" 8 U.S.C. § 1373(a) (emphasis added). As the Supreme Court has explained, statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (citing authorities); *Patel v. Garland*, 596 U.S. 328, 338–39, (2022) (same); *see also United States v. California*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018) (determining that the phrase "information regarding" should be read to "serve[] a purpose even when the statute is read narrowly"), *aff'd in part, rev'd in part and remanded*, 921 F.3d 865 (9th Cir. 2019).

Reading the term "regarding" to have such a "broadening effect," *Lamar*, 584 U.S. at 717, is especially appropriate in this statutory context because 8 U.S.C. § 1373(c)—which establishes federal officials' duty to share information with states—does not include the term in requiring federal officials to provide "the citizenship or immigration status of any individual" to states. Congress' inclusion of "regarding" in Section 1373(a), juxtaposed with its omission of that term in an otherwise-parallel provision of the same statute, indicates that "Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014). And, while the applicable context of "regarding" is important, proper interpretation also considers a statute's history and purpose. *Gundy v. United States*, 588 U.S. 128, 141 (2019). State Defendants would have this Court disregard that important piece of the puzzle.[5] ECF No. 37 at 11.

The legislative history of Section 1373 also provides useful insight into the meaning of "regarding" here. *See Arizona*, 567 U.S. at 405 (considering legislative history as part of a conflict-preemption analysis). Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens," not merely their legal classification.

---

[5] In support of this premise State Defendants cite several cases (ECF No. 37 at 11–12),but they are of little value in the analysis here where binding Supreme Court precedent in *Gundy* guides the outcome. For example, Defendants cite *Steinle v. City and Cnty. of San Francisco*, 919 F.3d 1154 (9th Cir. 2019), *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *United States v. Illinois*, No. 25-cv-01285, 2025 WL 2098688, at *10 (N.D. Ill. July 25, 2025), all of which are out of circuit and two of which, like another cited case—*Whiting*, 563 U.S. at 599—pre-date *Gundy*. Defendants also cite a Tenth Circuit case for this premise—*United States v. Herrera*—but importantly, the court there, in reaching its conclusion, erroneously relied on another case that pre-dates *Gundy*. 51 F.4th 1226, 1287 (10th Cir. 2022) (relying on *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)). *Gundy* is more instructive on this matter.

H.R. Rep. No. 104-725, at 383 (1996); *see also* S. Rep. No. 104-249, at 19–20 (1996) ("The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is … of considerable assistance to … achieving of the purposes and objectives of the [INA].").

Furthermore, the detention and removal provisions of the INA establish a clear relationship between an alien's release date and his immigration status. 8 U.S.C. § 1231(a)(4)(A) (providing that a convicted alien in state criminal custody who is subject to a final removal order may not be removed until "released from imprisonment"). The release date dictates when an alien must be detained and removed from the United States, a matter directly related to—thus "regarding"—the alien's "immigration status."

Contact information also directly bears on an alien's immigration status. Aliens must "notify the Attorney General in writing of each change of address and new address within ten days from the date of such change[.]" 8 U.S.C. § 1305. Absent a valid excuse, failure to comply with that provision is grounds for mandatory detention and removal. *See* 8 U.S.C. § 1306. An alien's current address reveals whether the alien has complied with the notification requirement, which in turn dictates whether he is subject to detention and removal. Contact information, like release-date information, is therefore also directly related to the alien's immigration status. In addition, information concerning employment status bears relevance on an individual's immigration status because it reveals whether an alien has engaged in unauthorized employment or has stayed in the United States beyond his authorized admission period. *See* 8 U.S.C. § 1227(a)(1)(C); 8 C.F.R. § 274a.12. State Defendants' narrow interpretation of § 1373 gives short shrift to recent

Supreme Court precedent instructing that "regarding" is a word of breadth, *see Lamar*, 584 U.S. at 716–17, as well as the principle that Congress's selective decision to include "regarding" in Section 1373(a) but not in Section 1373(c) should be given meaning. *See Russello v. United States*, 464 U.S. 16, 23 (1983). State Defendants' observation that Congress did not ultimately pass legislative text mirroring the House Report (ECF No. 37 at 10–11) is not compelling where the language Congress did choose is broad enough that it expressly preempts the Sanctuary Laws.

State Defendants' reading of their own laws is also impermissibly narrow. For example, C.R.S. § 24-76.6-103(1)(a) prohibits probation personnel from providing federal immigration officials with "personal information," which it defines as including, but not limited to, "home or work contact information; family or emergency contact information; probation meeting date and time; community corrections locations; community corrections meeting date and time; or the meeting date and time for criminal court-ordered classes, treatment, and appointments." *Id.* § 24-76.6-101(4). State Defendants assert that the absence of "citizenship and immigration status" in the statute means that § 1373 is not implicated. ECF No. 37 at 8. But, as they point out, the list of "personal information" in the statute is not exhaustive. *Id.* And for the reasons described *supra*, the information explicitly listed in the statute does indeed bear relevance to an individual's citizenship or immigration status. This, coupled with the fact that the statute restricts information sharing with federal immigration officials—and only federal immigration officials—and the fact that this statute, titled "Prioritizing State Enforcement of Civil Immigration Law" was passed for the purpose of imposing Colorado's version of what immigration law enforcement

should be, both undercut State Defendants' claim that this law is solely related to locating a person. To the contrary, this supports Plaintiff's conclusion that the statute falls within the ambit of § 1373. C.R.S. § 24-74-103 falls even more clearly within § 1373. This statute prohibits the release of PII in databases if "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement." PII is defined extensively to include "home or work addresses or other contact information," "immigration or citizenship status," "information contained in an employment authorization document," and "employer." *Id.* § 24-74-102(1). State Defendants' arguments to the contrary (ECF No. 37 at 9–10) are not compelling.

Put simply, State Defendants imply that civil immigration law is not federal law and so it follows that none of their "exceptions" will apply in this context. The statutory text supports this interpretation. C.R.S. § 24-72-204(7) carves out an exception for release of information to government agencies *unless* it is for the purposes of investigating, participating in, cooperating with, or assisting federal immigration enforcement. *See also* C.R.S. § 42-1-206(3.5) (permitting sharing certain information with criminal justice agencies—but specifically excluding requests "made for the purpose of investigating for, participating in, or assisting in federal immigration enforcement"). State Defendants' message is clear: they do not consider federal immigration law to be "federal law" notwithstanding clear Congressional intent to the contrary.

State Defendants make their intent clear in application of the Sanctuary Laws as well: the State has sued one of its police officers for sharing the driver's license information of an individual pulled over in a traffic stop with federal immigration officers.

*See* Complaint, *State of Colorado v. Alexander Zwinck*, Case No. 2025-cv-30303 (Mesa County, CO, District Ct.) (July 22, 2025).[6] The State sought an injunction barring the police officer from ever sharing such information with federal immigration authorities again—its savings clause notwithstanding. *Id.* Accordingly, their savings clauses—enacted with no functional purpose under their interpretation of law and ignored in practice—cannot shield them from a preemption challenge.

Denver Defendants fare no better. Denver broadly prohibits its employees from "us[ing] any city funds or resources" to assist in enforcing immigration law including "[a]ssisting or cooperating in one's official capacity with any investigation … relating to alleged violations of the civil provisions of federal immigration laws" D.R.M.C. § 28-250(a)(1). That provision undoubtedly bars responding to inquiries regarding immigration or citizenship status. Denver law subsequently allows for "[d]isseminating information about the national origin, immigration or citizenship status of any individual except to the extent required by … 8 U.S.C. § 1373 and 8 U.S.C. § 1644" (*id.* § 28-250 (a)(4)). But that exception is hollow because §§ 1373(a) and 1644 do not *require* local governments to share and maintain that information, they only prohibit restrictions on those activities. State Defendants' argument suffers from the same malady. *See* ECF No. 37 at 10–11

---

[6] After the police officer resigned, Colorado Attorney General Weiser agreed to dismiss the lawsuit, since the laws "apply only to state and local employees." Aaron Adelson, *Lawsuit dropped against Mesa County deputy accused of helping ICE make immigration arrests*, 9NEWS (Aug. 29, 2025), https://www.9news.com/article/news/crime/lawsuit-dropped-mesa-county-deputy-ice-immigration-arrests/73-7430cd53-a66c-4e6e-982f-ca6d7f1598a9. But Weiser made clear he was "retaining the right to re-file the case if" the former officer "becomes a state or local employee in the future." *Id.*

(citing C.R.S. §§ 24-74-103 and 104's exception allowing for cooperation as *required* by federal law).

Denver Defendants also argue that because participation in federal immigration enforcement is voluntary, D.R.M.C. § 28-250's savings clause—allowing for disclosure when *required* by federal law—protects them. ECF No. 39 at 19–20. But this reading again misconstrues Denver Defendants' obstruction as passive objection. As discussed *infra*, Denver Defendants are not being told to enforce federal immigration law but rather to abstain from unlawfully obstructing implementation of those laws. Further, if Denver Defendants' interpretation were correct, the savings clause they enacted would effectively serve no purpose. This leads to one of two alternatives: Denver Defendants either enacted a law that included a savings clause it knew would serve no purpose, or they recognize the limits of their "opt out." Again, § 1373 does not *require* a locality to share and maintain information, but it does forbid *prohibiting* or *restricting* those activities. Denver Defendants have indeed prohibited and restricted the sharing of information required by valid federal law and in direct violation of their own statute. *See* D.R.M.C. §§ 28-250(b) (recognizing the validity of warrants only if issued by judges or magistrates, which runs contrary to the INA); 28-252(a) (same); 28-250(a)(4) (prohibiting the dissemination of information concerning immigration or citizenship status, except where required by federal law). Federal Law expressly preempts the challenged provisions.

Indeed, none of the savings clauses any Defendant has enacted averts the conflicts their Sanctuary Laws create.[7] Where State Defendants refuse to recognize civil immigration law as federal law, such exceptions are meaningless. *See, e.g.*, C.R.S. §§ 24-76.6-102 (refusing to honor detainers valid under federal immigration law); 24-76.6-103 (prohibiting the release of information otherwise required under federal immigration law for immigration enforcement officials to carry out their responsibilities); 24-74-105 (prohibiting access to databases if the purpose is federal immigration enforcement).

### B. Federal Law impliedly preempts the Sanctuary Laws.

State law must yield to a federal statute—even absent an express preemption provision—when Congress "intends federal law to 'occupy the field'" (field preemption) or when the state law conflicts with a federal statute (conflict preemption). *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted). One category of conflict preemption occurs when the state law creates an obstacle to a federal statutory purpose (obstacle preemption), *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

Under the principles of implied field preemption, the INA preempts the Sanctuary Laws. Under its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012), Congress enacted the INA. Through the INA, Congress established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. of United States v.*

---

[7] State Defendants do not address exceptions or savings clauses for the remaining challenged statutes because they do not exist. *See* C.R.S. §§ 24-76.6-101 to 103; 24-76.7-101 to 103; 24-74.1-101 to 103.

*Whiting*, 563 U.S. 582, 587 (2011). To effectuate that scheme, the INA defines categories of aliens who may not be admitted to the United States; makes unlawful entry and reentry federal offenses; specifies which aliens may be removed from the United States and the procedures for such removal; and vests federal immigration officials with significant discretion, among other things. *See Arizona*, 567 U.S. at 396; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are … entrusted exclusively to Congress…"); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government"); *see also Hines v. Davidowitz*, 312 U.S. 52, 68 (1941) ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Here, Defendants have elected to invent their own immigration policy despite and contrary to the comprehensive system Congress created. Defendants wish to override Congress's intentions at nearly every turn—either flatly prohibiting communication and cooperation or adding requirements well beyond what Congress has expressly required, specifically designed to frustrate enforcement of federal law. The INA field-preempts their scheme.

Defendants do not contest that Congress intended the federal government to occupy the entire field of apprehension and detention of aliens. The INA's comprehensive system of civil administrative warrants for immigration arrest and removal leaves no doubt that this was Congress's manifest intention. Yet Defendants try to invade and regulate the

apprehension and detention space by, for example, flatly prohibiting any compliance with the immigration detainers Congress expressly authorized in order for federal immigration authorities to take custody of and detain aliens (8 U.S.C. § 1226(a)). *See, e.g.*, D.R.M.C. § 28-253(c); C.R.S. §§ 24-76.6-102(1)–(2). In evaluating field-preemption, the Supreme Court has "emphasize[d] the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasis in original). The Sanctuary Laws expressly target civil immigration detainers. *See* D.R.M.C. § 28-253(c) ("A city law enforcement officer shall not detain an individual solely on the basis of a civil immigration detainer."); C.R.S. § 24-76.6-102(2)(a) ("A law enforcement officer shall not arrest or detain an individual on the basis of a civil immigration detainer."). Therefore, they are field-preempted.

The FAC also states a clear claim of implied conflict preemption. State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. Thus, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). The Sanctuary Laws stand as obstacles to federal immigration officers' ability to inspect, detain, and remove illegal aliens as required by the INA in several ways. *See e.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

*First*, the Sanctuary Laws prohibit state and local officers from releasing aliens into federal custody when presented with congressionally authorized detainers and administrative warrants—even after the alien's state or local custody has ended, extinguishing the locality's regulatory interest in the alien. *See* C.R.S. § 24-76.6-102(2)(a);

D.R.M.C. §§ 28-250(a)(1), 28-253(c). But Congress requires federal immigration agents to detain criminal illegal aliens immediately upon their release from state or local custody, pending their removal from the United States. *See, e.g.*, 8 U.S.C. § 1226(a) (expressly authorizing the use of administrative warrants); *id.* § 1226(c) (requiring federal agents to assume custody of an alien immediately upon the alien's release from state or local custody); *id.* § 1231 ("Once an alien is ordered removed, the Attorney General must remove the alien from the United States within 90 days, and the alien must be detained during the removal period.").[8] Thus, the Sanctuary Laws obstruct federal immigration enforcement apprehension, prosecution, and removal priorities and practices—as embodied in 8 U.S.C. §§ 1226 and 1231—which establish a system of civil administrative warrants for immigration arrest and removal, and do not require judicial warrants. Defendants obstruct federal immigration enforcement by forbidding compliance with the system Congress designed.

*Second*, after local officials (at the compulsion of Defendants) refuse to release individuals into federal immigration authorities' custody (even when they present the congressionally authorized detainer), the Sanctuary Laws further obstruct federal immigration enforcement by prohibiting personnel from complying with immigration enforcement authorities' requests for information critical to apprehending and removing aliens. *See, e.g.*, C.R.S. §§ 24-74-103, 105; *id.* § 24-76.6-103; D.R.M.C. §§ 28-250, 28-

---

[8] *See, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted) (explaining that Congress mandated arrest and detention of certain aliens to address the fact that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers").

253. *See* FAC ¶¶ 75–78, 80, 82. An alien's release from state or local custody—a process solely under that locality's control—must occur before the Federal Government can assume custody. *See* FAC ¶ 31.

Sanctuary Laws forbid state and local personnel from complying with information requests. This leaves federal agents to facilitate congressionally-authorized arrests without the most basic information about the alien and creates an obstacle to Congress's "full purposes and objectives," as articulated in the INA. *Hines*, 312 U.S. at 67. *See* FAC ¶¶ 78, 82. The Tenth Amendment does not sanction such active interference with federal law enforcement, as discussed *infra*.

Moreover, the information-sharing restrictions and certification requirements interfere with "an important feature of the immigration system": the flow of information between federal, state, and local authorities. *See Arizona*, 567 U.S. at 411; *see also* 8 U.S.C. § 1373(a). Specifically, the Sanctuary Laws prohibit state and local agencies from providing any records or information to federal immigration officials. C.R.S. § 24-76.6-103; C.R.S. §§ 24-74-103, 105; C.R.S. § 42-1-206(3.5)(b); D.R.M.C. §§ 28-250, 251, 253. And the certification requirements extend that prohibition to any recipient of information from their databases or automated networks. C.R.S. § 24-74-105. These provisions thus "substitute[] a new regulatory scheme for the one" Congress designed, serving to inhibit enforcement of federal law, and are conflict preempted. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

*Third*, the Sanctuary Laws directly interfere with federal law enforcement investigations by requiring state and local personnel to tip-off illegal aliens about federal

immigration authorities' requests for information or interviews. *See* C.R.S. §§ 24-76.6-103(2), 24-74.1-102(3)(a)(VII); D.R.M.C. § 28-253(d). For obvious reasons, notifying the subject of an investigation about that investigation's existence facilitates the subject's evasion of law enforcement. *Cf. Franks v. Delaware*, 438 U.S. 154, 169 (1978) ("[T]he subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence."). The Sanctuary Laws facilitate aliens' evasion of federal immigration law by simultaneously alerting aliens to a request for their information while barring the disclosure of that information to federal immigration authorities.

Defendants also impermissibly restrict federal immigration authorities' ability to inspect and interview detainees. Defendants only allow federal immigration authorities to conduct telephone or video interview with a detainee if the detainee has first been advised of a series of "rights"—in the language of his choice. C.R.S. § 24-76.6-103(2); D.R.M.C. § 28-252(b). Federal immigration authorities have no control over when (or if) local law enforcement can or will provide such a list of "rights" to a detainee. *See* ECF No. 37 at 16 (noting the law "imposes a narrow obligation on state law enforcement"). Therefore, the laws obstruct federal immigration authorities' ability to enforce federal immigration law. *See* 8 U.S.C. §§ 1182, 1225(b)(2).

Defendants' contentions that federal law does not "require" states to comply with immigration detainers, detain people for immigration purposes, or transfer them to immigration authorities upon release, and that refusal to help is not the same as impeding (ECF No. 37 at 17, 19, 20), miss the mark. The Sanctuary Laws categorically prohibit all cooperation—even if voluntary. States do not have to participate in a federal program, but

they cannot actively obstruct it. *See Arizona*, 567 U.S. at 406 ("a state law to the contrary is an obstacle to the regulatory system Congress chose"). To ensure the successful implementation of the INA, Congress anticipated coordination between federal, state, and local officials. *See, e.g.*, 8 U.S.C. §§ 1373(a), 1373(b), 1644, 1357(g)(10); *see also City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems"). Defendants' across-the-board bar on such cooperation is an obstacle to the entire "extensive and complex" statutory scheme for the "governance of immigration and alien status," that regulates individual aliens present in the United States. *Arizona*, 567 U.S. at 395. *See Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (explaining that state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties"); *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 240 (1967); *see also Murphy*, 584 U.S. at 477 (noting preemption of state law is proper where "it impose[s] a duty that [i]s inconsistent—i.e., in conflict—with federal law").

Defendants ask this Court to conclude that their Sanctuary Laws merely reflect a choice to stay out of immigration matters (ECF No. 37 at 13, 18, 24–25; ECF No. 39 at 1, 11–12) when in fact their laws actively stymie Plaintiff's ability to enforce immigration law, a responsibility exclusively delegated to the Federal Government. *See* U.S. Const. art. I § 8, cl. 4; *Arizona*, 567 U.S. at 394. This is not a case where ICE is conducting an immigration operation and local law enforcement chooses not to participate in the planning or execution of it.  It is an across-the-board state created immigration policy that

bans any local official from cooperating with the federal government, even if they want to. What the Federal Government seeks here is not that Defendants *enforce* federal immigration laws, but rather that they *abstain* from unlawfully *obstructing* implementation of those laws. *See generally* FAC. Accordingly, and as discussed in more detail below, Defendants' anticommandeering arguments are unavailing.

### C.   The Tenth Amendment is not implicated.

Defendants contend that 8 U.S.C. §§ 1373(a) and 1644 violate the Tenth Amendment and thus cannot preempt the Sanctuary Laws. ECF Nos. 39 at 17–20, 37 at 12–15. They are wrong on both counts.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, it "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 112 (2d Cir. 2020); *see City of New York*, 179 F.3d at 35 (rejecting a facial commandeering challenge to 8 U.S.C. § 1373). "A commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *New York v. U.S. Dep't of Justice*, 951 F.3d at 113.

Although certain rights are reserved to the States, under the Supremacy Clause, federal law is the "supreme Law of the Land" U.S. Const. art. VI, cl. 2, and "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). A state

enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Thus, it is a well-settled concept underpinning our system of government that state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35.

Defendants' Tenth Amendment arguments hinge on a fundamental mischaracterization of §§ 1373(a) and 1644. Denver Defendants assert that §§ 1373(a) and 1644 "force state and local governments like Denver to assist with federal civil immigration activities" (ECF No. 39 at 18). But the statutes plainly only forbid *restricting* assistance—they do not mandate any action. 8 U.S.C. §§ 1373(a), 1644. Likewise, State Defendants try to reframe the federal statutes as "dictat[ing] how states maintain their data and how state employees spend their time" (ECF No. 37 at 13); in reality, §§ 1371(a) and 1644 leave states free to control how employees maintain data and spend their time—so long as employees remain permitted to voluntarily share information with federal immigration authorities. *Id.*[9]

A comparison to *Printz v. United States*, 521 U.S. 898 (1997) and *New York v. United States*, 505 U.S. 144 (1992) is illuminating. In those cases, the states or their

---

[9] The fact that Defendants already grant other law enforcement agencies and members of the public the access to information, detainees, and facilities that they deny to federal immigration authorities undermines any notion that the federal government is "conscripting" local resources.

employees were conscripted into enacting or administering the federal programs. *See Printz*, 521 U.S. at 917–18 (distinguishing federal directives to states that only mandate providing information to the Federal Government from those that force the States to participate in the actual administration of a federal program—regardless of the fact that both types leave states with no choice but to comply). As one court explained: "The central teaching of these cases is that 'even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.'" *City of New York*, 179 F.3d at 34 (quoting *New York*, 505 U.S. at 166). But §§ 1373(a) and 1644 do not compel state or local governments to enact or administer a federal program—instead they bar state and local governments from restricting voluntary exchanges of information with federal immigration authorities. *City of New York*, 179 F.3d at 35 (citing *Printz*, 521 U.S. at 917-18). Indeed, the Second Circuit rejected a Tenth Amendment challenge to these provisions because it "asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *City of New York*, 179 F.3d at 35. *See also State of New York v. Department of Justice*, 951 F.3d at, 113 (finding "it is doubtful that States have reserved the power to adopt … immigration policies *contrary* to those preferred by the federal government" and set forth in statutes such as § 1373) (internal quotations and citation omitted).

Defendants contend that §§ 1373 and 1644 regulate states rather than individuals and are thus invalid, lacking preemptive force. ECF No. 37 at 14; ECF No. 39 at 16. Not so. These provisions of the INA do *not* purport to regulate the states, rather they govern the actions of private individuals, namely aliens. Courts have expressly recognized this nuance and declined to disturb the bedrock Supremacy clause principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 584 U.S. at 476–77. As the Supreme Court instructed there, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevents the States from obstructing federal regulation of private parties. *See Murphy*, 584 U.S. at 478. While the *Murphy* Court's understanding of preemption applies to Section 1373, which "imposes restrictions … on private actors"—aliens—by facilitating the enforcement of federal laws against those actors, *See id.* at 477, The Court's result in *Murphy* does not apply. There, the Government sought to legislate in a domain traditionally reserved to the state police power. *Id.* at 458–60 (describing the history of state regulation of gambling dating to the nineteenth century). But here, because the Federal Government seeks to regulate private individuals—aliens—and is operating in a realm of Federal rather than state authority, the INA's provisions withstand scrutiny and their preemptive force cannot be cast aside.

A comparison to environmental law is instructive. The Supreme Court has long recognized the supremacy of the federal government in the "regulation of activities causing air or water pollution, or other environmental hazards that may have effects in

more than one State." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 282 (1981). In *Hodel*, the Supreme Court rejected a Tenth Amendment challenge to the Surface Mining Control and Reclamation Act of 1977 (91 Stat. 447, 30 U.S.C. § 1201 et seq.), which established a nationwide program to protect the environment from surface coal mining operations. *Hodel*, 452 U.S. at 268. The district court had invalidated two of the Act's provisions, which prescribed performance standards for surface coal mining on steep slopes, on the basis that they interfered with the States' "traditional governmental function" of regulating land use and impermissibly constricted the State's ability to make "essential decisions." *Id.* at 283–85. The appellees asserted that the Act directly regulated the States as States because it established mandatory minimum federal standards. *Id.* at 289. The Court rejected this argument, explaining: "Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result." *Id.* at 290. That argument is even more forceful here because federal immigration laws have far less impact on the state than environmental laws. Defendants' Tenth Amendment argument also fails because here, as in *Hodel*, the preemptive provision does not regulate the state. Rather, the preemptive provision in *Hodel* regulated the environment and here it is regulating aliens.

In any event, as one circuit court has already recognized, Defendants' lens is too narrow: "§ 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons." *New York v. U.S. Dep't of Justice,* 951 F.3d at 114 n.27. Thus, the question is whether the *INA as a whole* regulates

private actors—aliens—and not whether §§ 1373 and 1644, when read (absurdly) narrowly, do so. There can be no dispute that the INA, which specifies who may enter and on what conditions, regulates private actors. *See, e.g.*, 8 U.S.C § 1101(a)(15) (classes of nonimmigrants who may seek to enter temporarily); *id.* § 1153 (classes of immigrants); *id.* § 1182 (inadmissible aliens); *id.* § 1188 (temporary agricultural workers). Sections 1373 and 1644 relate to information sharing to facilitate immigration policy and are thus just one part of the overall statutory scheme. Those sections are valid preemption statutes, foreclosing Defendants' argument to the contrary.

Defendants' challenge fails for another reason: a court must identify what power is reserved to the States to enact laws or policies "prohibiting their officials and agencies from engaging in even voluntary communications about citizenship and immigration status with federal authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d at 113. The Second Circuit explained that "[a] court undertaking that inquiry would have to recognize, as the Supreme Court has, that '[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *Id.* at 114 (quoting *Arizona*, 567 U.S. at 411). Indeed, the Supreme Court discussed information sharing provisions of the INA in *Arizona* and concluded that the federal scheme left room for a State policy *requiring* information sharing. *Id.* But, the Second Circuit observed that "[t]he same conclusion may not be so easy to reach … with respect to a State policy *prohibiting* information sharing." *Id.* Defendants have not explained how the power they seek—prohibiting information sharing—is reserved to the States. Their claims rest on general prerogatives to direct state and local resources (ECF No. 37 at 18, ECF No. 38 at 6) and

38

protect due process and invoke trust and collaboration between the community and law enforcement (ECF No. 39 at 3–4). But the Sanctuary Laws go far beyond these vague platitudes—they prohibit information sharing. And simply accepting Defendants' stated purposes at face value would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation by simply … articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (quoting *Perez v. Cambell*, 402 U.S. 637, 651–52 (1971)); *see also Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law."). More than this, the federal government's power over immigration is broad, it has an interest in information sharing across government entities to facilitate immigration policy, and the INA, including §§ 1373 and 1644, do not leave room for the States to prohibit that voluntary cooperation. Here, the United States challenges particular state and local laws that explicitly prohibit and restrict sharing the very information Congress said state and local governments cannot prohibit or restrict.

Moreover, the General Assembly's Tenth Amendment arguments (ECF No. 38 at 6) miss the mark because Plaintiff is not directing Colorado to pass any legislation or reallocate its resources. Plaintiff only challenges the *legality* of Sanctuary Laws which the

General Assembly passed. *See generally* FAC; ECF Nos. 38-1 (House Bill 19-1124), 38-2 (Senate Bill 21-121), 38-3 (House Bill 23-1100), 38-4 (Senate Bill 25-276).

Lastly, State Defendants note the "presumption against preemption" principle applies but do not show how the presumption applies here. *See* ECF No. 37 at 5–6. This failure is especially stark in light of the Tenth Circuit's holding that the presumption does not apply in express preemption cases. *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017) (citing *Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016)). In any event, the presumption does not apply here because Defendants are regulating in an area with a history of significant federal presence. The Constitution vests the power to regulate immigration exclusively in the Federal Government. *See* U.S. Const. art. I, § 8, cl. 4. Congress's enactment of the INA—an expansive statutory scheme regulating citizenship and naturalization—is a manifestation of that federal authority. Because the INA regulates immigration activities, which are "inherently federal in character," *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001), the presumption does not apply. *United States v. Locke*, 529 U.S. 89, 91 (2000) ("[A]n assumption of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").

Plaintiff has sufficiently pled its claim that federal law preempts the Sanctuary Laws.

## II. The Sanctuary Laws Unlawfully Discriminate Against the Federal Government (Count Two)

Count Two sufficiently pleads that Defendants' Sanctuary Laws unlawfully

discriminate against the Federal Government. The doctrine of intergovernmental immunity prohibits states from discriminating against the Federal Government. *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990). A state law discriminates against the Federal Government "by singling out the Federal Government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). And *any* discriminatory burden on the Federal Government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 171 (2019).[10] Although state laws that innocuously "touch[] on an exclusively federal sphere [are] not enough to establish discrimination," *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022)), state laws that uniquely *burden* the federal government in a manner that is tantamount to interference with performance of functions violate this nondiscrimination rule. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 323 (3rd Cir. 2025). And courts presume that such laws are invalid absent clear congressional authorization for that kind of state regulation. *See Washington*, 596 U.S. at 839; s*ee also United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024) (finding unlawful discrimination where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights).

Here, Defendants' Sanctuary Laws unlawfully discriminate against the Federal Government by singling out federal immigration enforcement authorities for unfavorable treatment in ways that do not apply to any other person or entity. Defendants' laws

---

[10] The principles of the intergovernmental tax immunity doctrine apply to the general  intergovernmental immunity doctrine.  *See North Dakota*, 495 U.S. at 434–39.

facially target "federal immigration authorities" by denying access to detainees, facilities, and information absent a criminal warrant—prohibitions applicable to federal immigration enforcement and *only* federal immigration enforcement. *See* C.R.S. § 24-74-103; *id.* § 24-74-105(1); *see also* D.R.M.C. § 28-252(a); *id.* § 28-253(c). The tip-off provisions in these laws require that individuals be notified when federal immigration authorities, and *only* such authorities, request information or access. *See* C.R.S. § 24-76.6-103(2); *id.* §§ 24-74.1-102(3)(a)(VII), 103(1); *id.* § 24-76.6-103(2) D.R.M.C. § 28-252(b); D.R.M.C. § 28-253(d). Similarly, Colorado's prohibition against a government entity "[e]nter[ing] into an agreement of any kind for the detention of individuals in an *immigration detention facility*…" discriminates exclusively against federal immigration authorities. C.R.S. § 24-76.7-102(1)(a). The law applies exclusively to prohibit contracting for federal immigration detention facilities—which in turn function only for federal immigration enforcement purposes. *See CoreCivic*, 145 F.4th at 325 ("Only the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law. It alone has the power to make these contracts in the first place."). Moreover, violation of State Defendants' prohibition on sharing personal information carries penalties that only apply when information is disclosed to federal immigration authorities. *See* C.R.S. § 24-74-107.

Because federal immigration authorities are responsible for the enforcement of federal immigration law, these provisions treat these officers less favorably than the general public and other law enforcement agencies. On their face, Defendants' Sanctuary Laws do not prevent state and local agents from sharing the information that

federal immigration authorities might request—including release dates and contact information—with anyone else, including members of the public. *See, e.g.*, C.R.S. §§ 24-76.6-103(1)–(3), 101(4); *see also id*. § 24-76.6-103(2) (imposing additional requirements on "federal immigration authorities" seeking telephone or video interviews that it does not impose on the general public); D.R.M.C § 28-252(b) (same). Defendants' Sanctuary Laws also facially treat federal immigration authorities worse than other federal law enforcement agents. *See, e.g.*, Senate Bill 21-131's amendment to C.R.S. § 24-72-204(7)(b)(I) ("the department may allow inspection of the information referred to in subsection (7)(a) of this section for the following uses: … (I) For use by any government agency, including any court or law enforcement agency" but excluding use for immigration enforcement); *see also* FAC ¶¶ 53, 95. These provisions—individually and collectively—thus treat federal immigration authorities less favorably than any other members of the law enforcement community and the public which intergovernmental immunity principles forbid. *See Dawson*, 586 U.S. at 177.

Defendants' arguments to the contrary are unavailing. Defendants contend that their laws apply equally to anyone charged with enforcement of immigration law and that there are no similarly situated people or entities that are treated more favorably. *See* ECF No. 39 at 21; ECF No. 37 at 22. In other words, because the Federal Government is exclusively charged with carrying out civil immigration enforcement, no similarly situated entity exists. Absent a comparator, Defendants aver that they are free to discriminate with impunity. But it is unnecessary (and impossible) to identify a comparator since the Sanctuary Laws explicitly, exclusively, and repeatedly target "federal immigration

authorities" (*e.g.*, C.R.S. §§ 24-76.6-102, 24-76.6-103(1)(a); D.R.M.C. §§ 28-252(a), (b))

or "federal immigration enforcement authorities" (*e.g.*, D.R.M.C. § 28-253) and "federal

immigration enforcement" (*e.g.*, C.R.S. at §§ 24-76.6-101(1), 24-74-103(1), 24-74-

105(1)(a), (b)) or "enforcement of federal immigration laws" (*e.g.*, D.R.M.C. §§ 28-250(a),

28-251, 28-252(a)). This targeting eliminates comparators because federal immigration

authorities are the only entities tasked with the activities the Sanctuary Laws regulate.

*See, e.g.*, 8 U.S.C. §§ 1103(a)(11), 1182, 1225–1229a, 1231, 1231(g); *see also Arizona*,

567 U.S. at 395 ("The federal power to determine immigration policy is well settled."); *id.*

("Federal governance of immigration and alien status is extensive and complex").

Furthermore, singling out functions that the Federal Government exclusively performs for

differential treatment in a manner that *burdens* the Federal Government is evidence of

discrimination. *See e.g. CoreCivic*, 145 F.4th at 323. "Similarly situated" language cannot

be read so narrowly. To the contrary, if the only difference justifying the discriminatory

treatment is the federal agency's enforcement of a particular federal law, the

discrimination is clear. *See King County*, 122 F.4th at 757–58 (rejecting the county's

argument that "significant differences" between ICE and others who chartered flights

justified the discriminatory treatment of ICE where the difference was ICE's role in

carrying out deportations); *United States v. California*, No. 2:18-cv-721-WBS-DB, 2018

WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it could

discourage conveyances of federal public lands because those lands, unlike private

lands, are preserved for the public's benefit: "This quality of federal public lands, however,

is so directly linked to their federal status that it cannot serve as the basis for non-

discriminatory differentiation."); *cf. McHenry County*, 44 F.4th at 594 (finding the prohibition on state and local officials entering into contracts to house immigration detainees in state or local facilities nondiscriminatory where the provision touched on a federal sphere in an innocuous way but did not treat anyone else better than the Federal Government). Here, the Federal Government suffers the "differential treatment" the *McHenry County* Court found lacking because other law enforcement agencies and the public are given access to government facilities, detainees, and information on more favorable terms than federal immigration authorities. *See, e.g.*, FAC ¶¶ 53, 95. Defendants' discrimination is not innocuous—their Sanctuary Laws are precisely designed to affirmatively burden the Federal Government's ability to do its job specifically because of their disagreement with federal immigration policy.

Additionally, State Defendants argue that even if their Sanctuary Laws were discriminatory—and they are—that would be permissible under Tenth Amendment anti-commandeering principles. ECF No. 37 at 24. Not so. At the outset, State Defendants cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected action. As Defendants have chosen to restrict, monitor, and sanction the sharing of information with federal immigration officials, and restrict contracting for federal immigration detention facilities, it is Defendants that are commandeering federal activity—not the other way around. And, to the extent Defendants choose to give other law enforcement agencies and members of the public access to information, detainees, and facilities, they cannot withhold the same from the Federal Government simply because of their disagreement with federal immigration

prerogatives. *See King County*, 122 F.4th at 758. Just as there is no "threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *id.*, there is no such threat when ICE accesses detainees upon their release from state and local custody (including in the public lobbies of state and local facilities) or when ICE accesses information already collected by the state and its localities.

The United States therefore has sufficiently pled a claim of discrimination.

### III. The Sanctuary Laws Unlawfully Regulate the Federal Government (Count Three)

Defendants' Sanctuary Laws unlawfully regulate the Federal Government by preventing federal agents from using the tools Congress gave them to facilitate alien detentions and removals. SAC ¶¶ 98–100 (Count Three). Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents states from regulating the Federal Government's activities. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch v. Maryland*, 17 U.S. 316, 436 (1819) (explaining that the states have no power to "in any manner control" the operations of the Federal Government). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

46

Under those principles, Defendants' Sanctuary Laws improperly regulate the Federal Government by requiring immigration enforcement authorities to procure judicial warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. *See* C.R.S. § 24-76.6-102(1)(b); D.R.M.C. § 28-253(c). Additionally, Colorado's prohibition on contracts for federal immigration facilities unlawfully regulates federal immigration enforcement. C.R.S. §§ 24-76.7-101 through 103. Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers). Whereas administrative warrants issue on probable cause that the individual is an alien subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that the subject has committed a crime, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but Defendants' Sanctuary Laws prevent federal agents from doing so unless they satisfy the latter, higher standard. This forecloses federal immigration authorities' use of the detention method Congress authorized and directly imposes a different method—with a different standard—on the Federal Government. Defendants have no such power to prevent federal agents from carrying out

their duties "until they satisfy a state officer." *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)). "Federal officers are immune from state interference with acts necessary and proper to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (internal quotation omitted).

As a result of that interference, the Sanctuary Laws "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See King County*, 122 F.4th at 756. In addition to interfering with federal immigration enforcement in and of themselves, the Sanctuary Laws are also used by State attorneys to haul senior ICE officials into Colorado State courts on allegations of contempt for violating the Sanctuary Laws. *See* Motion for Contempt Citation, *State of Colorado v. Francisco Casteneda Jaramillo*, Case No. 25-cr-1691 ¶ 12 (El Paso County, CO, District Ct.) (Sept. 8, 2025) ("both Marcos Charles and Todd Lyons are encouraging the violations of Senate Bill 20-083. In order to give the law any effect, they must be held in contempt"). "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to detain and remove aliens, the Sanctuary Laws are invalid under the intergovernmental immunity doctrine's regulation prohibition. *See King County*, 122 F.4th at 756.

Additionally, Colorado's prohibition on contracts for federal immigration facilities also unlawfully regulates federal immigration enforcement. C.R.S. §§ 24-76.7-101

through 103. Although Colorado's Sanctuary Laws explicitly apply to prohibit state entities from contracting with private entities, the laws necessarily regulate the federal government because they "prevent[] the federal government from choosing how and through whom it will carry out a core federal function. It does so by banning private parties from *selling* immigration detention when 'the only entity in the business, so to speak, of [buying private] immigration det[ention] is the federal government.'" *CoreCivic*, 145 F.4th at 325 (quoting *King County*, 122 F.4th at 757). As a result, the law "directly regulates the federal government by telling it how to carry out a core function. It is a direct regulation in everything but name." *Id.* at 326.[11]

Finally, Defendants cannot avoid a conclusion that they have unlawfully regulated federal immigration enforcement by suggesting, as the *McHenry County* court concluded, that laws "regulat[ing] only State and local entities and law enforcement" cannot possibly regulate the Federal Government. *See* ECF No. 37 at 25; ECF No. 39 at 23–24. Courts have recognized that laws can regulate the Federal Government even though, as here, they purport to operate against others. *See, e.g., Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (holding that California statute which phased out all private detention facilities within the state, as applied to ICE detention facilities operated by contractors,

---

[11] State Defendants argue that C.R.S. §§ 24-76.7-101 through 103 do not obstruct federal immigration enforcement, ECF No. 37 at 17–18, ECF No. 38 at 11, but this argument fails because it requires the Court—like Defendants—to misconstrue Plaintiff's argument. Plaintiff does not allege that 8 U.S.C. § 1357(g)(1) *requires* states to enter into agreements with state and local officials for immigration detention purposes. This argument is a red herring meant to distract from C.R.S. §§ 24-76.7-101, 102, and 103's explicit discrimination against (Argument § II), and unlawful regulation of (*supra* Argument § III) federal immigration authorities.

violated intergovernmental immunity); *King County*, 122 F.4th at 757 (finding unlawful regulation where a county order directed local officials to ensure that operators who leased space from the county's airport would not service ICE charter flights, thereby overriding the Federal Government's choice to use contractors to run its flights).

The United States has sufficiently pled a claim of unlawful regulation. Accordingly, Count Three withstands dismissal.

**IV. The Proper Defendants Are Named In This Suit.**

Finally, Defendants contend that the Colorado General Assembly, Denver City Council, Denver Sheriff Department, Denver Mayor Mike Johnston, and Sheriff Elias Diggins are not proper parties to this suit. *See* ECF No. 38; ECF No. 39 at 24–25.

 Government officers may be sued in their official capacity if they have sufficient connection to the challenged law. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act[.]"). Here, the former Mayor of Denver issued Executive Order No. 142, which *inter alia*, instructed all city agencies, including law enforcement departments, to comply with D.R.M.C. § 28-250(a)(1), which expressly prohibits assisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws. *See* ECF No. 39 at 4 (stating Mayor's office issued Executive Order No. 142 consistent with Denver City Council's policy objectives); ECF No. 39-2 (Exec. Order No. 142); FAC

¶¶ 70–73. Additionally, current Denver Mayor Johnston's (who is sued in his official capacity) public statements indicate such connection to the Sanctuary Laws. For instance, at a March 5, 2025 Congressional Hearing, Mayor Johnston stated: "Our laws allow city employees to cooperate with federal immigration enforcement authorities in the execution of a warrant issued by a federal judge or magistrate. Federal immigration authorities with such a warrant can access the secure areas of any city or county jail or other city-owned law enforcement facility for the purpose of enforcing federal immigration laws."[12] At the same congressional hearing, Mayor Johnston stated, "Under my leadership, Denver will continue to follow the law at all levels—local, state, and federal." *Id.* Given the Mayor's involvement with the challenged Sanctuary laws, his office has sufficient connections to be named as a party to this suit. *Ex parte Young*, 209 U.S. at 157.

With regard to the City Council and the Sherrif Department, Defendants cite *Brown v. City of Tulsa,* for the proposition that the Denver City Council and Sherrif Department lack the capacity to be sued unless Denver has "taken explicit steps to grant the servient agency with jural authority." ECF No. 39 at 25 (citing "*City of Tulsa*, 124 F.4th 1251, 1263 [sic] (10th Cir. 2025)"). But Defendants fail to note that the remainder of the quote states, "unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation *except in concert with the*

---

[12] HOUSE OF REPRESENTATIVES, *Statement of Mike Johnston Mayor, City and County of Denver before the Committee on Oversight and Government Reform, U.S. House of Representatives* (March 5, 2025), https://oversight.house.gov/wp-content/uploads/2025/03/Johnston-Denver-Written-Testimony.pdf (last visited Sept. 20, 2025).

*government itself*." *City of Tulsa,* 124 F.4th at 1264 (emphasis added). Here, Plaintiff has sued the City and County of Denver in concert with its servient agencies—the City Council and the Sherrif Department. Moreover, the Denver Sheriff Department and Sheriff Diggins are charged with the enforcement of the City and County of Denver's laws, and all of the Denver Sanctuary Laws challenged in this lawsuit directly implicate conduct that the Sheriff and his Department must, or must not, engage in. *See* D.R.M.C. §§ 28-250 to 28-253. Therefore, their connection to these laws is indeed sufficient to name them as parties to this lawsuit. *See Ex parte Young*, 209 U.S. at 157. Additionally, Defendant Denver City Council is responsible for the enactment of these Sanctuary Laws. It logically follows then that if those laws are found unconstitutional, whether to enact new laws in their place—and the substance of those laws—will fall to the Denver City Council once more.

The Colorado General Assembly is also a proper party to this suit. It misconstrues Plaintiff's argument in order to contend that it is not a proper party because it is a legislative body. *See* ECF No. 38 at 4–8. But Plaintiff does not seek to mandate or forbid any legislation in Colorado, as the General Assembly asserts—it seeks to enjoin enforcement of Colorado's Sanctuary Laws, which violate the Supremacy Clause, are expressly preempted by the INA, discriminate against the United States, and conflict with and obstruct the INA's statutory scheme for federal immigration enforcement. FAC ¶¶ 89–100.[13] The General Assembly is a necessary Defendant because it passed all of

---

[13] The absolute legislative immunity doctrine does not apply here. *See* ECF No. 38 at 7 n.6. That doctrine applies "only to legislators sued in their *individual capacities*, not to the legislative body itself." *Sable v. Myers*, 563 F.3d 1120, 1123 (10th Cir. 2009) (emphasis added). Plaintiff names no individual state legislators as parties to this litigation.

Colorado's Sanctuary Laws. *See* ECF Nos. 38-1 at 1, 38-2 at 1, 38-3 at 1 ("Be it enacted by the General Assembly of the State of Colorado"). Indeed, during the pendency of this matter, the Colorado General Assembly passed Senate Bill 25-276. Given its past and continued passing of unconstitutional legislation, the General Assembly is a proper party.

For the same reason, the Denver City Council is a proper party. It is vested with "[a]ll legislative powers possessed by the City and County of Denver, conferred by Article XX of the Constitution of the State of Colorado, or contained in the Charter of the City and County of Denver, and otherwise existing by operation of law[.]" Denver Code of Ordinances, Title I, Subtitle B, art. III, part 2, § 3.2.1. And it enacted D.R.M.C. §§ 28-250 to 28-253, the challenged Sanctuary Laws. *See Ex parte Young*, 209 U.S. at 157.

## CONCLUSION

For the foregoing reasons, Plaintiff has plausibly alleged that the Sanctuary Laws violate the Constitution. Thus, this Court should deny Defendants' motions to dismiss.

Dated: September 24, 2025                    Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General

                                             DREW C. ENSIGN
                                             Deputy Assistant Attorney General

                                             SEAN SKEDZIELEWSKI
                                             Counsel to the Assistant Attorney General
                                             Civil Division

ELIANIS N. PEREZ
Assistant Director

VICTORIA TURCIOS
Trial Attorney

<u>/s/ Catherine M. Reno</u>
CATHERINE M. RENO
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: 202-353-8557
Fax: 202-305-7000
Email: catherine.m.reno@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed the foregoing through

the CM/ECF system, which sends notification of such filing to all counsel of record.

/s/ Catherine M. Reno
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Catherine.M.Reno@usdoj.gov