DAVID L. JAROSLAV
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
Email: djaroslav@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 25-cv-1391-GPG-KAS

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF COLORADO,
JARED POLIS, Governor of Colorado, in his official capacity,
COLORADO GENERAL ASSEMBLY,
PHILIP WEISER, Attorney General of Colorado, in his official capacity,
CITY AND COUNTY OF DENVER,
DENVER CITY COUNCIL,
MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity,
DENVER SHERIFF DEPARTMENT,
ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

Defendants.

---

**BRIEF OF *AMICUS CURIAE***
**FEDERATION FOR AMERICAN IMMIGRATION REFORM**
**IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

---

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......... 1

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. The Defendants' Sanctuary Policies are Preempted .......... 2

A. Defendants' Sanctuary Policies are conflict-obstacle preempted. .......... 4

B. Defendants' Sanctuary Policies are conflict-impossibility preempted. .......... 7

II. The Tenth Amendment does not Shield Defendants' Sanctuary Policies, Because the Constitution Delegates Authority over Immigration and Naturalization to the Federal Government .......... 9

CONCLUSION .......... 11

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration.

FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of the executive branch of the federal government to identify and deal efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in defending the executive branch's ability to address the current illegal alien crisis and in State and local officials' ability to cooperate with federal immigration law enforcement.

## SUMMARY OF ARGUMENT

Defendants' sanctuary policies impede and interfere with federal immigration enforcement and were designed to do just that. By prohibiting local officers from sharing immigration-related information with federal officers, the policies stand as an obstacle to that cooperation among federal, state, and local law enforcement which it has been the purpose of Congress to facilitate. The policies also make it more difficult for the federal government to achieve another, very obvious, purpose of Congress: enforcement of the immigration laws it has

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

passed. As obstacles to both of these congressional purposes, the policies violate the Supremacy Clause of the Constitution.

The Defendants' sanctuary policies also require City officials to withhold information about the location of removable aliens from federal officials, in violation of federal anti-harboring provisions. The policies thus violate the Supremacy Clause by making it impossible for City officials to obey both them and federal law.

The Tenth Amendment is no defense. The Constitution has delegated to the federal government the power to control the admission and expulsion of aliens, and has prohibited, through the Supremacy Clause, states from adopting measures that conflict with federal law. On both grounds, a power to enact the Defendants' preempted immigration policies does not meet the conditions set forth in the Tenth Amendment for the reservation of a power to the states.

## ARGUMENT

### I. The Defendants' Sanctuary Policies are Preempted

The Constitution provides that "Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. When read together with the Necessary and Proper clause, *id.* at cl.18, the Naturalization Clause grants Congress plenary power over the admittance of aliens into, and the conditions of their lawful presence in, the United States. The plenary power of Congress in this area has long been affirmed by the Supreme Court. *See, e.g.*, *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("The supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution . . . ."); *Truax v. Raich*, 239 U.S.

33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.").

The Framers well understood the threats associated with the *lack* of uniform rules. As Alexander Hamilton noted, the authority to establish a uniform rule of naturalization "must necessarily be exclusive, because if each state had power to describe a distinct rule, there could not be a uniform rule." THE FEDERALIST NO. 32 (Alexander Hamilton), 250-51 (John C. Hamilton, ed., 1998).

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, state laws may be preempted by federal law. Preemption may be either express or implied, and implied preemption includes both conflict preemption and field preemption. A state statute is conflict preempted (via "conflict-impossibility preemption") if compliance with both that statute and federal law is impossible. *See Oneok, Inc. v. Learjet, Inc*., 575 U.S. 373, 376-377 (2015), *citing California v. ARC America Corp.*, 490 U.S. 93 (1989), *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). *See also Colorado Public Utilities Com. v. Harmon*, 951 F.2d 1571, 1576-83 (10th Cir. 1991) (reciting and applying standards for preemption). A state law, including an immigration-related one, is also conflict preempted (via "conflict-obstacle preemption") if it "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *De Canas*, 424 U.S. at 363 (quoting *Hines*, 312 U.S. at 67); *Colorado Public Utils. Com.,* 951 F.2d at 1580 (internal citations omitted). "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Gade v. Natl. Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)). *See also Blue Circle Cement v. Board of County Comm'rs*, 27 F.3d 1499, 1509 (10th Cir.

1994) ("In adopting an objective, rather than a subjective, analysis for our preemption review, we are following the lead of the United States Supreme Court. … 'Whatever the purpose or purposes of the state law, preemption analysis cannot ignore the effect of the challenged state action on the preempted field.'") (quoting *Gade*, 505 U.S. at 107).

**A. Defendants' Sanctuary Policies are conflict-obstacle preempted.**

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding that 8 U.S.C. § 1373 is constitutional).

By design, Defendants' sanctuary policies,[2] frustrate the Immigration and Nationality Act (INA) in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement.

As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012). For example, in passing the Illegal Immigration Reform and Immigrant Responsibility

[2] Co. Rev. Stats. Title 24 arts. 74, 76.6 and 76.7, Denver Rev. Mun. Code §§ 28-250-253, and Denver Exec. Order No. 142.

Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (IIRIRA), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996), quoted in *City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative effort among local, state, and federal law enforcement in the enforcement of immigration law.

Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," section 434 of this law (codified at 8 U.S.C. § 1644), is nearly identical to § 1373. *E.g.*, *City of New York*, 179 F.3d at 31-32. This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing § 1644: to bar any restriction on state or local government entities in their communications with federal immigration authorities, including information regarding the whereabouts of illegal aliens, which obviously includes the time of their release from detention.

> This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A). Likewise, Congress has expressly not required any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

Defendants' sanctuary policies frustrate, and are intended to frustrate, federal enforcement of immigration law. By design, these policies keep U.S. Immigration and Customs Enforcement (ICE) in the dark about an alien's place of birth, country of origin, home and work addresses, place of employment, incarceration status, and other information of the kind contemplated by PRWORA, which ICE depends on to conduct enforcement operations. *See e.g.*, Co. Rev. Stats. § 24-74-105 (restricting personal identifying information from being used for federal immigration enforcement); *id.* § 24-76.6-103(1) ("A probation officer or probation department employee shall not provide personal information about an individual to federal immigration authorities."); Denver Rev. Mun. Code § 28-250(a) (prohibiting city employees from assisting or cooperating with federal immigration enforcement). Because Defendants'

sanctuary policies, by their terms, mandate noncooperation with federal enforcement of immigration laws, and have both the intent and the effect of hampering such enforcement, they thwart the congressional purpose of fostering such cooperation and Congress's undoubted intent that the federal government enforce the immigration laws effectively.

**B. Defendants' Sanctuary Policies are conflict-impossibility preempted.**

In addition to being obstacle preempted, Defendants' sanctuary policies require that state and local officials violate the federal criminal anti-harboring statute, Section 274(a) of the INA, codified at 8 U.S.C. § 1324, which provides in pertinent part:

> **Bringing in and Harboring Certain Aliens**
> **(a) Criminal penalties.—**
>
> (1) (A) Any person who—
> …
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> …
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations

and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

By preventing state and local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, Defendants' policies compel such officials to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE seeks to arrest or detain an illegal alien in state or local custody, and state or local authorities refuse to cooperate, as mandated by Defendants' sanctuary policies, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection." *See* Co. Rev. Stats. § 24-76.6-102 (prohibiting law enforcement officers from arresting or detaining an individual on the basis of a civil immigration detainer request); Denver Rev. Mun. Code § 28-253 (same). Also, if ICE seeks to detain an illegal alien in a safe location, such as a jail, and state or local officials either bar the immigration officials or otherwise prevent the arrest, as mandated by Defendants' sanctuary policies, they are "conceal[ing]" the alien "in a[] building" at any time the alien is at that address. *See* Denver Rev. Mun. Code § 28-252 (barring access to jails). Even if state or local officials claim that receiving a Form I-247A (INS Immigration Detainer Notice of Action form notifying them enforcement of an alien's removability)[3] from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence. *See, e.g.*, Co. Rev. Stats.

[3] Sample form available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

§ 24-76.6-102(2) and Denver Rev. Mun. Code § 28-253(c) (expressly barring officials from honoring immigration detainers).

Accordingly, the Defendants' sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and state law an impossibility, and they are, therefore, conflict preempted. *See Oneok,* 575 U.S. at 377; *Colorado Public Utils. Com.*, 951 F.2d at 1583.

## II. The Tenth Amendment does not Shield Defendants' Sanctuary Policies, Because the Constitution Delegates Authority over Immigration and Naturalization to the Federal Government

Defendants attempt to justify their sanctuary policies under the Tenth Amendment, contending that the Complaint should be dismissed on this basis. *See e.g.*, ECF 37 at pp. 1, 2, 12-14; ECF 38 at pp. 8-12; ECF 39 at pp. 16-17, 20-22. The Tenth Amendment, however, only reserves "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. CONST. amend. X. Thus, when a party invokes the Tenth Amendment, courts must ask whether the federal law (or action) in question was enacted "within the powers granted [the federal government] under the Constitution." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also New York v. United States*, 505 U.S. 144, 155 (1992) ("In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I."). If Congress acts within its constitutional powers, through the Supremacy Clause, "Congress may impose its will on the States." *Gregory*, 501 U.S. at 460; *see also Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (holding that States possess "sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause"). In other words, no state has a power reserved in the Tenth Amendment to take measures that conflict with

federal laws that conform to the Constitution, because the Constitution, through the Supremacy Clause, prohibits any such power to the states.

The power to regulate immigration is not only enumerated, but it is also an attribute of sovereignty, deriving in part from constitutional provisions empowering the federal government to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (holding that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (holding that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Arizona*, 567 U.S. at 395 ("The Constitution grants the federal government an 'undoubted power over the subject of immigration and the status of aliens'"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

In these ways, the power to regulate both naturalization and immigration is delegated by the Constitution to the United States. *See United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898), *citing Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259 (1817) ("The power, granted to Congress by the Constitution, 'to establish an uniform rule of naturalization,' was long ago adjudged by this court to be vested exclusively in Congress"). Because the Constitution delegates naturalization and immigration authority to the federal government, and the Defendants' policies are preempted by federal law made pursuant to that power, the Tenth Amendment does not reserve the power to make those policies to either Denver or the State of Colorado.

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss should be denied.

Dated: September 30, 2025

Respectfully submitted,

s/ David L. Jaroslav

David L. Jaroslav
FEDERATION FOR AMERICAN IMMIGRATION REFORM
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
(202) 328-7004
djaroslav@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform