**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-1391-GPG-KAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

STATE OF COLORADO,
JARED POLIS, Governor of Colorado, in his Official Capacity,
COLORADO GENERAL ASSEMBLY,
PHILIP WEISER, Attorney General of Colorado, in his Official Capacity,
CITY AND COUNTY OF DENVER,
DENVER CITY COUNCIL,
MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity,
DENVER SHERIFF DEPARTMENT,
ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

      Defendants.

---

**REPLY IN SUPPORT OF MOTION TO DISMISS BY STATE OF COLORADO,
GOVERNOR JARED POLIS, AND ATTORNEY GENERAL PHILIP WEISER**

---

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

ARGUMENT.....................................................................................................2

I.      Federal Law Does Not Preempt the Challenged Anticommandeering Laws
        (Count I). .............................................................................................2

        A.      There Is No Express Preemption. ...............................................2

                1.      There is no conflict between federal and state law.........................2

                        a.      The United States' anti-textual reading of §§ 1373 and
                                1644 has been rejected by every court. ...............................2

                        b.      Colorado's state and local employee provision mandates
                                compliance with federal law.................................8

                        c.      Colorado's probation provision does not apply to
                                information regarding immigration and citizenship status. . 11

                2.      Sections 1373 and 1644 are not valid preemption provisions. ......13

        B.      There Is No Obstacle Preemption...........................................15

                1.      The United States has not identified any conflict between
                        federal law and Colorado's Anticommandeering Laws.................16

                2.      Federal laws regulating only federal officials are not valid
                        preemption provisions. .................................................19

        C.      There Is No Field Preemption. ...............................................20

        D.      Accepting the United States' preemption argument would violate the
                Tenth Amendment.  ..............................................................24

II.     The Challenged Anticommandeering Laws Do Not Discriminate Against the
        United States (Count II). ....................................................................26

III.    The Challenged Anticommandeering Laws Do Not Regulate the United
        States (Count III). .............................................................................28

CONCLUSION ...............................................................................................30

## INTRODUCTION

The United States' response only shows the weakness of its arguments. The United States falsely claims Colorado "establish[ed] their own set of immigration rules." Dkt. 52 ("Opp.") at 1. But on their face, the challenged Anticommandeering Laws do no such thing and instead direct and prioritize the use of Colorado state resources, a right expressly reserved to the states by the Tenth Amendment. Unable to challenge the laws as written, the United States invents various strawmen, including that Colorado "prohibit[s] state and local officers from releasing aliens into federal custody," *id.* at 28, requires state employees to "tip-off" persons under investigation, *id.* at 30, and does "not consider federal immigration law to be 'federal law,'" *id.* at 23. None of that is true.

The United States' application of federal law fares no better, wrongly attempting to transform a federal scheme that expressly allows states to choose whether to cooperate into one where states are prohibited from choosing not to. Courts have rejected the United States' anti-textual arguments again and again.

The United States' claims fail many times over. The preemption claims fail because there is no conflict between federal and state law. These claims are premised on distorting state and federal law to manufacture a conflict that does not exist. The preemption claims also fail because they are based on invalid preemption provisions. All the claims further fail because accepting the United States' arguments would run afoul of the Tenth Amendment, unlawfully prohibiting Colorado from choosing how to utilize state resources. Finally, the Anticommandeering Laws do not regulate or discriminate against the federal government. The Amended Complaint should be dismissed.

## ARGUMENT

**I.    Federal Law Does Not Preempt the Challenged Anticommandeering Laws (Count I).**

**A.    There Is No Express Preemption.**

The United States' express preemption claim—that Colorado information-sharing statutes purportedly violate 8 U.S.C. §§ 1373 and 1644—is without merit. First, there is no conflict between federal and state law, a prerequisite for a valid express preemption claim. Second, sections 1373 and 1644 are not valid preemption provisions because they regulate only state actors, not private actors.

**1.    There is no conflict between federal and state law.**

The express preemption claim fails initially because the United States cannot meet its "burden of showing that federal and state law conflict," *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1143 (10th Cir. 2010). The purported conflict is premised on an anti-textual reading of 8 U.S.C. §§ 1373 and 1644 that has been soundly rejected by every court and a similarly flawed reading of Colorado law that is contrary to the methodologies employed by the Colorado Supreme Court. Once these errors are removed, there is no conflict, and the express preemption claim fails as a matter of law.

**a.    The United States' anti-textual reading of §§ 1373 and 1644 has been rejected by every court.**

The United States does not dispute, nor could it, that every court has rejected its overbroad reading of sections 1373 and 1644. *United States v. Illinois*, No. 25-cv-01285, 2025 WL 2098688, at *10 (N.D. Ill. July 25, 2025) ("Without exception, each [other court that has considered the issue] has rejected the United States's capacious reading of § 1373.") (collecting cases). In the face of this substantial case law, it

nevertheless persists with its anti-textual interpretation in a fruitless attempt to
manufacture a conflict between federal and state law. The Court should reject the
United States' arguments and apply the statute as written.

As detailed in the Motion to Dismiss, Dkt. 37 ("Mot.") at 10–12, and as courts
have uniformly held, the plain meaning of "the phrase 'information regarding the
citizenship or immigration status, lawful or unlawful, of any individual' is naturally
understood as a reference to a person's legal classification under federal law," not to
broad swaths of other information like addresses, court and meeting dates, release
dates, or contact information. *United States v. California*, 921 F.3d 865, 891 (9th Cir.
2019); *see also Illinois*, 2025 WL 2098688, at *10. Congress chose to focus the statute
specifically on "citizenship or immigration status," emphasizing this point by adding a
further clause "lawful or unlawful." 8 U.S.C. §§ 1373(a), 1644. Surely, if Congress
intended to cover all sorts of other information, it would have said so in a more direct
manner. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 262 (1994) (refusing "to
assume that Congress chose a surprisingly indirect route to convey an important and
easily expressed message"). This is especially so because Congress chose "more
expansive phrases in other provisions of Title 8 when intending to reach broader swaths
of information." *California*, 921 F.3d at 892. Congress chose to home in on citizenship
and immigration status, and this statutory limitation must be given effect.

None of the United States' arguments have merit. First, the United States argues
that the inclusion of the term "regarding" overrides the statutory focus on citizenship or
immigration status to cover all sorts of other information, such as "whereabouts[] or

activities of aliens," Am. Compl. ¶ 5. While a term like "regarding" or "related to"

"generally has a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S.

709, 717 (2018), and thus may encompass some narrow universe beyond the mere fact

of a person's citizenship or immigration status, it does not override the specific statutory

focus on "citizenship or immigration status." Indeed, in analogous preemption

circumstances, the Supreme Court rejected a similar argument where a party sought to

use the term "relate to" to significantly expand the scope of preemption: "If 'relate to'

were taken to extend to the furthest stretch of its indeterminacy, then for all practical

purposes pre-emption would never run its course, for '[r]eally, universally, relations stop

nowhere.' But that, of course, would be to read Congress's words of limitation as mere

sham, and to read the presumption against pre-emption out of the law whenever

Congress speaks to the matter with generality."[1] *N.Y. State Conf. of Blue Cross & Blue*

*Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (citation modified).

Applying this precedent, courts have uniformly rejected the United States'

attempt to allow "regarding" to swallow the statute's express focus on "citizenship or

immigration status." *See, e.g.*, *California*, 921 F.3d at 892; *Illinois*, 2025 WL 2098688, at

---

[1] The United States claims that the presumption against preemption does not apply in express preemption cases. Opp. at 40. It does not dispute the presumption applies with respect to all forms of implied preemption (conflict and field). But as *New York State Conference of Blue Cross & Blue Shield Plans* shows, the Supreme Court does employ "the presumption against pre-emption" in evaluating the meaning of an express preemption clause, including specifically attempts to expand that clause through a term like "related to" or "regarding." Moreover, where, as here, the historic state police powers are at issue, the Supreme Court holds that those powers are not preempted "unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation modified). The United States has not met this high standard.

*12. Courts have rejected the United States' futile attempts, repeated here, that rely on the most tangential links to claim that virtually any information about an individual relates to immigration status.[2] *See, e.g.*, *Illinois*, 2025 WL 2098688, at *12 (offering point-by-point analysis as to why contact information, release dates, and custody status do not fall within the statute); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 375 (D. N.J. 2020); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018).

Second, the United States tries to discount the voluminous cases that have directly rejected, or are contrary to, its arguments by claiming that those cases either pre-date *Gundy v. United States*, 588 U.S. 128, 141 (2019), or erroneously fail to apply *Gundy*. Opp. at 20 & n.5. But *Gundy* did not change how the Court interprets statutes. *Id.* It stands for the unremarkable, decades-old principle that a statute must be read in "context." *Id.* at 141. *Gundy* does not purport to overrule any precedent, as claimed; to the contrary, it relies on precedent dating back to 1943. *Gundy* was not a watershed case and numerous Supreme Court cases just last Term continue to reject the United States' arguments relying on legislative history and vague notions of purpose to override statutory text. *See, e.g.*, *Medina v. Planned Parenthood of S. Atl.*, 145 S. Ct. 2219, 2236 (2025) (rejecting similar arguments because "[w]hen it comes to interpreting

---

[2] The United States also claims that because § 1373(a) uses "regarding" while § 1373(c) does not, this supports its expansive interpretation. Opp. at 20. Courts have repeatedly rejected this argument, noting that the two sections are structured slightly differently, and the slight semantic differences are also explained by common sense: "actors providing information under § 1373(a) may not have access to information that directly indicates citizenship or immigration status, while DHS, which responds to inquiries under § 1373(c), does." *Illinois*, 2025 WL 2098688, at *12. The minor semantic differences do not support *vastly* different scopes; to the contrary, they emphasize the statute's narrow focus on citizenship and immigration status, not other information.

the law, speculation about what Congress may have intended matters far less than what Congress actually enacted"); *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2067 (2025) (rejecting similar arguments because "as this Court has 'emphasized many times,' what Congress (possibly) expected matters much less than what it (certainly) enacted"); *Martin v. United States*, 145 S. Ct. 1689, 1699–700 (2025) ("Whatever the reason, no amount of guesswork about the purposes behind legislation can displace what the law's terms clearly direct. Legislative history is not the law." (citation modified)).

The United States' reliance on legislative history to override the statutory text is especially unwarranted here because, as numerous courts have recognized, the legislative history itself indicates that "information regarding the immigration status" and the "presence, whereabouts, or activities of illegal aliens" are two distinct, "non-overlapping" categories. *California*, 921 F.3d at 892 n.18; *Illinois*, 2025 WL 2098688, at *12. A House Report states: "no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the [federal government] information regarding the immigration status of an alien *or* the presence, whereabouts, or activities of illegal aliens," indicating these are distinct. H.R. Rep. No. 104-725, at 383 (1996) (emphasis added). While the report later discusses facilitating communication about "presence, whereabouts, or activities" of noncitizens, this only leads to speculation about the messy legislative process: "[l]egislation is, after all, the art of compromise," *Stanley*, 145 S. Ct. at 2067. We are left only to speculate as to what occurred—perhaps there was some sort of legislative compromise or perhaps some

staffer, unhappy about the legislative scope, inserted this language into the report.[3]
*See, e.g.*, *Blanchard v. Bergeron*, 489 U.S. 87, 98 (1989) (Scalia, J., concurring)
(describing issues with relying on such reports). But the Supreme Court has repeatedly
emphasized that none of that matters: "Congress's 'authoritative statement is the
statutory text, not the legislative history.'" *Chamber of Commerce v. Whiting*, 563 U.S.
582, 599 (2011) (citation omitted).

Finally, to emphasize its anti-textual position, the United States claims that the
Court should ignore the statute's express focus on "citizenship or immigration status"
because it would supposedly be "pointless" to share citizenship or immigration status
information as the United States allegedly already has all of it. Opp. at 19. This is just a
brazen attack on the statutory text: Congress expressly chose to focus on "citizenship or
immigration status," and it would have used different language to focus on other
information. Moreover, as we have unfortunately seen, there are many well-documented
cases where federal immigration officers have wrongly arrested and detained U.S.
citizens and wrongly deported individuals.[4] These episodes show that federal officials

---

[3] It bears noting that this legislation was passed in August 1996 against the
backdrop of the Supreme Court's anticommandeering revolution. *New York v. United
States*, 505 U.S. 144 (1992), had recently been decided and in June 1996, just two
months prior to passage, the Supreme Court granted certiorari in *Printz v. United
States*, 518 U.S. 1003 (1996). Congress may have compromised on the statute's
narrow scope, recognizing the need to limit obligations imposed on state governments.

[4] *See, e.g.*, Laura Romero, *US-born citizen sues after twice being arrested by
immigration agents*, ABC News (Oct. 1, 2025), https://abcnews.go.com/US/us-born-
citizen-sues-after-arrested-immigration-agents/story?id=126129734; Chas Danner, *All
the U.S. Citizens Who've Been Caught Up in Trump's Immigration Crackdown,* N.Y.
Mag. (May 3, 2025), https://nymag.com/intelligencer/article/tracking-us-citizens-children-

regularly lack accurate information. Most importantly, the Supreme Court has repeatedly

rejected "elevat[ing] vague invocations of statutory purpose over the words Congress

chose." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022); *see also New*

*Prime Inc. v. Oliveira*, 586 U.S. 105, 106–07 (2019) (courts "are not free to pave over

bumpy statutory texts in the name of more expeditiously advancing a policy goal"). The

Court should apply the language actually enacted.

     In sum, the Court should follow every other court and reject the United States'

anti-textual, overbroad reading of sections 1373 and 1644. As detailed below, once this

erroneous interpretation is rejected, there is no conflict between federal and state law

and thus no express preemption.

        **b.   Colorado's state and local employee provision
mandates compliance with federal law.**

     As the Colorado Defendants showed, Mot. at 7, Colorado's main information-

sharing provision, § 24-74-103 (the "state and local employee provision"), contains an

express carve-out for compliance with federal law, allowing information to be disclosed

"as required by federal or state law." C.R.S. § 24-74-103(1); *see also* C.R.S. §§ 24-72-

204(7), 42-1-206(3.5) (identical carve-out). By definition, this ensures no Supremacy

Clause issue. After all, the Supremacy Clause is merely a "rule of decision," specifying

that "federal law is supreme in case of a conflict with state law." *Murphy v. NCAA*, 584

U.S. 453, 477 (2018). Here, in the case of a conflict, state law allows disclosure as

---

detained-deported-ice-trump-updates.html; *Brown v. Ramsay*, No. 4:18-cv-10279 (S.D.
Fla., May 30, 2025), Dkt. No. 241 (order granting summary judgment where ICE
wrongfully issued an immigration detainer to detain a U.S. citizen).

required by federal law. The United States is unable to point to *any* case where a similar law with a carve-out for compliance with federal law has been held to be preempted.

Apparently recognizing the weakness of its position, the United States' main argument is that "State Defendants imply that civil immigration law is not federal law and so it follows that none of their 'exceptions' will apply in this context." Opp. at 23. This argument is nonsensical. Of course, civil immigration law is federal law. The United States cannot point to any authority in support. The two statutes they rely upon show the opposite. For example, C.R.S. § 24-72-204(7) allows release of certain information to government agencies but "does not apply to a request made for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement . . . *except as required by federal or state law*." *Id.* (emphasis added). On its face, this provision allows releasing information where required by federal law, regardless of purpose or the type of federal law; there is no caveat nor representation that says immigration law is not federal law. *See also* C.R.S. § 42-1-206(3.5)(b) (same). Indeed, according to the United States' anti-textual analysis, the clause allowing compliance with federal law would be superfluous, contrary to longstanding rules of statutory interpretation. *Goodman v. Heritage Builders, Inc.*, 390 P.3d 398, 401 (Colo. 2017) (courts must "reject interpretations that render words or phrases superfluous").

Likewise, the legislative declarations make clear that immigration law is federal law, but that it is the federal government's job, not the state's, to administer it. *E.g.*, HB 19-1124, § 1(a) (declaring that "[t]he federal government does not have the authority to command state or local officials to enforce or administer a federal regulatory program"

and that "Colorado has the right to be free from mandates or financial obligations to perform the duties of the federal government"). Lest there be any doubt, House Bill 19-1124 expressly states that the Act is "concerning clarification of the authority of criminal justice officials with respect to the enforcement of certain federal civil laws." *Id.*

The Court should therefore quickly reject the United States' anti-textual arguments. In this lawsuit, the United States has chosen to bring facial challenges to the Anticommandeering Laws. It is therefore the United States' burden to show, on their face, "that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). Because on their face, the laws provide for compliance with federal law, there is no conflict and no express preemption issue.

Finally, because this is a facial challenge, the United States' attempt to rely on a single enforcement example is misplaced. Opp. at 23–24; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("[A] plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." (citation modified)). In any event, *State of Colorado v. Zwinck*, Case No. 2025-cv-30303 (Mesa County, CO, Dist. Ct., July 22, 2025), offers no support for the United States. The United States' arguments are premised on a wildly inaccurate description of the facts and the relief sought. The facts actually alleged are that after "there was no further criminal law enforcement purpose," a deputy sheriff (not a police officer) intentionally violated Colorado law by sharing "the Driver's license plate number, mile-marker location on Interstate 70, and the direction in which she was traveling" for the sole

purpose of assisting federal officers enforce civil immigration law. Zwinck Compl. ¶¶ 9–13, 69–70. None of this unlawfully shared information implicates sections 1373 or 1644 or the "as required by federal law" exception. The relief sought an order enjoining the deputy sheriff "from violating any provision of article 74 of Title 24 of the Colorado Revised Statutes."[5] Zwinck Compl. p. 11. This action was consistent with Colorado's correct interpretation of its statutes.

In sum, the Court should reject the United States' anti-textual interpretation and conclude that there is no conflict between federal law and Colorado laws containing an express carve-out for compliance with federal law.

### c. Colorado's probation provision does not apply to information regarding immigration and citizenship status.

With respect to the other provision, § 24-76.6-103 (the "probation provision"), Colorado Defendants showed that this statute does not apply to "information regarding immigration and citizenship status, lawful or unlawful" and therefore there is no conflict with federal law. Mot. at 8–10. In particular, "personal information," as defined by the statute, does not cover immigration or citizenship status because under well-established Colorado state-law principles of statutory construction:

(1) the statute expressly omitted citizenship or immigration status from its list;

(2) all the listed examples in the statute relate to means of locating a person and thus under the canon of "noscitur a sociis," the definition is most naturally read as applying only to this type of information;

---

[5] The United States asserts: "The State sought an injunction barring the police officer from ever sharing [driver license] information with federal immigration authorities again—its savings clause notwithstanding." Opp. at 24. This is not true.

(3) the General Assembly expressly chose to make the definition of "personal information" far narrower than for other similar statutes, and a court must give effect to that narrower definition; and

(4) the doctrine of constitutional avoidance counsels adopting a narrower reading to avoid any Supremacy Clause concern.

Mot. at 8–10. Thus, when applying the statutory text and Colorado Supreme Court case law concerning statutory construction, the best reading of the statute reveals no conflict with federal law. *See, e.g.*, *United States v. DeGasso*, 369 F.3d 1139, 1145–46 (10th Cir. 2004) (holding that "state courts are the final arbiters of state law" and that federal courts must apply state law as the state's highest court would).

The United States does not seriously grapple with these arguments, nor does it attempt to apply Colorado state-law principles. Instead, it offers two arguments in an attempt to manufacture a conflict with federal law. Neither has merit. First, it rehashes its anti-textual argument, rejected by every court, that 8 U.S.C. §§ 1373 and 1644 actually cover broad swaths of information. This argument should be rejected for the many reasons explained in Section I.A.1.a. Second, the United States argues that the Court should take into consideration that the statute "was passed for the purpose of imposing Colorado's version of what immigration law enforcement should be." Opp. at 22–23. But that is just a political talking point. Under Colorado law, to the extent statutory purpose is relevant, the Colorado Supreme Court has directed that the legislative declarations control. *Colo. Dep't of Lab. & Emp. v. Esser*, 30 P.3d 189, 195 (Colo. 2001) ("When construing legislative intent, we consider legislative declarations of purpose."). The legislative declarations contain no such purpose and instead demonstrate a narrow purpose to prevent the commandeering of state resources to do

the federal government's immigration duties.[6] House Bill 19-1124, § 1. None of the legislative declarations alter the construction of the definition of "personal information."

The Court should therefore rule that Colorado's probation provision does not apply to information regarding citizenship or immigration status and, consequently, there is no conflict between federal and state law and no express preemption. To the extent the Court has concerns about the construction of Colorado law in this case, it should consider certifying those questions to the Colorado Supreme Court.

### 2.  Sections 1373 and 1644 are not valid preemption provisions.

The United States' preemption claim fails for another independent reason: sections 1373 and 1644 are not valid preemption provisions because these provisions do not regulate private actors. *See Murphy*, 584 U.S. at 477. As Colorado Defendants demonstrated, Mot. at 14–15, the plain language of sections 1377 and 1644 operate directly on what the "state legislature may or may not do" with respect to governmental actors, not private actors. *Murphy*, 584 U.S. at 474, 477. For example, 8 U.S.C. § 1644 only targets government actors: "no State or local government entity may be prohibited, or in any way restricted." Likewise, 8 U.S.C. § 1373(a) provides: "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official." Neither provision covers private actors. As a result, as

---

[6] The United States also points to the heading of one Article entitled "Prioritizing State Enforcement of Civil Immigration Law." This inartfully worded heading offers little interpretative value as to the definition of "personal information." At most, it suggests, consistent with the legislative declarations, that the General Assembly was limiting the use of state law enforcement for civil immigration law, consistent with Tenth Amendment anticommandeering principles.

courts have repeatedly found, neither provision can validly preempt state law. *See Ocean Cnty. Bd. of Comm'rs v. Attorney General*, 8 F.4th 176, 181–82 (3d Cir. 2021); *Illinois*, 2025 WL 2098688, at *16; *Philadelphia*, 309 F. Supp. 3d at 329; *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018).

The United States offers two arguments in response, neither of which has merit. First, the United States claims that the challenged provisions do not regulate states and only "govern the actions of private individuals, namely aliens." Opp. at 36. But that is plainly not true. Nothing in sections 1373(a) or 1644 regulate "aliens" in any way.[7] While *Murphy* cautioned against requiring any "particular linguistic formulation," *id.* at 478, its primary holding is that to have preemptive effect, a provision must operate on private actors, namely either by "confer[ring] any federal rights on private actors" or "impos[ing] any federal restrictions on private actors." 584 U.S. at 479-80. Neither section 1373(a) nor 1644 confers any rights or imposes any restrictions on "aliens." Instead, these sections operate on governmental actors, making them invalid preemption provisions. Indeed, were the roles reversed, and a state passed a law requiring that federal employees must be allowed to share information with the state, the federal government would (correctly) challenge that law as directly regulating the federal government.

Second, the United States asserts that "the question is whether the *INA as a whole* regulates private actors," not whether the challenged provisions do. Opp. at 37–

---

[7] The United States offers a wholly inapt analogy to environmental law. Opp. at 36–37. The federal standards there clearly applied to private parties, indeed the claims were brought by private coal producers who did not want to meet the federal standards. *Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 282 (1981).

38. But this argument was directly rejected by the Supreme Court in *Murphy*, which held

that the analysis turns on whether the challenged provision regulates private actors, not

the Act as a whole. 584 U.S. at 479-80. In *Murphy*, the Supreme Court held "that the

[challenged] PASPA provision prohibiting state authorization of sports gambling is not a

preemption provision because there is no way in which this provision can be understood

as a regulation of private actors." *Id.* The Supreme Court held this even though "a

closely related provision of PASPA, § 3702(2), *does* restrict private conduct, but that is

not the provision challenged." *Id.* In other words, the Supreme Court directly held that

the analysis must focus on the particular provision, not other parts of the same Act.[8]

Thus, for this independent reason, the Anticommandeering Laws are not

expressly preempted by sections 1373 or 1644.

### B. There Is No Obstacle Preemption.

For similar reasons, the Court should reject the obstacle preemption claims. The

United States' arguments rest on misreading Colorado's Anticommandeering Laws and

improperly seeking to transform a federal scheme that, on its face, allows states to

choose whether to voluntarily cooperate into one that prohibits states from choosing not

to. Once these errors are removed, the obstacle preemption claims fail because there is

no conflict between federal and state law and no valid preemption provisions.

---

[8] The United States relies on dicta in a footnote of Second Circuit decision. *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 114 n.27 (2d Cir. 2020). But this dicta is irrelevant because *Murphy* already rejected the argument.

#### 1. The United States has not identified any conflict between federal law and Colorado's Anticommandeering Laws.

The obstacle preemption claims fail first because the United States has failed to meet its burden to show a conflict with federal law, including failing to meet the "high threshold [that] must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Whiting*, 563 U.S. at 607. Not only does the United States misread both state and federal law, it also misapplies obstacle preemption, engaging in the very "freewheeling" inquiry "into whether a state statute is in tension with federal objectives" that the Supreme Court has forbidden. *Id.*

The United States' first purported conflict with Colorado law misconstrues it. Nowhere do the Anticommandeering Laws "prohibit state and local officers from releasing aliens into federal custody." Opp. at 28. Consistent with Colorado's goal of preserving its law enforcement resources for criminal justice, the statute restricts the use of state and local detention resources for civil immigration purposes. C.R.S. § 24-76.6-102(2)(a). But it allows individuals to be released into ICE custody after their period of state detention for criminal justice purposes has ended.[9]

Properly read, Colorado's statute does not obstruct federal officials' use of administrative warrants to take individuals into federal custody, 8 U.S.C. § 1226(a), power to assume custody of individuals released from state custody, *id.* § 1226(c), or

---

[9] *See, e.g.*, Cleo Westin, *El Paso County transfers 26 people to ICE custody over 3 months, sets new monthly high*, Colorado Springs Gazette (Oct. 16, 2025), https://gazette.com/2025/10/16/el-paso-county-transfers-26-people-to-ice-custody-over-3-months-sets-new-monthly-high/.

duty to detain certain individuals pending removal from the United States, *id.* § 1231. Colorado instead declines to have its extremely limited detention and correctional resources conscripted by the federal government for purposes of civil immigration detention. This does not pose an obstacle to the federal scheme, which only imposes obligations on federal officers and does not even purport to require use of state detention resources. *See* 8 U.S.C. § 1357(g)(1), (9) (allowing agreements to use state and local resources for detention but expressly prohibiting that this statute "be construed to require" states to enter into such agreements).[10]

The United States also overreaches in claiming Colorado requires its employees to "tip-off" persons who are the subjects of ICE investigations. Opp. at 30. First, state law provides that when state law enforcement coordinates interviews between federal immigration authorities and detained individuals, those individuals are to be notified of the interview in writing along with an advisement of their basic rights. It is not, in fact, "obvious" how this "facilitates the subject's evasion of law enforcement," Opp. at 31, given that the person is already detained and does not have the option to flee, nor will they typically be in a position to "destroy or remove evidence" while confined in a detention facility, *id.* Outside of the detention context, Colorado law requires public education providers, public health care facilities, and public libraries to have policies in

---

[10] Perhaps recognizing this, in its response, the United States seems to have dropped its preemption claim with respect to Colorado's laws directing that state and local detention facilities shall not be used for civil immigration detention. *Compare* Am. Compl. ¶ 80 *with* Opp. at 49 n. 11 (pressing only the claims that Colorado's laws discriminate against and unlawfully regulate the federal government).

place that include procedures for communicating, "as appropriate," to their students, patients, or patrons about federal immigration authorities' requests for information or access to those individuals. State law does not dictate the details of the required procedures, or when or how such information may be communicated. On its face, the law does not "facilitate[] . . . evasion of law enforcement." Opp. at 31.

Nor do Colorado's laws conflict with the federal scheme. A federal immigration officer's request for a state or local employee to share information or facilitate an interview is not confidential. Even if the Anticommandeering Laws were not in effect, nothing would prevent a state or local employee from notifying the subject of the interview or information request about that inquiry. The United States speculates that Colorado law enforcement might either delay or refuse to provide detainees with written notice of their rights, preventing immigration interviews from taking place altogether. But the Amended Complaint does not allege that such delay or refusal has occurred, let alone on any recurring or systemic basis. Most importantly, the United States' unfounded fear is irrelevant to a statutory facial challenge. *Rahimi*, 602 U.S. at 693.

The United States' final obstacle preemption argument rests on several Colorado laws that restrict state and local employees from sharing certain information for purposes of civil immigration enforcement. This is largely a rehashing of its express preemption claim that failed for lack of a conflict between state and federal law. *See* Section I.A.1. Again misstating the scope of Colorado's laws, the United States claims that Colorado bars "providing any records or information" to federal immigration authorities. Opp. at 30. In reality, the Anticommandeering Laws disallow the sharing of

narrower categories of information, with certain exceptions for compliance with federal or state law or a court order. *See* C.R.S. § 24-74-103(1) (prohibiting state agency and political subdivision employees from disclosing "personal identifying information," as defined by statute, that is not already publicly available, except as required by federal or state law or court order); *id.* § 24-74-105 (similar requirements to obtain "access to personal identifying information through a database or automated network"); *id.* § 24-76.6-103 (prohibiting probation and pretrial service officers from sharing an individual's "personal information," as defined by statute).[11] The information governed by these laws is collected and/or maintained by state and local personnel as part of their official duties, through use of state resources. Colorado's choice to extricate itself from civil immigration enforcement by generally declining to share this information does not amount to "active interference" with federal immigration enforcement. Opp. at 30. As court after court has recognized, "refusing to help is not the same as impeding." *California*, 921 F.3d at 888. As a result, there is no obstacle preemption here.

## 2. Federal laws regulating only federal officials are not valid preemption provisions.

Like the express preemption claim, the obstacle preemption claims also fail for the independent reason that the claims are premised on invalid preemption provisions. *See Murphy*, 584 U.S. at 477 (valid preemption provisions must regulate private actors). The United States does not directly address this argument, focusing only on §§ 1373 and 1644. Opp. at 36–38. But their broader contention that the Court should focus on

---

[11] The United States' response also mentions C.R.S. § 42-1-206(3.5)(b), though they did not name that statutory provision or challenge it in their Amended Complaint.

"the INA as a whole," instead of on the specific allegedly preemptive provisions, is flawed and unpersuasive for the reasons discussed above in Section I.A.2.

Here, the United States specifically relies on provisions that authorize or require the U.S. Attorney General to detain and remove individuals under certain circumstances. *See* 8 U.S.C. § 1226(a), (c); *id.* § 1231. The supposedly preemptive provisions target government officials; they do not confer rights or impose restrictions on any private parties. Similarly, Colorado's allegedly conflicting Anticommandeering Laws do not operate on private actors; they impose obligations or restrictions on state and local entities or employees. Because the federal and state laws do not impose conflicting rights or obligations on private actors, they do not operate in the manner *Murphy* describes as triggering the Supremacy Clause: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." 584 U.S. at 477. The United States' obstacle preemption claims should be rejected.

**C.    There Is No Field Preemption.**

The Court should also reject the United States' new field preemption claim. As an initial matter, the Court should decline to address this claim as it is not pleaded in the Amended Complaint. A plaintiff may not amend its complaint through a response. *See, e.g.*, *Avila v. Barr*, No. 1:18-CV-02393-RM-NRN, 2020 WL 2744139, at *4 (D. Colo. May 27, 2020) ("There is no mention of possible due process violations anywhere in the Amended Complaint, and a plaintiff may not effectively amend his complaint in his

response to a motion to dismiss."); *Sneed v. PNC Bank, Nat'l Ass'n*, No. 10-CV-03016-REB-MJW, 2011 WL 7429423, at *5 (D. Colo. Sept. 7, 2011) (a plaintiff "may not effectively amend her pleading by alleging new claims or theories in her response to the motion to dismiss"), *adopted*, 2012 WL 638792 (D. Colo. Feb. 28, 2012). In any event, the claim lacks merit. Congress did not clearly and manifestly oust all state regulation in the field of state and local cooperation with federal immigration enforcement, nor could it have lawfully done so under the Tenth Amendment.

The Supreme Court has set a high bar to establish field preemption. *See, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (field preemption is "rare"). The United States must show "that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress.'" *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. The United States must therefore "prove that federal law evinces 'the clear and manifest purpose of Congress' to preclude even complementary state legislation on the same subject." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (quoting *DeCanas*, 424 U.S. at 357).

As the Courts have uniformly held, "[f]ederal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo*, 890 F.3d at 178; *McHenry County v. Raoul*, 44 F.4th 581, 588–91 (7th Cir. 2022) (same). "While Congress has the exclusive province to regulate federal civil immigration law, the INA

itself contemplates that States shall have the ability to determine the extent to which they participate in the enforcement of such laws." *Grewal*, 475 F. Supp. 3d at 384. Indeed, the INA contains numerous provisions directly contemplating that states may choose to, but are not required to, cooperate in immigration enforcement consistent with state laws, which is wholly inconsistent with field preemption.[12] *See, e.g.*, 8 U.S.C. § 1357(g) (allowing states to enter into agreements to carry out immigration functions but "[n]othing in this subsection shall be construed to require any State . . . to enter into an agreement").

The United States has not previously argued for field preemption in similar cases, and for good reason: if the argument were accepted, it would entirely undermine the system Congress established allowing states to voluntarily cooperate in immigration enforcement. Field preemption would even prevent a state from passing legislation requiring its employees and agencies to cooperate, because states would be prohibited from *all* regulation. For example, the law passed by Arizona, upheld by the Supreme Court, requiring state officials to share information with ICE would be unconstitutional because field preemption would prohibit *all* state regulation in the field. *Arizona*, 567 U.S. at 412–13. Likewise, the law passed by Texas, upheld by the Fifth Circuit, prohibiting local subdivisions from limiting their cooperation with immigration enforcement, would be unconstitutional. *City of El Cenizo*, 890 F.3d at 176–78. As the Fifth Circuit recognized, federal law, in fact, regulates only "*how* local entities may

---

[12] This is in contrast with *Arizona*, 567 U.S. at 401, where Congress preempted the narrow field of alien registration, thus preventing states from enforcing, even through parallel or complementary standards, in the field.

cooperate in immigration enforcement" but leaves wide open the relevant field as to *whether* state and local entities choose to cooperate.[13] *Id.* at 177.

Most importantly, Congress enacted this voluntary regime, where states choose whether to cooperate, because, as addressed more fully in Section I.D, a mandatory regime would run afoul of the Tenth Amendment. *Id.* at 181 ("Congress did not choose to make these laws voluntary; it could not have made them mandatory."). The United States' argument is thus inconsistent with the Tenth Amendment. It would allow the federal government to use field preemption to commandeer states, preventing them from directing their own employees and state resources. For example, the unlawful commandeering of state resources in *Printz* could be accomplished through field preemption. The Tenth Amendment reserves for the states control over their own resources; it prohibits the commandeering of those resources through any mechanism.

In sum, the United States has failed to show a "clear and manifest" intent by Congress to prohibit states from deciding whether to use state resources to cooperate with immigration enforcement. Instead, Congress allowed states to choose whether to cooperate, consistent with the Tenth Amendment's anticommandeering principle. The Anticommandeering Laws are not barred by field preemption.

---

[13] For identical reasons, the United States' field preemption argument regarding detainers is meritless. Opp. at 28. Detainers are just requests that leave the field entirely open for states to decide whether to agree to provide state resources to assist the requests. *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 641, 643 (3d Cir. 2014) (noting that "[§ 1357(d)] does not authorize federal officials to command state or local officials to detain suspected aliens subject to removal" and "settled constitutional law clearly establishes that they must be deemed requests").

D.    **Accepting the United States' preemption argument would violate the Tenth Amendment.**

The United States' preemption argument must also be rejected because it would allow the federal government to commandeer Colorado's limited law enforcement and personnel resources. Indeed, the United States barely pretends otherwise. It says sections 1373 and 1644 "leave states free to control how employees maintain data and spend their time," but quickly adds a caveat: "so long as employees remain permitted to voluntarily share information with federal immigration authorities." Opp. at 34. But if the federal government can require that state and local employees be permitted to spend their official time and resources sharing information with it, then the federal government wrests control of those employees' job duties from the state and local governments that employ them. The United States suggests there is no commandeering so long as the state or local employees "want to" participate in federal immigration enforcement. Opp. at 33. But just as the state may bar its employees from spending official salaried time recreating for personal enjoyment or working on a private business venture, it is the state's prerogative to prohibit its employees from spending their time assisting with federal immigration enforcement.[14] A federal law that provides otherwise amounts to unconstitutional commandeering.

The United States weakly argues that the Tenth Amendment does not apply to the state laws regarding information sharing because "information sharing" is not a

_____

[14] Notably, the United States prohibits its own employees from disclosing any information from its files or databases or acquired through official duties without express prior agency authorization. *See, e.g.*, 28 C.F.R. § 16.22(a). Its position here, that this is not a state's prerogative, is directly in conflict.

traditional state power. Opp. at 38. But the challenged provisions do not regulate

"information sharing" with immigration authorities writ large; they regulate the activities

of state and local employees as well as data collected and maintained via state and

local resources. The state's interest in controlling the activities of its own agents,

political subdivisions, and funds is at the core of the state's sovereign powers, and the

United States cites no authority to the contrary. *See, e.g.*, *Printz,* 521 U.S. at 930–31

(rejecting distinction between federal efforts to control a state versus its officers);

*California*, 921 F.3d at 887 n.11 ("A state's ability to regulate its internal law

enforcement activities is a quintessential police power."); *Illinois*, 2025 WL 2098688, at

*24 (the anticommandeering doctrine prevents the federal government from shifting the

costs of federal programs to the states).

Instead, the United States claims there is a "well-settled concept underpinning

our system of government that state and local governments do not have 'an

untrammeled right to forbid all voluntary cooperation by [their] officials' with federal

immigration authorities." Opp. at 34 (citing *City of New York v. United States*, 179 F.3d

29, 35 (2d Cir. 1999)). But the Second Circuit case it cites for this proposition relies

significantly on a distinction between federal laws that affirmatively compel actions by

states and those that prohibit state action—a distinction the Supreme Court soundly

rejected in *Murphy*. *Compare City of New York*, 179 F.3d at 35 ("These Sections do not

directly compel states or localities to require or prohibit anything."), *with Murphy*, 584

U.S. at 474–75 (describing as "empty" the distinction between Congress "command[ing]

'affirmative' action" by a state and "prohibiting a State from enacting new laws"). And

contrary to being "well-settled," the United States' proposed rule has been rejected by scores of courts around the country. *See, e.g.*, *California*, 921 F.3d at 889–91; *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020).

Aside from this broad (and unsubstantiated) claim, the United States makes no effort to respond to State Defendants' Tenth Amendment arguments regarding its laws other than those focused on information sharing. And for good reason: if the federal government, through preemption, could implicitly require states to detain individuals in state and local facilities based on civil immigration detainer requests or to enter into immigration detention agreements, this would unquestionably be a commandeering of the state's facilities and personnel for enactment of a federal program. *See, e.g.*, *Galarza*, 745 F.3d at 643; *City of El Cenizo*, 890 F.3d at 178. Because the anticommandeering doctrine forbids this, the United States' preemption argument is precluded by the Tenth Amendment.

## II. The Challenged Anticommandeering Laws Do Not Discriminate Against the United States (Count II).

The United States' attempt to repackage these same failed arguments under the intergovernmental immunity doctrine is without merit. As Colorado Defendants showed, Mot. at 22–24, the Anticommandeering Laws do not discriminate against the United States. Critically, the United States cannot identify any entities "'similarly situated' to the federal government that receive more favorable treatment" under the challenged laws. *McHenry Cnty*, 44 F.4th at 594 (quoting *North Dakota v. United States*, 495 U.S. 432, 438 (1990) (plurality opinion)). It now argues that it is "unnecessary" to identify a similarly situated comparator. Opp. at 43. However, it offers no authority as to why this

"critical" element is unnecessary despite longstanding caselaw to the contrary. *McHenry Cnty*, 44 F.4th at 594; *see also Washington v. United States,* 460 U.S. 536, 544–45 (1983) ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.").

Next, the United States claims that it suffers differential treatment but offers no support, other than a cite to the Amended Complaint, for the assertion that "other law enforcement agencies and the public are given access to government facilities" and detainees on more favorable terms than the federal government. Opp. at 45. But the Amended Complaint offers nothing more than conclusory assertion along with citations to irrelevant statutes and constitutional provisions that Colorado Defendants already addressed in their Motion to Dismiss. Mot. at 23 & n.11. Again, this is a facial challenge. It is the United States' burden to show that the challenged laws, on their face, discriminate against the federal government. The United States has not even attempted to meet this heavy burden, let alone succeeded.[15] That Colorado has chosen to limit

---

[15] The United States' reliance on *McHenry County* is odd because the plaintiffs there made an identical argument against a similar statute that prohibited the use of Illinois state and local detention facilities for immigration purposes, but not other forms of detention. The Seventh Circuit rejected this same argument and held that it did not constitute discrimination against the federal government even if it was directed at "an exclusively federal domain." 44 F.4th at 593–94. The same holds true here.

Indeed, no court has held these types of laws discriminate against the federal government. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025), did not even address discrimination, and concerned a ban on private contractors from providing detention services for the federal government. *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), concerned a ban on private contractors from servicing ICE charter flights. Neither case has any relevance here. Indeed, the Ninth Circuit upheld an analogous California law limiting the use of state resources for immigration enforcement. *California*, 921 F.3d 865.

use of its resource for civil immigration purposes applies across the board to everyone.

This is not unlawful discrimination against the federal government.

Finally, with respect to the anticommandeering principle, the United States offers

no argument other than the assertion that Colorado is actually commandeering the

federal government, which is plainly untrue. This is just empty rhetoric. And its sole

citation to *King County* flatly contradicts its argument. 122 F.4th at 758. There, the Ninth

Circuit distinguished that case from the laws at issue here, recognizing the

anticommandeering principle prevents the federal government from conscripting states

to carry out federal immigration law and accordingly protects state laws limiting

cooperation and use of state resources for immigration purposes.[16] *Id.* (citing *California*,

921 F.3d at 876, 889–90 and *McHenry Cnty.*, 44 F.4th at 586, 592-94). For the same

reasons explained in Section I.D, the Anticommandeering Laws are constitutional under

the Tenth Amendment.

## III.    The Anticommandeering Laws Do Not Regulate the United States (Count III).

The Anticommandeering Laws do not "regulate the United States directly," and

Count III should be dismissed. The United States argues that the laws regulate the

federal government by "requiring" federal immigration authorities "to procure judicial

warrants" rather than allowing use of "detainers and administrative warrants." Opp. at

47. But the Government's claim here fails multiple times over. Most crucially, § 24-76.6-

102(1)(b) and the other challenged laws regulate state law enforcement officials, not

---

[16] The United States repeats its false claim that Colorado law prohibits ICE from accessing detainees upon their release from custody. Opp. at 46. There is no such law.

federal ones. *See* C.R.S. § 24-76.6-101(3). Federal officers remain free to use administrative warrants and freely do in Colorado. The laws prohibit only *state* law enforcement officers from "arrest[ing] or detain[ing]" an individual on the basis of an immigration detainer but impose no such limitations upon federal law enforcement. *Id.* § 24-76.6-102(1)(b). The laws represent a policy choice and prioritization by Colorado to not volunteer its limited law enforcement resources to administer a federal program. *See* 8 C.F.R. § 287.7(a) (noting that a detainer is merely a "request" for cooperation). This is not regulation of the federal government, but instead a state lawfully exercising its sovereign right to choose and prioritize how it uses its limited resources.

Next, the United States claims that the challenged laws "require ICE to entirely transform its approach" and "impermissibly override" the government's operational decisions. Opp. at 48 (citation modified). It offers no factual support, nor explains how federal authorities have had to "transform" their approach.[17] The United States also misleadingly claims that § 24-76.7-101 imposes a "prohibition on contracts for federal immigration facilities" by "banning private parties from *selling* immigration detention" services to the federal government. Opp. at 48–49 (emphasis in original). But as the United States is well aware, the law does no such thing. It seemingly confuses the facts of *CoreCivic*, 145 F.4th 315, which it cites extensively, for the facts here. There, the

---

[17] Grasping at straws, the United States claims high-level ICE officials were "haul[ed]" into state court to face a sanctions motion filed by "State attorneys" in a criminal action in El Paso County. Opp. at 48. Not so. The referenced motion from a defense attorney was rejected for filing by the court and does not appear on the docket. Nobody was "hauled" into court, let alone sanctioned. And the Senate Bill allegedly referenced in the motion is not even challenged in this case. None of this is relevant.

challenged New Jersey law banned *all* contracting to provide immigration detention services. *Id.* at 320, 327, 329. But Colorado's laws do not prohibit private entities from offering immigration detention services, § 24-76.7-101. *See* Am. Compl. ¶ 80.[18]

Finally, the United States observes that a law can regulate the federal government despite purporting to operate against others. Opp. at 49. Colorado Defendants have never disputed that, but it is not the case here. The two inapposite cases the United States cites involved challenged laws that "regulate[d] private detention operators out of existence through a direct ban," *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022), and effected "an outright ban on hiring any private contractor to transport noncitizens," *King Cnty.*, 122 F.4th at 757 (citation modified). Most importantly, those cases expressly distinguished state laws, like Colorado's, that merely decline to provide state resources for the purpose of immigration detention. *See CoreCivic*, 145 F.4th at 324 (favorably noting the distinction drawn in *McHenry*); *King Cnty.*, 122 F.4th at 759 (same). Colorado's challenged laws "directly regulate[] only State and local entities and law enforcement—not the federal government" or its contractors. *McHenry*, 44 F.4th at 593.

## CONCLUSION

For the foregoing reasons and those in the Motion to Dismiss, the Court should dismiss the Amended Complaint with prejudice.

---

[18] The Court can take judicial notice that ICE has a contract for a large private immigration detention facility in Aurora, Colorado. *See* Fed. R. Evid. 201; https://www.ice.gov/detain/detention-facilities/aurora-contract-detention-facility.

Dated: October 23, 2025

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ David Moskowitz
David Moskowitz
*Deputy Solicitor General*
Talia Kraemer
*Assistant Solicitor General*
Sam Wolter
*Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Talia.Kraemer@coag.gov
Samuel.Wolter@coag.gov

*Counsel for the State of Colorado, Jared Polis, and Philip Weiser*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on October 23, 2025, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF system, which will send notification of such
filing to all counsel of record.


                                  /s/ David Moskowitz
                                  *Deputy Solicitor General*